## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.          )
                                          )
                Plaintiff,       )       Civil Action No.  07-0506 (RJL)
                                            )
v.                                         )
                                         )
U.S. DEPARTMENT OF HOMELAND   )
SECURITY, *et al.*,                    )
                Defendants.    )
_____)

### SUPPLEMENTAL RESPONSE IN SUPPORT OF PLAINTIFF'S
### APPLICATION FOR INJUNCTIVE RELIEF

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel, and pursuant to

Fed.R.Civ.P. 65(a) and LCvR 65.1(C), respectfully requests that the Court enjoin Defendant U.S.

Department of Justice ("DOJ")[1] and Defendant's agents, attorneys, employees, representatives,

and all other persons acting in concert with or providing assistance to DOJ, from continuing to

withhold records requested by Judicial Watch under the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, *et seq.*  Pursuant to the Court's instruction, Judicial Watch respectfully submits

this supplemental brief in support of its application for injunctive relief.  As grounds therefor,

Judicial Watch states as follows:

### MEMORANDUM OF LAW

**I.**    **Introduction**.

On July 23, 2007, the Court held a hearing on Judicial Watch's application for injunctive

relief.  As a result of that hearing, Judicial Watch submits this supplement as a means of

---

[1]    Judicial Watch concedes, that, however inadequate Defendant U.S. Department of State's ("DOS") search and production was, the application for injunctive relief no longer applies to DOS.  However, it should be noted that DOS only produced the records until after Judicial Watch moved for injunctive relief and the Court granted a hearing.

supporting its application and allaying concerns voiced by the Court during the hearing.

## II.    <u>Discussion</u>.

Injunctions are not unprecedented relief in FOIA cases.  This Court, as well as courts in other jurisdiction have granted requests for injunctive relief when the plaintiff demonstrates the four necessary factors.  Judicial Watch's request satisfies the four factors, and injunctive relief should be granted in its favor.

### A.    <u>The Freedom of Information Act and Injunctive Relief.</u>

A request for injunctive relief is not uncommon in a FOIA case.  *See e.g., Electronic Privacy Information Center (EPIC) v. DOJ*, 416 F. Supp. 2d 30 (D.D.C. 2006); *Gerstein v. CIA*, 2006 U.S. Dist. LEXIS 89883 (N.D. Cal. Nov. 29, 2006); *Aguilera v. FBI*, 941 F. Supp. 144 (D.D.C. 1996); *American Civil Liberties Union v. Dep't of Defense*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004); *Cleaver v. Kelley*, 427 F. Supp. 80 (D.D.C. 1976); *The Washington Post v. Dep't of Homeland Security*, 459 F. Supp. 2d 61 (D.D.C. 2006), *dismissed on appeal*, 2007 U.S. App. LEXIS 6682 (D.C. Cir. Feb 27, 2007).  Courts have been inclined to grant injunctive relief in two types of FOIA cases: criminal cases in which the requestor faces a very real possibility of severe incarceration, and in cases in which the information is necessary for timely public awareness and debate.  Judicial Watch's request squarely fits within the latter type.

### 1.    <u>Judicial Watch Will Prevail on the Merits of this Case</u>.

It is very likely that Judicial Watch will prevail in this matter.  It is uncontested that DOJ has failed to conduct a reasonable search or perform a segregability analysis as is required by FOIA.  Therefore, there is a substantial likelihood that Judicial Watch will prevail on the merits of its FOIA complaint.  *See* Plaintiff's Application for Injunctive Relief at 3-7.

### 2.     Judicial Watch Is Suffering Irreparable Harm as a Result of DOJ's Willful Failure to Comply with the FOIA.

Contrary to DOJ's assertions, Judicial Watch is suffering an irreparable harm as a result of its refusal to search for responsive records, conduct a segregability analysis and produce all non-exempt records. This Court has found that, in FOIA cases, delay is tantamount to a denial. *See EPIC*, 416 F. Supp. 2d at 40 (quoting H.R. Rep. No. 93-876, at 6 (1974)). In FOIA cases in which the records requested are important to timely public awareness, it is clear that "stale information is of little value," *Payne Enters. Inc. v. U.S.,* 837 F.2d 486, 494 (D.C. Cir. 1988), and the loss of that value constitutes a cognizable harm – one that is likely irreparable. *EPIC*, 416 F. Supp. 2d at 40-41. In *EPIC*, the Court held that beyond losing its right to expedited processing, the plaintiff was "also precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administrations's warrantless surveillance program." *Id.* at 41.

Judicial Watch's harm is similar to the harm faced by EPIC. It was uncontested during the hearing that the subject matter of Judicial Watch's FOIA request is the focus of current public debate. *See also* Affidavit fo Meredith L. Di Liberto ("Di Liberto Affidavit") at ¶¶ 9-16, attached as Exhibit 1 to Plaintiff's Application For Injunctive Relief. Without injunctive relief, DOJ will not be required to perform a reasonable search or conduct a segregability analysis within a meaningful time frame. The parties will litigate the issue again in summary judgment motions which the Court itself suggested could take upwards of one year to complete. Because the law of this Circuit clearly requires DOJ to perform both a search and segregability analysis, *see infra* § B, the only outcome that comports with this Circuit's law will be to require DOJ to perform a

3

search and segregability analysis.  This means that DOJ's search and segregability analysis will likely occur a year or two from now and this will most certainly cause an irreparable harm to Judicial Watch's ability to obtaining and disseminating information vital to the current and ongoing debate regarding the prosecution of U.S. Border Patrol Agents Ignacio Ramos and Jose Compean by U.S. Attorney Johnny Sutton and the coordination between U.S. agencies and the Mexican Government.

This Court is not alone in holding timely and current debate as sufficient basis for irreparable harm.  In *Gerstein v. CIA*, the plaintiff sought records relating to unauthorized disclosure of classified information.  2006 U.S. Dist. LEXIS at *3.  In that case, after failing to disclose responsive records or adequately justify withholding them, the plaintiff moved to compel the defendants to comply with FOIA.  The court, treating the motion as a request for preliminary injunction held that the plaintiff was being irreparably harmed by the delay as the "ongoing debate about how to respond to classified leaks and how aggressively to investigate them cannot be restarted or wound back." *Id.* at *14.  The court found that, being unable to obtain in a timely fashion information vital to the current and ongoing debate" was clearly an irreparable injury.  *Id.* at *14-15.

In *ACLU v. Dep't of Defense*, the court held that the information sought -- information pertaining to the deaths of detainees in U.S. custody – was of significant public interest, and any further delay in disclosure or justification would "subvert the intent of FOIA." 339 F. Supp. 2d at 504.  The Court further held that "if the documents are more of an embarrassment than a secret, the public should know of our government's treatment of individuals captured and [sic] held abroad.  *Id.* at *504-05.

4

Judicial Watch's similarly seeks timely information in a case of current and ongoing debate and is being irreparably harmed by DOJ's refusal to search for responsive records, conduct a segregability analysis and produce non-exempt records.[2] Without injunctive relief, the information sought by Judicial Watch will become stale and have little, if any, value.

### 3.        Entry of an Injunction Will Not Cause Harm to DOJ.

DOJ will not be harmed in any meaningful way by an injunction. DOJ has not asserted, as its co-Defendant U.S. Department of Homeland Security has, that Judicial Watch's request presents a burdensome task, or that it is currently experiencing an unusual backlog. Rather, DOJ asserts that an injunction requiring it to comply with FOIA is an "unnecessary and onerous expenditure of Agency time." Defendants U.S. Department of Justice's and U.S. Department of State's Opposition to Plaintiff's Application For Injunctive Relief ("Def's Opp.") at 10. DOJ offers no admissible evidence in support of this assertion. It does not include any sworn affidavits describing the unnecessary and onerous reasons it should not comply with FOIA now. And, as demonstrated below, DOJ's statutory duty is to search for and produce non-exempt records responsive to Judicial Watch's request. *See infra*, § B; *see also* Plaintiff's Application for Injunctive Relief at 8.[3]

---

[2]        In *EPIC*, the Court also made note that President Bush had invited public debate in the very subject of the FOIA request – the warrantless surveillance program. 416 F. Supp. 2d at 41. The Court held that public debate could only occur if "DOJ processes its FOIA requests in a timely fashion ans releases the information sought." *Id*. In a similar way, both DOJ (primarily through the person of U.S. Attorney Johnny Sutton) and the President have stated that the public should "get al the facts" about the case. Supplemental Affidavit of Meredith L. Di Liberto at ¶ 4. This hardly seems possible with DOJ's refusal to permit the public access to the very facts it needs.

[3]        DOJ's assertion that Mr. Davila will be harmed by an injunction is also incorrect. As demonstrated fully below, DOJ's assertion is without merit. *See supra* § B.2.

### 4.    Entry of An Injunction Is in the Public's Interest.

Despite the Court's acknowledgment during the hearing that this case is of public interest, DOJ maintains that, at most, the public interest is in the criminal case as a whole.  DOJ's assertions aside, Judicial Watch has presented evidence in the form of sworn affidavits that describes the nature of the public's interest.  In fact, as a result of the Court's hearing, every major news organization has contacted Judicial Watch regarding its request.  Supplemental Affidavit of Meredith L. Di Liberto ("Suppl. Di Liberto Affidavit") at ¶ 3.  Additionally, Judicial Watch representatives have been interviewed in television and radio regarding the request.  *Id.* And, Judicial Watch has received correspondence from supporters regarding its request.  DOJ has not, in any meaningful way, disputed the evidence put forth by Judicial Watch.  *See* Plaintiff's Application for Injunctive Relief at 8-14.

### B.    DOJ Has A Duty to Search.

FOIA mandates that government agencies make "reasonable efforts to search" for records responsive to a FOIA request.  5 U.S.C. § 552(a)(2)(E)(ii)©); s*ee Ginarte v. Mueller*, 2007 U.S. Dist. LEXIS 42262, *3 (D.D.C. June 12, 2004). The law of the D.C. Circuit regarding the reasonableness of an agency's FOIA search is clear.  In responding to a FOIA request, an agency is required to show that it made "a good faith effort to conduct a search for the requested records, using methods that can be reasonably expected to produce the information requested." *Nation Magazine v. United States Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. United States Dep't. of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

The burden of persuasion as to the reasonableness of a search falls on the agency. *McGhee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983).  Any affidavit(s) submitted by the agency

6

describing its search for documents must be "relatively detailed and non-conclusory, and . . . submitted in good faith." *Safecard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Additionally, if the reasonableness of a search is challenged, as in this case, an agency must "demonstrate 'beyond a material doubt' that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).

It is uncontested that DOJ has not conducted a search for records responsive to Judicial Watch's FOIA request. *See* Di Liberto Affidavit, Exhibit 1. Nor has DOJ submitted any relatively detailed, non-conclusory affidavits. Rather, DOJ asserts that all of the records sought by Judicial Watch are *per se* exempt under the Privacy Act and FOIA privacy exemptions. *Id.*[4] This assertion is simply incorrect as a matter of law.

DOJ's assertion that it can unilaterally declare all the records responsive to Judicial Watch's FOIA per se exempt is not only contrary to the overall purpose of FOIA, it is contrary to the law of this Circuit. First, permitting an agency to refuse to search based on no more than the agency's own assertion that the records – in their entirety – are exempt, turns FOIA on its head. The purpose of FOIA is to foster openness and accountability in government – to let the people know what their Government is up to. *See Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1118 (D.C. Cir. 2004); *see also U.S. Dep't of Justice v. Reporters Committee for Freedom of the*

---

[4]     Counsel for DOJ repeated this assertion during the July 23, 2007 hearing before the Court.

*Press*, 489 U.S. 749, 773 (1989).[5] DOJ's proposition would permit government agencies to hold all of the cards by simply asserting blanket exemptions to entire records, files or databases. A requesters ability to challenge this blanket assertion is severely limited at best. Without having benefit of knowing what types of information is included in the records, a requester has little recourse. In fact, unless the Court granted *in camera* review, thereby burdening the Court with the agency's obligation, the requestor has no meaningful opportunity to challenge the agency's blanket assertion of exemption.

Second, the D.C. Circuit has cautioned against permitting an agency to presume or assume that all of its records are per se exempt. In *Church of Scientology v. IRS*, 792 F.2d 146, 151-52 (D.C. Cir. 1986), the Court rejected the Internal Revenue Service's ("IRS") blanket assertion that it was not required to search beyond a very limited scope because all of the information was exempt under FOIA Exemption 3 as "return information." The Court held that the IRS' "contention would be justified only if, as a matter of law, all information in IRS files is return information. That is unquestionably not so." *Id.* at 151. The Court further held that the "District Court erred in accepting the IRS' blanket assertion that all the information responsive to the Church's request ... was exempt from disclosure." *Id.* at 152.

This Court also has rejected agency's assertions of unilateral blanket exemptions. In *Santos v. DEA*, 357 F. Supp. 2d 33, 38 (D.D.C. 2004), the Court rejected the Drug Enforcement Agency's ("DEA") blanket assertion that all of the records requested by the plaintiff were exempt

---

[5]     FOIA provides a framework of liberal disclosure for agency records and "provides that all documents are available to the public unless specifically exempted by the Act itself." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973) (footnote omitted). Exemptions from disclosure "***must be construed narrowly***, in such a way as to provide the maximum access consonant with the overall purpose of the Act." *Id.* (emphasis added).

as criminal investigatory records.  The Court held:

> While it may be that documents requested by the plaintiff are subject to categorical exemptions applicable to investigatory files of third parties that would justify nondisclosure, ***the Court cannot apply a blanket exemption to an investigatory record,*** especially where the agency fails to put forth a sufficiently detailed description of the documents withheld and the exemptions to which the documents correspond.

*Id.* (emphasis added) (internal citations omitted).

DOJ has not submitted any detailed descriptions of the records at issue in this case.  In fact, DOJ has not provided anything more than a belated denial letter laden with conclusory statements of exemption.  *See* Di Liberto Affidavit, Exhibit 1.

### 1.    DOJ's Failure to Provide a Segregability Analysis.

In addition to its overall failure to search or provide a detailed affidavit of the records withheld, DOJ also has failed to conduct a segregability analysis.  FOIA requires agencies to disclose "all reasonably segregable information ... after redaction or deletion of the exempt materials."  5 U.S.C. § 552(b).  Only information that is "inextricably intertwined with exempt portions" need not be disclosed.  *See Mead Data Center v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  The D.C. Circuit held that the "segregability requirement limits claims of exemption to discrete units of information; to withhold an entire document, all units of information in that document must fall within a statutory exemption."  *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999).  Even when the parties themselves do not address segregability, the court must raise it *sua sponte*.  *See Trans-Pacific Policing Agreement,* 177 F.3d at 1028 (D.C. Cir. 1999).

DOJ has not performed a segregability analysis of the records responsive to Judicial

Watch's FOIA. *See* Di Liberto Affidavit, Exhibit 1. DOJ's failure is compounded by the fact that it is asserting a blanket exemption based on a refusal to search. This Court held that, "the Court errs if it 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Stolt-Nielson Transportation Group, LTD v. USA*, 480 F. Supp. 2d 166, 182 (D.D.C. 2007); *see also Perry-Torres v. Dep't of State*, 2006 U.S. Dist. LEXIS 71258, *9 (D.D.C. Sept. 29, 2006) ("Indeed 'the focus of FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.'") (quoting *Mead Data Center*, 566 F.2d at 260).

DOJ cannot, of course, perform a segregability analysis until it performs a search for responsive records. DOJ must be required to conduct a search for responsive records, and release all non-exempt portions thereof.

### 2.    Privacy Exemptions and Segregability.

DOJ's blanket denial is based on privacy exemptions.[6] In its response, DOJ states that the two privacy exemptions "were applied to law enforcement (and/or personnel) records related specifically to a third party witness Mr. Aldrete-Davila." *See* Def's Opp. at 7.

Generally, a privacy exemption "'permits the Government to withhold only the specific information to which it applies [*i.e.*, third party identifying information], not the entire page or document in which the information appears.'" *Dixon v. DOJ*, 2005 U.S. Dist. LEXIS 37796, * 10

---

[6]    In it's June 15, 2007 letter, DOJ also relies on the Privacy Act as grounds for withholding the responsive records. *See* Di Liberto Affidavit, Exhibit 1. In its application for injunctive relief, Judicial Watch demonstrated that the Privacy Act applies ***only*** to citizens of the United States or to aliens lawfully admitted for permanent residence. 5 U.S.C. § 552a(a)(2). Osbaldo Aldrete-Davila is a Mexican national, therefore, the Privacy Act does not apply to him. DOJ appears to concede this point as it did not raise the Privacy Act as an exemption in its response.

(D.D.C. Sept. 22, 2005) (quoting *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000).

Ordinarily, Exemptions 6 and 7(C) are applied to names, driver's licence numbers, social security

numbers, agency contact names and numbers, home addresses, dates of birth and e-mail

addresses. *See Brunetti v. FBI*, 357 F. Supp. 2d 97, 106 (D.D.C. 2004); *see also Stolt-Nielsen*,

480 F. Supp. 2d at 179. As described by this Court, these are, in the ordinary course, discrete

units of information, easily redacted. *See Dixon*, 2005 U.S. Dist. LEXIS 37796 at * 10; *see also*

*Trans-Pacific Policing Agreement* , 177 F.3d at 1027. Therefore, it is highly unlikely that the

records responsive to Judicial Watch's request are, in their entirety, exempt.

  Lastly, it is disingenuous at best for DOJ to assert the privacy rights of Osbaldo Aldrete-

Davila as the reason for refusing to search for, segregate and produce responsive records because

it is DOJ itself that has made Mr. Davila a very publicly known person. Suppl. Di Liberto

Affidavit at ¶¶ 5-10. As shown above, DOJ admits that the individual whose privacy it seeks to

protect is Mr. Davila's. Def's Opp. at 7. This in and of itself is highly unusual - the agency

naming the individual it purports to protect. *See e.g.*, *Mays*, 234 F.3d at 1327-28 (DEA never

publicly acknowledged whose identity it was protecting); *Santos*, 357 F. Supp. 2d at 35 (DEA

would neither confirm nor deny the existence of third-party records); *Romero-Cicle v. DOJ*, 2006

U.S. Dist. LEXIS 84077, * 13-14 (D.D.C. Nov. 20, 2006) (DOJ never publicly acknowledged

whose identity it was protecting, just the types of information being redacted). DOJ simply

cannot claim a privacy exemption for an individual who DOJ itself has made public.

  The D.C. Circuit has spoken on the issue and held that "the government may not rely on a

FOIA exemption to withhold information that has been 'officially acknowledged' or is in the

'public domain.'" *Davis v. DOJ*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (quoting *Afshar v. DOJ*,

702 F.2d 1125, 1130-34 (D.C. Cir. 1983)). DOJ has been very public with information about Mr. Davila. Suppl. Di Liberto Affidavit at ¶ 5-10. DOJ has publicly acknowledged that Mr. Davila entered the United States illegally with a van load of illegal drugs. *Id.* at ¶ 5-8. DOJ has acknowledged that it went to Mexico to find Mr. Davila. *Id.* DOJ has publicly acknowledged that Mr. Davila was offered immunity to testify against two Border Patrol agents in a federal trial. *Id.* DOJ had publicly acknowledged that it has not prosecuted Mr. Davila for illegally crossing the border, smuggling drugs, or breaking his immunity deal. *Id.* These facts, among others, have been publicly acknowledged by DOJ on numerous occasions and appear in publicly available written form as well. In fact, DOJ has waged a very public media campaign regarding the shooting incident, including numerous references to Mr. Davila, his criminal activity and his role in DOJ's federal prosecution against the Border Patrol agents. Quite simply, it is too late for DOJ's concern for Mr. Davila's privacy - the DOJ has already laid bare Mr. Davila's personal information.[7]

## III.    Conclusion.

Judicial Watch respectfully requests that the Court enjoin DOJ from continuing to withhold records responsive to Judicial Watch's January 24, 2007 FOIA request by requiring DOJ to search for and produce all non-exempt responsive records by a date certain and a *Vaughn* index of any and all responsive records subject to a claim of exemption.

---

[7]    On July 25, 2007, it was publicly revealed that Mr. Davila received several so-called "border crossing cards" from the U.S. Department of Homeland Security. Perhaps the most interesting aspect of the cards is the Government's statement on five of the six cards regarding the purpose of the border crossing: "public interest" or "public benefit." Surely if it was in the public's interest to have Mr. Davila cross the border repeatedly for a number of months, it is in the public's interest to know what type of communications the U.S. Government and Mexican Government had regarding Mr. Davila. Suppl. Di Liberto Affidavit at ¶ 10.

Dated:  July 27, 2007                                Respectfully submitted,

                                                     JUDICIAL WATCH, INC.

                                                      /s/ Meredith L. Di Liberto
                                                     D.C. Bar No. 487733
                                                     Paul J. Orfanedes
                                                     D.C. Bar No. 429716
                                                     Suite 500
                                                     501 School Street, S.W.
                                                     Washington, DC 20024
                                                     (202) 646-5172

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  1:07-cv-00506 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

<u>**SUPPLEMENTAL AFFIDAVIT OF MEREDITH L. Di LIBERTO**</u>

I, Meredith L. Di Liberto, being duly sworn, hereby depose and say:

1.      I am an attorney with Judicial Watch, Inc. ("Judicial Watch"), which is located at
501 School Street, SW, Suite 500, Washington, DC 20024.  I make this declaration based upon
my personal knowledge of the contents herein.

2.      On July 23, 2007, I appeared at a hearing on Judicial Watch's application for
injunctive relief.  During that hearing, the Court expressed concern about granting extraordinary
relief in this case.

3.      Following the hearing the media department informed me that every major news
organization has contacted Judicial Watch regarding its request.  In addition to print media,
Judicial Watch representatives have been interviewed on television and radio regarding our
request.  Judicial Watch also has received correspondence from supporters regarding its request.

4.      According to newspaper reports and television transcripts, U.S. Attorney Johnny

Sutton of the U.S. Department of Justice, as well President George W. Bush, have claimed that the public's outrage over this case is based on a misunderstanding of the case, or a lack of facts about the case. Attached hereto as Exhibit 1 are true and correct copies of two (2) newspaper articles and one (1) television transcript revealing Mr. Sutton and President Bush's aforementioned statements.

  5.  A LexisNexis® search revealed that U.S. Attorney Sutton has appeared on several nationally televised news programs. The purpose of Mr. Sutton's appearance was generally to defend the actions taken by DOJ and other agencies. According to the transcripts, Mr. Sutton readily discussed Osbaldo Aldrete-Davila, that he entered the U.S. illegally with a van load of illegal drugs, that government agents searched for Mr. Davila and traveled to Mexico to find him, that he was offered immunity to testify against two Border Patrol agents in a federal trial, and that Mr. Davila was not prosecuted for illegally crossing the border, smuggling drugs, or breaking his immunity deal.

  6.  Attached hereto as Exhibit 2 are true and correct copies of five (5) press releases issued from the U.S. Department of Justice, U.S. Attorney's Office, Western District of Texas. The releases are accessible on the U.S. Attorney's website.

  7.  On or about July 17, 2007, the Senate Judiciary Committee conducted a hearing on the prosecution of U.S. Border Patrol Agents Ignacio Ramos and Jose Compean. U.S. Attorney Johnny Sutton was called as a witness and presented a written statement. The hearing was also televised on C-SPAN.

  8.  Attached hereto as Exhibit 3 is a true and correct copy of the statement of Johnny

Sutton, U.S. Attorney for the Western District of Texas before the U.S. Senate Committee on the Judiciary.  The statement is available on the Committee's website.

9.    House Foreign Affairs Subcommittee on International Organization, Human Rights and Oversight will hold a hearings on the matter of Mr. Davila and Agents Ramos and Compean on July 31, 2007

10.    On or about July 25, 2007, it was publicly revealed that Mr. Davila received several so-called "border crossing cards" from the U.S. Department of Homeland Security.  On five of the six cards, the stated purpose for Mr. Davila's border crossing was identified as "public interest" or "public benefit."  Attached hereto as Exhibit 4 is a true and correct copy of the border crossing cards.

I declare under penalty of law that the foregoing is true and correct.  Executed on July 27, 2007 in the District of Columbia.

Meredith L. Di Liberto

EXHIBIT 1



Copyright 2007 Fox News Network, LLC.
Fox News Network

**SHOW:** FOX HANNITY & CO 9:30 PM EST

July 17, 2007 Tuesday

**TRANSCRIPT:** 071703cb.253

**SECTION:** NEWS; Domestic

**LENGTH:** 1467 words

**HEADLINE:** Interview With Johnny **Sutton**

**BYLINE:** Sean Hannity, Alan Colmes

**GUESTS:** Johnny Sutton

**BODY:**

(NEWSBREAK)

(BEGIN VIDEO CLIP)

JOHNNY **SUTTON,** U.S. ATTORNEY: Their actions after the shooting showed that they knew that the shooting was illegal and destroyed the credibility of their later claims that the drug smuggler appeared to have a weapon as he ran away.

(END VIDEO CLIP)

COLMES: That was U.S. attorney Johnny **Sutton** earlier today, justifying his prosecution of Border Patrol agents Ignacio Ramos and Jose **Compean** to a

Senate sub-panel. The two agents are serving 11- and 12-year sentences for shooting and wounding a fleeing, unarmed Mexican drug smuggler.

Supporters of the agents want a full pardon for the men.

(BEGIN VIDEO CLIP)

REP. DANA ROHRABACHER (R), CALIFORNIA: Prosecutors decided to go after the good guys and gave the bad guy immunity. The prosecutors then, let us note, began to vilify the Border Patrol agents in order to justify their decision.

(END VIDEO CLIP)

COLMES: Joining us now, the man who prosecuted the agents, United States attorney Johnny Sutton. As you pointed out, Mr. Sutton, this is not about immigration. This is really about rule of law. Isn't it?

SUTTON: That's exactly right, Alan. You know, there's been so much misinformation and people trying to tie this into immigration debate. And really, it has to do with immigration. What it has to do with is law enforcement officers stepping out of their uniform and into the position of literally trying to shoot to kill an unarmed drug smuggler who was running away.

My job is to enforce the law. This is a 2.5-week jury trial. It wasn't just something that my prosecutors invented out of their minds. I mean, we tried this case.

Those guys were convicted on the evidence, which was overwhelming, and they were punished by the laws that were set in place by Congress. And thankfully, today, I got to make that case with the American people. And hopefully, we'll get that information out.

COLMES: I guess the anger is the perception, as you're taking the word of an illegal immigrant over two enforcers of the law and who are U.S. citizens. And that's why so many people, I guess, are angry about this.

SUTTON: Well, and they -- and I wish they could have been at the trial and they would have seen it wasn't just the word of that dope dealer, illegal alien who I would have loved to have put in prison and would be in prison, had **Compean** and Ramos done their job.

But everything -- much of what he said was corroborated by other agents at the scene, as well as the physical evidence. And frankly, the most damning piece of evidence was the cover-up. If that drug smuggler had a gun, there's no reason in the world the Border Patrol agent should cover it up.

They were -- they were acting if he didn't have begun at the scene, and that's what the jury heard. And that's why the jury convicted him.

COLMES: Let me ask you about this, though. And I understand everything you're saying. I truly understand and respect it. Even Dianne Feinstein, the Democratic senator from California, says that the sentence is too harsh, that these are men who never broke the law before.

Is it worth 12 years in jail for people with no previous record on this kind of a conviction?

SUTTON: Well, I agree with her that that is a harsh sentence, but that is a sentence that was set in place by Congress. Congress has made it very clear for prosecutors that we feel very strong about violent crimes committed with firearms. They passed that law. They did not make any exceptions for law enforcement.

And when a law enforcement officer steps over the line, not defending himself, but commits crimes against innocent people, than they're held to account, just like everybody else.

HANNITY: Senator Feinstein said this is a case a prosecutorial over charging in the case. And they strongly questioned why you and the other prosecutors, you know, charged the pair with using a weapon during the commission of a crime here when they were on their job, on top of giving immunity, and allowing the drug smuggler, who's here illegally, to testify against them? That's what this boils down to.

SUTTON: Well, and that's what the irony of this is. We're here not because of what my prosecutorial team did, but because these two agents committed crimes. If they had done their job, that drug smuggler would be in prison like all the other drug smugglers put there.

HANNITY: You know...

SUTTON: But wait, Sean, for just a second.

HANNITY: This is outrageous.

SUTTON: Look, they were acting like this guy, like this guy had a gun. We litigated at trial. He didn't. All the evidence pointed the other way, and...

HANNITY: You should be -- at the border. I've been there five times. Perhaps you should go down there and see how difficult it is for these border agents.

SUTTON: What are you talking about, Sean? My job is...

HANNITY: These guys...

SUTTON: That's my job. I'm in charge of 660 miles of border.

HANNITY: But these guys have to make split second decisions here, and in this particular case, what really outrages most Americans, you've got a drug smuggler, with over a million-dollar payload of marijuana, entering this country illegally, who gets immunity and testifies against the agents that were trying to do their job, protecting Americans.

And these guys get 12 years in jail, and you go for the maximum, prosecuting them. People like me are outraged about this, and I do think these guys deserve a pardon in this case.

SUTTON: Well, I mean, Sean, today -- we testified to this today. Since I've been U.S. attorney, there's been 14 shootings in El Paso sector. Three of them were killing. There's another killing right before I became U.S. attorney. All of them cleared.

Chief Aguilar said today, chief of the Border Patrol, 144 agents shot people, used deadly force, in the last two years. None of those guys were prosecuted.

HANNITY: Where is the prosecutorial discretion? And the understanding that these guys, they don't know what is going on in this case.

First of all, he was a non-fatal shooting in the buttocks of a guy that had a million-dollar payload and entering the country illegally. And he becomes the guy that testifies against the agents. You don't see anything wrong with that? Or understand why people are upset about that?

SUTTON: What I'm trying to tell you is...

HANNITY: You're not answering that question. Do you not understand why people are upset? Dianne Feinstein, Duncan Hunter, John Cornyn, Sean Hannity, Dana Rohrabacher? You don't get that?

SUTTON: I do get it, because you don't understand the **facts.** What a jury -- what a West Texas jury.

HANNITY: Only you do, right?

SUTTON: We were there, Sean. My people tried the case. A west Texas jury doesn't convict law enforcement officers on a whim. They only convict people when the evidence is overwhelming. These guys committed serious crimes. This was not a split-second decision.

HANNITY: You know what, though? If you get your conviction...

SUTTON: They shot an unarmed guy, and they covered it up. Look, Sean, listen.

HANNITY: Wait a minute. Let me address that. He said they perhaps deserved a reprimand, and a reprimand was turned into a felony. And then people that you use to convict these agents are people. They get immunity and will say anything that were drug dealers. And they don't even get charged. Why do the -- and he was flown back into the United States for testimony. An illegal immigrant drug dealer. That's insane.

Case 1:07-cv-00506-RJL     Document 18-2     Filed 07/27/2007     Page 10 of 48

SUTTON: Look, if you had been in El Paso, you know that Juarez is right across the river. You don't fly, you walk. Second of all, this guy was given immunity because these agents screwed up the case so bad it was impossible for us to prosecute him.

COLMES: All right.

SUTTON: We're prosecuting them for the crime they did. They got the punishment that Congress set. That's the **fact**.

COLMES: Mr. Sutton, we -- we thank you for coming on our show tonight. Thank you for your time, sir.

We check in with Greta Van Susteren, Greta here to tell us what's coming up right after "Hannity & Colmes" at 10 Eastern.

Good evening, Greta.

GRETA VAN SUSTEREN, HOST, "ON THE RECORD": Good evening, Alan.

We have breaking news. A commercial airliner has crashed. More than 150 people on board. The number of fatalities unknown at this hour. But we're going to have the breaking news as it develops throughout the hour.

Plus news in the Chris Benoit case. We have that, as well as a University of Washington at Green Bay student is missing. That and much more. Back to you, Alan.

COLMES: And coming up, a convicted sex offender walks free, and parents in Alabama are scared he'll strike again. We'll speak with one concerned mother.

And Chris Benoit's toxicology report comes out, and the results are frightening.

(BEGIN VIDEO CLIP)

DR. KRIS SPERRY, GEORGIA CHIEF MEDICAL EXAMINER: It is our opinion that Daniel Benoit was sedated by Xanax at the time that he was murdered.

(END VIDEO CLIP)

**LOAD-DATE:** July 18, 2007



Copyright 2007 The Dallas Morning News
The Dallas Morning News (Texas)

Distributed by McClatchy-Tribune Business News

July 20, 2007 Friday

**SECTION:** STATE AND REGIONAL NEWS

**ACC-NO:** 20070720-DA-0720-Bush-doesn-t-promise-pardon-for-ex-border-agents

**LENGTH:** 545 words

**HEADLINE:** Bush doesn't promise pardon for ex-border agents: He doesn't promise pardon for 2 convicted in '05 border shooting

**BYLINE:** Todd J. Gillman, The Dallas Morning News

**BODY:**

Jul. 20--WASHINGTON -- President Bush -- under pressure to grant clemency to two Border Patrol agents who shot an unarmed drug smuggler from behind and covered up the incident -- gave a full-throated defense to the San Antonio-based prosecutor in the case Thursday, calling him a "dear friend" and an "even-handed guy."

"I know this is an emotional issue, but people need to look at the **facts.** These men were convicted by a jury of their peers after listening to the **facts** as my friend, Johnny **Sutton,** presented them," Mr. Bush said Thursday in Nashville.

Mr. **Sutton** has been vilified on conservative talk radio for sending agents Ignacio Ramos and Jose **Compean** to prison for 11- and 12-year terms, while

Case 1:07-cv-00506-RJL     Document 18-2     Filed 07/27/2007     Page 13 of 48

cutting a deal that has allowed the accused smuggler -- who fled after getting caught with a van filled with $1 million worth of marijuana near El Paso -- remain free.

The agents have served six months in prison. Advocates call their prison terms excessive and say they deserve as much mercy as Mr. Bush showed vice presidential aide Lewis "Scooter" Libby, whose sentence for perjury he commuted.

Texas Republican Sen. John Cornyn and Sen. Dianne Feinstein, D-Calif., led a hearing Tuesday at which Mr. **Sutton** was forced to defend his handling of the case, particularly the use of enhanced federal firearms charges that brought the bulk of the agents' sentences. The senators wrote Mr. Bush the next day, urging immediate commutation for the agents.

During a town hall-style meeting Thursday, a woman asked Mr. Bush if he would pardon the agents and noted that the Tennessee General Assembly had urged the state's congressional delegation to advocate a pardon.

"I'm not going to make that kind of promise in a forum like this," Mr. Bush said. "Obviously I am interested in **facts.** I know the prosecutor very well, Johnny **Sutton.** He's a dear friend of mine from Texas. He's a fair guy. He is an even-handed guy."

When Mr. Bush became governor in the 1990s, Mr. **Sutton** served five years as his director of criminal justice policy. When Mr. Bush was preparing to assume the presidency, Mr. **Sutton** helped plan the new administration's Justice Department, and he served briefly as an associate deputy attorney general.

In fall 2001, Mr. Bush named him chief federal prosecutor for the Western District of Texas -- a 93,000-square-mile territory with most of the state's international border and a disproportionate share of its drug cases.

Law enforcement officers are allowed to use deadly force only if they or someone else are threatened. The agents didn't claim to have seen any weapons during the 17-minute chase with Osvaldo Aldrete-Davila in February 2005. One agent fired 14 shots, the other a single shot.

The smuggling suspect, who remains free, is suing the U.S. government for $5 million and is suspected of smuggling a second marijuana load months later.

To see more of The Dallas Morning News, or to subscribe to the newspaper, go to http://www.dallasnews.com. Copyright (c) 2007, The Dallas Morning News Distributed by McClatchy-Tribune Information Services. For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

**LOAD-DATE:** July 20, 2007



Copyright 2007 The New York Times Company
The New York Times

**January** 20, 2007 Saturday
Late Edition - Final

**SECTION:** Section A; Column 3; National Desk; Pg. 12

**LENGTH:** 478 words

**HEADLINE:** Bush Comments on Agents Who Shot Suspected Drug Dealer

**BYLINE:** By RACHEL L. SWARNS

**DATELINE:** WASHINGTON, Jan. 19

**BODY:**

President Bush waded this week into the furor surrounding two former border patrol agents who were each convicted and sentenced to more than a decade in prison in the shooting of a suspected Mexican drug dealer in Texas.

The case has become something of a cause among some advocates for tougher border security, who argue that the agents should be pardoned because they were doing their jobs in 2005 when they fired on the man, an assertion that has been contested by the federal prosecutors overseeing the case.

In an interview with KFOX-TV in El Paso, Mr. Bush was asked on Thursday whether he would consider a pardon for the two former agents, Ignacio Ramos and Jose Alonso **Compean,** who began serving their federal prison sentences of 11 years and 12 years respectively this week.

"There are standards that need to be met in law enforcement, and according to a jury of their peers, these officers violated some standards," Mr. Bush said. "On this case, people need to take a hard look at the facts, at the evidence that the jury looked at, as well as a judge. And that's -- I will do the same thing."

"Now, there's a process for pardons," he continued. "I mean, it's got to work its way through a system here in government. But I just want people to take a sober look at the reality. It's a case, as you said, it's got a lot of emotions."

Some interpreted Mr. Bush's remarks to imply that he would consider a pardon for the two men. But Justice Department officials said on Friday that the two men were ineligible for consideration of a pardon at this time.

Requests for pardons, which are screened by the Justice Department before being considered by the White House, are not considered until at least five years after a petitioner has been convicted or released from jail or prison, according to the department's guidelines.

A commutation of sentence, which reduces the period of incarceration, is not generally considered for people who are appealing their convictions, the guidelines said.

The two former agents have said they will appeal their convictions.

Johnny **Sutton,** the United States attorney who oversaw prosecution of the case, , dismissed the idea that the two men were simply doing their jobs or defending themselves. During their trial, the agents said they had scuffled with the suspected drug dealer, who they believed had a gun, before firing at him.

"Nothing could be further from the truth," Mr. **Sutton** said in a statement last week, noting that the two men did not report the shooting to their superiors.

"These agents shot someone who they knew to be unarmed and running away," Mr. **Sutton** said. "They destroyed evidence, covered up a crime scene and then filed false reports about what happened. It is shocking that there are people who believe it is O.K. for agents to shoot an unarmed suspect who is running away."

**URL:** http://www.nytimes.com

**LOAD-DATE:** January 20, 2007

EXHIBIT 2



**U.S. Department of Justice**
**U.S. Attorney's Office**
**Western District of Texas**

**Johnny Sutton, U.S. Attorney**

FOR IMMEDIATE RELEASE

Shana Jones, Special Assistant
Daryl Fields, Public Information Officer
(210) 384-7452

January 10, 2007

### STATEMENT OF U. S.  ATTORNEY JOHNNY SUTTON TO ALLEGATIONS OF WRONGFUL PROSECUTION OF BORDER PATROL AGENTS COMPEAN AND RAMOS

In response to the allegation that these agents were prosecuted for just doing their job, nothing could be further from the truth. These agents shot someone who they knew to be unarmed and running away.  They destroyed evidence, covered up a crime scene and then filed false reports about what happened.  It is shocking that there are people who believe it is okay for agents to shoot an unarmed suspect who is running away.

The law recognizes that agents will make mistakes and the government takes responsibility for good faith mistakes made in the line of duty.  But no agent is given license to willfully shoot an unarmed, fleeing suspect in the back simply because the job is difficult, dangerous or important. My job and that of federal prosecutors is to enforce the laws the best we can.  If law enforcement officers break the law, they have to face the consequences just as anyone else.

Agents Compean and Ramos were unanimously found guilty by a jury in a United States Federal District Court after a trial that lasted more than two and a half  weeks.  Both agents told their stories from the witness stand and had full opportunities to explain their version of events and to offer their own evidence.  The jury heard everything including their claims of self defense.  The jury did not believe their stories because they were not true.

In this case, the evidence showed that around 1:00 p.m.(not in the middle of the night) Aldrete , the Mexican alien, initially ran from the agents, but attempted to surrender with his empty hands raised over his head after Agent Compean pointed his shotgun at him.  When Agent Compean tried to push Aldrete  to the ground with the butt of  his shotgun Agent Compean tripped and fell. Aldrete then took off running again toward the Rio Grande River and Mexico.  Compean chased Aldrete firing at him with his pistol fourteen times, pausing once to reload and then shoot some more.  Agent Ramos shot once and struck Aldrete in the buttocks.  Neither agent made any further effort to apprehend him.  After the shooting, they lied to their supervisors about the shooting, picked up and threw away the fired shell casings and filed a false investigative report leaving out any mention of the confrontation with Aldrete.

If Compean and Ramos truly believed Aldrete was a threat, why did they abandon him after shooting him?  And if they truly believed the shooting was justified, why did they not report it, leave the scene undisturbed, and let the investigation absolve them?  The answers to these questions are simple.  The agents knew that Aldrete did not pose a threat as he fled, they knew the shooting was unjustified and unlawful, and they knew an investigation would incriminate them.  So they chose to cover up their crimes.  In America, law enforcement officers do not get to shoot unarmed suspects who are running away, lie about it to their supervisors and file official reports that are false. That is a crime and prosecutors cannot look the other way.

###



# Department of Justice

### United States Attorney Johnny Sutton
### Western District of Texas

FOR IMMEDIATE RELEASE
WEDNESDAY, JANUARY 17, 2007
www.usdoj.gov/usao/txw

CONTACT:  SHANA JONES
PHONE:  (210) 384-7452
FAX:  (210) 384-7105

### STATEMENT OF U.S. ATTORNEY JOHNNY SUTTON REGARDING THE
### PROSECUTION OF BORDER PATROL AGENTS COMPEAN AND RAMOS

"For months, there has been a concerted effort by a few to intentionally distort the facts of the Compean and Ramos case.  However, after a trial that lasted two and a half weeks, where facts were presented and the case was argued, Agents Compean and Ramos were unanimously found guilty by a jury in the United States Federal District Court.  In order to dispel the myths and set the record straight, I have listed the facts of the case below:

"Agents Compean and Ramos were prosecuted by my office because they committed a number of serious crimes. They shot 15 times at an unarmed man who was running away from them and posed no threat. They lied about what happened, covered up the shooting, conspired to destroy evidence and then proceeded to write up and file a false report.

"United States Border Patrol agents are some of America's most unsung heroes. They have an enormously difficult job and, at times, they face great danger.

"The law recognizes that agents will make mistakes and the government takes responsibility for good faith mistakes made in the line of duty. But no agent is given license to willfully shoot an unarmed, fleeing suspect in the back simply because the job is difficult, dangerous or important. The job of federal prosecutors is to enforce the laws the best we can.  If law enforcement officers break the law, they have to face the consequences just like anyone else. Agents Compean and Ramos were unanimously found guilty by a jury in a United States Federal District Court after a trial that lasted more than two and a half weeks.  Both agents told their stories from the witness stand and had full opportunities to explain their version of events and to offer their own evidence.  The jury heard everything including their claims of self defense.  The jury did not believe their stories because they were not true.

"In this case, the evidence showed that around 1:00 p.m. MT Aldrete, the Mexican alien, initially ran from the agents, but attempted to surrender with his empty hands raised over his head after Agent Compean pointed his shotgun at him.  When Agent Compean tried to push Aldrete to the ground with the butt of his shotgun, Agent Compean tripped and fell. Aldrete then took off running again toward the Rio Grande River and Mexico.  Compean chased Aldrete, firing at him with his pistol 14 times, pausing once to reload and then shoot some more.  Agent Ramos shot once and struck Aldrete in the buttocks.  Neither agent made any further effort to apprehend him.  After the shooting, they lied to their supervisors about the shooting, picked up and threw away the fired shell casings and filed a false investigative report leaving out any mention of the confrontation with Aldrete.

"If Compean and Ramos truly believed Aldrete was a threat, why did they abandon him after shooting him?   And if they truly believed the shooting was justified, why did they not report it, leave the scene undisturbed, and let the investigation absolve them?   The answers to these questions are simple.  The agents knew that Aldrete did not pose a threat as he fled, they knew the shooting was unjustified and unlawful, and they knew an investigation would incriminate them.  So they chose to cover up their crimes.

"In America, law enforcement officers do not get to shoot unarmed suspects who are running away, lie about it to their supervisors and file official reports that are false.  That is a crime, and prosecutors cannot look the other way."

###



# Department of Justice

### United States Attorney Johnny Sutton
### Western District of Texas

FOR IMMEDIATE RELEASE
WEDNESDAY, JANUARY 17, 2007
www.usdoj.gov/usao/txw

CONTACT:  SHANA JONES
PHONE:  (210) 384-7452
FAX:  (210) 384-7105

## MYTH VS. REALITY--THE FACTS OF WHY THE GOVERNMENT PROSECUTED AGENTS COMPEAN AND RAMOS

**Myth: THE AGENTS WERE JUST DOING THEIR JOBS**

Reality: Securing our nation's borders can be a tough and dangerous job.  Often, Border Patrol agents find themselves in difficult and dangerous situations. We give them guns and allow them to defend themselves. Border Patrol training allows for the use of deadly force when an agent reasonably fears imminent bodily injury or death. An agent is not permitted to shoot an unarmed suspect who is running away.

There was no credible evidence that the agents were in a life-threatening situation or that Aldrete, the Mexican alien, had a weapon that would justify the use of deadly force.  In fact, Border Patrol Agent Juarez, who was at the scene, testified at trial that he did not draw his pistol because he did not believe there was a threat.  He also testified that Aldrete did not have a weapon and was almost to Mexico when Agent Compean began firing at him.

In America, law enforcement officers do not get to shoot unarmed suspects who are running away, lie about it to their supervisors and file official reports that are false.  That is a crime and prosecutors cannot look the other way.

**Myth: THE GOVERNMENT LET A DRUG SMUGGLER GO FREE**

Reality:  My office would have much preferred to see Aldrete convicted and sent to prison for his crimes.  We are in the business of putting guys like Aldrete behind bars.  In fact, this office leads the nation in the number of drug smuggling cases we prosecute.  Because the agents could not identify him, found no fingerprints, could not tie him to the van and did not apprehend him after shooting him, the case against Aldrete could not be proven.

**Myth: THESE BORDER PATROL AGENTS SHOULD NOT HAVE BEEN PROSECUTED**

Reality:  The crimes committed by these agents rise to the level of felonies and are not mere administrative oversights.  This was not a simple case of discharge of a firearm that was not reported. The truth of this case is that Agents Compean and Ramos shot 15 times at an unarmed man who was running away from them and who posed no threat.

1

This office cannot ignore these agents' crimes just because the person they shot turned out to be a drug smuggler. Our system of justice requires that a person be tried in a court of law before he is punished. We do not permit police officers to summarily punish those whom the officers think have committed crimes. A police officer cannot shoot at an unarmed suspect who does not pose an immediate serious threat to the life of the officer or a bystander.

In order to maintain the rule of law, federal prosecutors cannot look the other way when law enforcement officers shoot unarmed suspects who are running away, then lie about it to their supervisors and file official reports that are false.

**Myth: ALDRETE HAS BEEN ARRESTED FOR SMUGGLING MORE DRUGS INTO THE UNITED STATES**

Reality: Aldrete has not been subsequently arrested for drug smuggling. Our office is in the business of prosecuting drug traffickers and alien smugglers. We are on the front lines of this battle and we aggressively prosecute these criminals every day in court. In fact, the Western District of Texas leads the nation in the number of individuals we prosecute for illegally smuggling drugs into this country. If we had a provable case against Aldrete, we would prosecute him.

**Myth: THE GOVERNMENT GAVE ALDRETE BLANKET IMMUNITY FOR HIS CRIMES**

Reality: Agent Compean failed to arrest Aldrete when he attempted to surrender; instead, Compean tried to hit Aldrete with the butt of his shotgun, at which time Aldrete began to run towards the border. The agents shot at him 15 times, hitting him once, knocking Aldrete to the ground. Compean and Ramos chose not to walk over to the wounded Aldrete and arrest him; rather, they re-holstered their guns, turned around and left the scene. When Aldrete then got back to Mexico without having been apprehended and identified, there was no longer any way to tie him to the load of marijuana, except through his own admissions.

Prosecutors promised Aldrete they would not use his truthful statements and testimony to prosecute him for the events that occurred on Feb. 17, 2005. Prosecutors around the country routinely make similar representations to obtain crucial testimony. This type of "use immunity" does not give blanket immunity for any crimes he may have committed or may commit in the future. If there were other admissible evidence besides his own statements sufficient to convict him, he could be prosecuted for the offense he describes.

As a practical matter, the promise to Aldrete gave up very little since the case against him was not prosecutable. There was no way to prosecute Aldrete while he was in Mexico. We could not have forced him to come back to the United States to be prosecuted, and there was no evidence against him until he agreed to cooperate.

**Myth: ALDRETE HAD A GUN AND THE AGENTS ONLY FIRED IN SELF DEFENSE**

2

Reality: Trial testimony from other Border Patrol agents who were at the scene and who arrived shortly after the shooting shows that this is not true. Testimony further revealed that Agents Compean and Ramos never took cover nor did they ever warn the other agents to take cover. This action demonstrates that they did not perceive a threat. In his statement to investigators, Compean admitted that Aldrete had attempted to surrender with both hands open and in the air.

Had Agents Compean and Ramos truly believed Aldrete was a threat, they would not have abandoned him after the shooting and they would have warned their fellow agents who arrived at the scene to stay out of the open while an armed suspect was on the loose. If the agents had believed that the shooting was justified then they would have left the crime scene undisturbed and let the investigation absolve them. The agents knew that Aldrete did not have a weapon and they knew he posed no threat to them as he fled. Agent Juarez also testified that Aldrete was surrendering to Compean with his hands open and empty palms turned to Compean.

**Myth: THE AGENTS WERE NOT SURE OF WHAT THEY SAW BECAUSE IT WAS IN THE MIDDLE OF THE NIGHT**

Reality: The events of Feb. 17, 2005, occurred at approximately 1:00 P.M MT.

**Myth: JOHNNY SUTTON IS AN OVERZEALOUS PROSECUTOR WHO IS ON THE WRONG SIDE OF THE LAW**

Reality: These agents were found guilty by a unanimous jury in a United States District Court after a trial that lasted more than two and a half weeks.

The two agents were represented by experienced and aggressive trial attorneys, both of whom vigorously challenged the Government's evidence through cross examination.

Both agents told their stories from the witness stand and had full opportunities to explain their version of events and to offer their own evidence. The jury heard everything including the defendants' claims of self defense. The problem for Agents Compean and Ramos is that the jury did not believe their stories because they were not true.

**Myth: THESE AGENTS ARE FACING TOO MUCH TIME IN FEDERAL PRISON**

Reality: Congress determined the penalties imposed on Compean and Ramos by setting the punishment for discharging a firearm during a crime of violence at a mandatory minimum of ten years (on top of any other sentence imposed). Congress did not make an exception for law enforcement officers

**Myth: THE DRUG SMUGGLER WAS AWARDED A GREEN CARD**

Reality: Aldrete was not given a green card which would enable him to have permanent legal resident status in this country. A military physician in the United States removed the bullet from Aldrete because it was an important piece of evidence and because the law requires the government to render such assistance. In order to have the bullet removed, meet with federal

3

investigators and to testify in court in El Paso, he was entitled to come into the United States on a limited basis within a limited geographical area and only for those purposes. The last time he was legally allowed to enter the United States was in February 2006.

**Myth: ALDRETE NEVER HAD HIS HANDS UP AND WAS NOT ATTEMPTING TO SURRENDER**

Reality: In their sworn testimony, Agent Compean and Agent Juarez both testified that Aldrete did have his hands in the air in an effort to surrender.

**Myth: COMPEAN WAS BLOODIED FROM A STRUGGLE WITH ALDRETE**

Reality: Trial testimony showed that the only blood on Agent Compean was between his thumb and forefinger and was a result of him improperly holding his weapon. When asked if he was injured, he said "no" and when further asked if he wanted to file a report for his injury, he again said "no."

**Myth: THESE AGENTS DID NOT REPORT THE SHOOTING TO SUPERVISORS BECAUSE THE SUPERVISORS WERE ON THE SCENE OF THE SHOOTING**

Reality: The trial testimony of the defendants, fellow Border Patrol agents who were on the scene and who arrived shortly thereafter, as well as taped radio communications showed that there were no supervisors at the scene at the time of the shooting. The agents knew they must report any discharge of a firearm and had just received training to this effect the day before this shooting. Further, Agent Ramos was a Border Patrol firearms instructor and a member of the evidence recovery team. He was well aware of this requirement as he had taught this to other agents. They did not report the discharge because they knew the shooting was not justified. Furthermore, based on their training and experience, they were aware of what law enforcement resources would be dispatched to the crime scene to investigate a shooting, including sector evidence team, the Federal Bureau of Investigation, and state and local law enforcement.

**Myth: ILLEGAL ALIENS DO NOT HAVE ANY CONSTITUTIONAL RIGHTS**

Reality: The courts have held that the 4th Amendment to the Constitution protects all persons in the United States whether they are here legally or illegally. It is a violation of the 4th Amendment to shoot an unarmed person who poses no threat to the shooter. This law applies regardless of immigration status.

**Myth: AGENT RAMOS CLAIMS THAT THE BULLET EXTRACTED FROM ALDRETE MIGHT NOT HAVE COME FROM HIS SERVICE REVOLVER**

Reality: Agent Ramos stipulated and agreed before trial that the bullet extracted from Aldrete came from his service weapon. Independent forensic analysis also showed that the bullet extracted from Aldrete matched Agent Ramos' weapon.

**Myth: AGENT RAMOS WAS BORDER PATROL AGENT OF THE YEAR**

Reality: Agent Ramos has never received any formal recognition or award for being the Border Patrol Agent of the year.  In fact, he has been arrested on at least two occasions for domestic abuse and was formally disciplined for conduct unbecoming a federal officer.

###



**U.S. Department of Justice**

United States Attorney
Western District of Texas

---

JOHNNY SUTTON
*United States Attorney*

*601 NW Loop 410 STE 600*
*San Antonio, Texas 78216*

*(210)384-7400*
*FAX: (210)384-7474*

**FOR IMMEDIATE RELEASE**
March 10, 2003
**On the Web at: WWW.USDOJ.GOV/USAO/TXW/INDEX.HTML**

Contact: Brent Gray, DOJ Civil Rights Division
(877) 678-2201
Daryl Fields
(210) 384-7440

**FORMER BORDER PATROL AGENT SENTENCED FOR CIVIL RIGHTS VIOLATION**

**(DEL RIO, TEXAS)** U.S. Attorney Johnny Sutton announced today that former U.S. Border Patrol agent **GARY MARK BRUGMAN** was sentenced to 27 months in federal prison for violating the rights of a Mexican citizen while acting as a peace officer. In addition to the prison term, U.S. District Judge William Wayne Justice also ordered that Brugman be placed under supervised release for a period of two years after completing his prison term.

On October 31, 2002, a federal jury in Del Rio convicted the 36-year-old Eagle Pass, Texas, resident on one count of deprivation of civil rights under color of law. The jury found that on January 14, 2001, a group of ten Mexican Nationals illegally crossed the Rio Grande river onto Rosetta Farms, a pecan orchard just outside Eagle Pass. U.S. Border Patrol agents were dispatched to the area to investigate ground sensor activity. When they arrived at the location, the agents discovered the aliens and a foot chase ensued. The aliens ultimately gave up and sat down on the ground. Brugman caught up with the group of aliens and in front of two other Border Patrolmen, began kicking and punching one of the captured aliens.

"Law enforcement officers are entrusted to uphold the law, not break it," stated U.S. Attorney Johnny Sutton. "Mr. Brugman's actions were inexcusable."

Mr. Sutton commended the investigative cooperation received by Jorge Espejel, the Consul of Mexico in Eagle Pass, Texas, for locating the victim in Mexico and making him available to U.S. authorities.

This case was investigated by Special Agent Gary Moore with the Office of Inspector General and prosecuted by Assistant U.S. Attorney Bill Baumann and Department of Justice Civil Rights trial attorney Brent Gray.

#####



**U.S. Department of Justice**
**U.S. Attorney's Office**
**Western District of Texas**

**Johnny Sutton, U.S. Attorney**

---

<table>
<tr><td><strong>FOR IMMEDIATE RELEASE</strong></td><td>Shana Jones, Special Assistant</td></tr>
<tr><td></td><td>610 N.W. Loop 410</td></tr>
<tr><td>April 25, 2007</td><td>San Antonio, Texas 78216</td></tr>
<tr><td></td><td>(210) 384-7452</td></tr>
</table>

## UNITED STATES ATTORNEY JOHNNY SUTTON SETS THE RECORD STRAIGHT REGARDING THE PROSECUTION OF RAMOS AND COMPEAN

Former Border Patrol Agents Ignacio Ramos and Jose Compean were found guilty by a unanimous jury in a United States District Court after a trial that lasted more than two and a half weeks. The two agents were represented by four experienced and aggressive trial attorneys, all of whom vigorously challenged the Government's evidence through argument and direct and cross examination.

Both agents told their stories from the witness stand and had full opportunities to explain their version of events and to offer their own evidence. The jury heard all admissible evidence, including the defendants' claims of self defense, but the jury did not find their stories credible.

The case is now on appeal to the U.S. Court of Appeals for the Fifth Circuit, which recently agreed with the District Court that Ramos and Compean should not be released on bond pending appeal.

Unfortunately, some of the media attention and heated debate over the prosecution of this case has been based on, and has led to, many factual inaccuracies and unfounded criticism. The purpose of this fact sheet is to identify some of those inaccuracies and provide corrections with factual information from the public record, to the extent possible given that this case is currently on appeal.[1]

**Allegation:**   **THE AGENTS WERE JUST DOING THEIR JOBS AND SHOULD NOT HAVE BEEN PROSECUTED**

Response: Securing our nation's borders can be a tough and dangerous job. Often, Border Patrol agents find themselves in difficult and dangerous situations. The Border Patrol provides them with guns and the law allows them to defend themselves. The law allows for the use of deadly force when an agent reasonably fears imminent bodily injury or death. But, an agent is not permitted to shoot an unarmed suspect who is running away, regardless of whether the victim is illegally in this country or turns out to be a drug smuggler. In order to maintain the rule of law, federal prosecutors cannot look the other way when law enforcement officers shoot unarmed suspects who are running away, then destroy evidence, engage in a cover-up, and file official reports that are false.

---

[1]   The page numbers referenced herein are to the transcript available on the website at http://www.usdoj.gov/usao/txw/press_releases/index.html

There was no credible evidence that the agents were in a life-threatening situation or that Osvaldo Aldrete Davila, the Mexican alien, had a weapon that would justify the use of deadly force. In fact, Border Patrol Agent Oscar Juarez, who was at the scene, testified at trial that he did not draw his pistol because he did not believe that Aldrete posed a threat to his or Agent Compean's safety. *Vol. VIII, p. 173; Vol. IX, p. 22.* He also testified that Aldrete's hands were empty when Compean attempted to strike Aldrete with the butt of Compean's shotgun. *Vol. VIII, p. 176.* By the time Agent Juarez saw Compean shooting, Aldrete was almost in Mexico. *Vol. IX, p. 21-22.*

The crimes committed by these agents are felonies, not mere administrative oversights. This was not a simple case of discharge of a firearm that was not reported. The truth of this case is that Agents Ramos and Compean intentionally, and with the intent to kill, shot 15 times at an unarmed man who was running away from them and who posed no threat.

**Allegation:** **THE GOVERNMENT LET THE DRUG SMUGGLER GO FREE BY GIVING HIM BLANKET IMMUNITY**

<u>Response</u>: We are in the business of putting guys like Aldrete behind bars. In fact, this office leads the nation in the number of drug smuggling cases we prosecute. My office would have much preferred to see Aldrete convicted and sent to prison for his crimes. Aldrete was not prosecuted for the drugs he had on February 17, 2005, because of the conduct of Agents Ramos and Compean. Instead of arresting Aldrete as he attempted to surrender, Agent Compean tried to strike Aldrete with the butt of his shotgun. *Vol. VIII, p. 174-175; Vol. IX, p. 13; Vol. VII, p.107.* When Agent Compean missed, lost his balance and fell into a ditch, Aldrete ran around him and toward Mexico. *Vol. VIII, pp. 176-178.* Compean got up, ran after Aldrete, and fired at him fourteen times as Aldrete ran away. *Vol. XIII, pp. 161-164; Vasquez Transcript, pp.37-38; Vol. XIV, p. 153.* When Compean stopped shooting, Ramos fired once, *Vol. XII, p. 209,* and struck Aldrete in the buttocks. *Vol. VII, pp. 117-122.* Aldrete fell to the ground and waited for the agents to arrest him. *Vol. VII, pp. 122, 133.* According to Aldrete, when he saw the agents had turned and walked away, making no effort to apprehend him, he crossed the river into Mexico. *Vol. VII, pp. 123-125, 133.*

Because the agents failed to apprehend him, and because they later lied about the shooting, there was no way to prove Aldrete's involvement except through Aldrete's own admissions and cooperation. Even Ramos admitted that by not reporting the shooting, he prevented the recovery of evidence that would have made it possible to prove the marijuana case against Aldrete. *Vol. XIII, p. 88.*

With respect to the immunity offered to Aldrete, it is not unusual for prosecutors to give immunity to witnesses, victims and even defendants suspected of criminal activity, in order to secure testimony, evidence, or other participation in a case. Given Ramos' and Compean's criminal conduct in this case, there was insufficient, legally admissible, competent evidence to prosecute Aldrete in this case, *Vol. XIII, p. 88; Vol. XIV, pp. 70-71,* and we could not force him to return to the United States through extradition. His testimony and evidence were needed to investigate and prosecute violent criminal activity by federal agents. Accordingly, in exchange for his agreement to come to the United States and testify truthfully about the events that occurred on February 17, 2005, Aldrete was promised that he would not be prosecuted for offenses he disclosed that he committed on that date. This immunity, as a practical matter, gave up very little, since the case against him was not prosecutable.

**Allegation:**     **ALDRETE HAD A GUN AND THE AGENTS ONLY FIRED IN SELF DEFENSE**

Response: The jury in this case evaluated the testimony from Border Patrol agents, including the defendants, whose testimony established that Aldrete did not have a gun in his hands when Compean had an opportunity to arrest him. Agent Juarez testified that Aldrete's hands were visible and empty as Aldrete approached Compean. *Vol. VIII, pp. 175-176; Vol. IX, p. 155.* Ramos testified that he did not see anything in Aldrete's hands as Aldrete moved through the ditch. *Vol. XIII, p. 43.* Compean testified that Aldrete's hands were empty as he went through the ditch and later, that Aldrete had no weapon in his hands. *Vol. XIII, pp. 154-155; Vol. XIV, pp. 66-68, 71-72.* In his statement to investigators, Compean admitted that Aldrete had attempted to surrender with both hands open and in the air. In their sworn testimony, Agents Juarez and Compean both confirmed that Aldrete had his hands in the air, *Vol. VIII, p. 175; Vol. IX, pp. 155-156; Vol. XIII, pp. 154-155; Vol. XIV, pp. 66-68, 71-72,* in an apparent effort to surrender.

Testimony also revealed that Agents Ramos and Compean never took cover nor did they ever warn the other agents to take cover. *Vol. VIII, p. 176; Vol. X, pp. 168-169.* This action contradicts their claims that they believed they were in danger. Had Agents Ramos and Compean truly believed Aldrete was a threat, they would not have abandoned him after the shooting, *Vol. VII, pp. 122-125,* and they would have warned their fellow agents who arrived at the scene to stay out of the open while an armed suspect was on the loose.

Agent Compean testified that after the shooting, he picked up his spent casings and threw them into the drainage ditch. *Vol. XIII, pp. 165-166; Vol. XIV, p. 157.* He even admitted that he may have picked up Ramos' casing. *Vol. XIV, p. 158.* He could not explain at trial why he did this. *Vol. XIII, pp. 165-166; Vol. XIV, pp.156-158.* Agent Arturo Vasquez testified that Compean actually removed the casings from the scene, showing them to Vasquez as Compean was returning to the Fabens Border Patrol Station. *Vasquez Transcript, pp. 36-38.* According to Vasquez, Compean showed him nine spent casings and calculated he was missing five more, based on the number of live rounds remaining in his magazine. *Vasquez Transcript, pp. 37-38.* If the agents had believed that the shooting was justified, they would have left the crime scene undisturbed and let the investigation absolve them. Their conduct established that the agents knew that Aldrete did not have a weapon and they knew he posed no threat to them as he fled.

Immediately following the shooting, when Ramos encountered Agent Jose Luis Mendoza near the van, Ramos did not say he was in fear for his life or that he shot at anyone. *Vol. X, p. 35.* While Compean confessed to his fellow agents, David Jacquez and Vasquez, that he shot at the driver, he did not tell them that the driver had a gun, that he saw something shiny in the driver's left hand, or that he or Ramos were ever in danger. *Vol. X, pp. 69-70, 80; Vasquez Transcript, p. 35.* Had Aldrete actually had a gun or a shiny object in his left hand, or had Aldrete truly posed a danger to either Ramos or Compean at any time, they would have broadcast to any and everyone that the driver had a gun.

**Allegation:**     **THE AGENTS WERE NOT SURE OF WHAT THEY SAW BECAUSE IT WAS IN THE MIDDLE OF THE NIGHT**

Response: The events of Feb. 17, 2005, occurred at approximately 1:00 P.M. MT. *Vol. VIII, pp. 103-104; Vol. X, p. 191.*

**Allegation:     AGENT COMPEAN WAS BLOODIED FROM A STRUGGLE WITH ALDRETE**

Response: Compean testified at trial that he had a cut to his hand and a cut to his chin. *Vol XIII, p. 168.* He told Agent Mendoza that he cut his chin when he slipped and fell trying to apprehend Aldrete. *Vol. X, pp. 32-33.* Agent Jacquez noticed the cut between Compean's thumb and finger, but did not consider the injury to be traumatic. *Vol. X, p. 90.* Compean cleaned up the cuts in the bathroom at the station. *Vol. XI, p. 77.* Compean twice told his supervisor that he had not been hit or assaulted by Aldrete. *Vol. X, pp. 217; Vol. XI, p. 77.* He also refused to fill out an injury report. Had Compean been assaulted he would have reported this to his supervisor. *Vol. X, p. 217.*

**Allegation:     AGENT RAMOS CLAIMS THAT THE BULLET EXTRACTED FROM ALDRETE MIGHT NOT HAVE COME FROM HIS SERVICE WEAPON**

Response: Agent Ramos stipulated and agreed before trial that the bullet extracted from Aldrete came from his service weapon. *Vol. VII, pp. 118-121.* This stipulation was based on independent forensic analysis that Ramos did not dispute at trial.

**Allegation:     THESE AGENTS DID NOT REPORT THE SHOOTING TO SUPERVISORS BECAUSE THE SUPERVISORS WERE ON THE SCENE OF THE SHOOTING**

Response: The evidence introduced at trial and credited by the jury demonstrated that no supervisors were on the scene during the shooting. Two supervisors arrived after the shooting. *Vol. X, pp. 22-25.* Field Operations Supervisor Jonathan Richards arrived after the shooting, after all but two other agents were already on the scene. *Vol. X, p. 209.* Supervisor Robert Arnold arrived shortly after Richards. *Vol. X, p. 216; Vol. XI, p. 72.* Richards was not aware there had been a shooting, *Vol. X, p. 225,* and no one reported the shooting to him. Supervisor Richards testified that he first learned of the shooting when he was interviewed about the incident by the agent of the Inspector General in mid-March, about a month after the shooting. *Vol. X, p. 239.* Supervisor Arnold first learned of the shooting in mid-March, when he was told two agents were soon to be arrested for it. *Vol. XI, p. 78.*

Ramos admitted that he knew Border Patrol policy required him to report a shooting within an hour. *Vol. XIII, pp. 18-19.* He had been a firearms instructor *Vol. XIII, pp.19-20* and a member of the evidence recovery team responsible for investigating shootings. *Vol. XIII, p. 84.* Compean also knew he was required to report the shooting and he did not. *Vol. XIV, pp.169-170.* Compean admitted to Luis Barker, then the Chief of the El Paso Border Patrol Sector, that he knew he had to report the shooting and that he knew it was wrong for him and Ramos not to report the shooting. *Vol. XI, p.167.* Compean admitted to Barker that he knew that if he had reported the shooting, they would have gotten in trouble. *Vol. XI, p.167.*

**Allegation:     THESE AGENTS DID NOT REPORT THE SHOOTING BECAUSE BORDER PATROL POLICY PROHIBITS THEM FROM DOING SO**

Response: Border Patrol policy requires that a Border Patrol agent who fires his or her weapon anytime (on or off duty), must notify their supervisor within an hour. Further, Border Patrol policy requires that all who participated in or observed the shooting shall report it to their supervisor. Testimony of several agents and supervisors as well as the transcript of the radio transmissions, indicate that no supervisor was on scene at the

time of the shooting. Yet, neither Ramos nor Compean reported the shooting of Aldrete as required by Border Patrol policy. Ramos' assertion that supervisors already knew about the shooting, or that someone else had reported it, is inaccurate, unsupported by the evidence, and did not excuse their obligation to report within an hour.

Additionally, Compean proceeded to write the I-44 report (the Report of Apprehension or Seizure) concerning the incident, with input from Ramos. The report made no reference to several key events that afternoon, including Compean's encounter with Aldrete on foot in the ditch, his having pointed the shotgun at Aldrete, the ensuing foot chase as Aldrete fled, and the firing of shots at Aldrete. The claim that Border Patrol policy does not require the reporting of a shooting in the I-44 is specious. To protect agents involved in shootings from self-incrimination, the Border Patrol practice allows for an agent other than the one involved in the shooting to write the I-44. The I-44 still must include all significant information about the events being reported. That includes the fact that shots were fired. By undertaking to write the I-44, Compean was required to write a truthful report, not a report that contained material omissions amounting to falsehoods. Indeed, in the context of Border Patrol practices and policy, by undertaking to write the I-44, Compean was intentionally creating the impression that there was no shooting. And by omitting the relevant facts, with the aid of Ramos, they submitted and caused to be submitted a false report.

**Allegation:**   **THE BALLISTICS REPORT FAILED TO PROVE THE BULLET CAME FROM RAMOS' GUN AND THE MEDICAL REPORT OF THE BULLET ENTRY WAS CONSISTENT WITH RAMOS' CONTENTION THAT THE SMUGGLER WAS TURNING AROUND WITH WHAT LOOKED LIKE A WEAPON**

Response: Agent Ramos stipulated and agreed before trial that the bullet extracted from Aldrete came from his service weapon. *Vol. VII, pp. 118-121.* This stipulation was based on independent forensic analysis that Ramos did not dispute at trial. The stipulation was entered into evidence at trial with Ramos' agreement. Regarding Aldrete's movements at the time the bullet struck him, the medical testimony was inconclusive. *Vol. IX, pp. 197-98.* The doctor testified he could not know exactly how Aldrete was turned. *Vol. IX, p.195.*

**Allegation:**   **RAMOS AND COMPEAN DID NOT BELIEVE THEY WOUNDED THE SMUGGLER BECAUSE HE KEPT RUNNING AND ESCAPED ACROSS THE BORDER INTO A WAITING VEHICLE**

Response: This assertion is directly contradicted by Compean's handwritten statement provided to the investigator in which Compean stated "I think Nacho [Ramos] might have hit him." *Vol. XIV, p. 155.*

**Allegation:**   **RAMOS AND COMPEAN'S ONLY "LIE" WAS THAT THEY GAVE AN INCOMPLETE REPORT OF THEIR CONFRONTATION WITH THE SMUGGLER ON FEBRUARY 17, 2005**

Response: These agents were prosecuted and convicted of the serious felony offenses of illegally using deadly force when their lives were not in danger, depriving another of rights under color of law and obstructing justice. There was no credible evidence that the agents were in a life-threatening situation or that Aldrete had a weapon that would justify the use of deadly force. In fact, Border Patrol Agent Juarez, who was at the scene, testified at trial that he did not draw his pistol because he did not believe that Aldrete posed a threat to his or

Agent Compean's safety. *Vol. VIII, p. 173; Vol. IX, p. 22.* He also testified that Aldrete's hands were empty when Compean attempted to strike Aldrete with the butt of Compean's shotgun. *Vol. VIII, pp. 175-176.* By the time Agent Juarez saw Compean shooting, Aldrete was almost in Mexico. *Vol. IX, p. 22.*

**Allegation:**    **THE GOVERNMENT SHOULD HAVE PROSECUTED THE DRUG SMUGGLER AND GIVEN IMMUNITY TO THE BORDER PATROL AGENTS**

Response: My office would have much preferred to see Aldrete convicted and sent to prison for his crimes. We are in the business of putting guys like Aldrete behind bars. In fact, this office leads the nation in the number of drug smuggling cases we prosecute. Because the agents could not identify him, found no fingerprints tying him to the van and did not apprehend him after shooting him, the case against Aldrete could not be proved. Furthermore, the shooting of a fleeing suspect who posed no threat to agents Ramos and Compean is a serious crime that federal prosecutors could not ignore.

**Allegation:**    **THE GOVERNMENT USED THE WRONG LAW THAT CARRIES A MANDATORY ADDITIONAL 10 YEAR SENTENCE.**

Response: The prosecution used the law that Congress enacted. Congress made it a crime to discharge a firearm during a crime of violence, punishable by a mandatory prison term of at least ten years. Agents Ramos and Compean committed that crime, as well as others. Congress did not provide an exemption for law enforcement officers. The crimes committed by these agents were serious -- shooting 15 times at a fleeing, unarmed suspect -- and because of that this charge was warranted.

**Allegation:**    **THE GOVERNMENT WITHHELD CRUCIAL EVIDENCE FROM THE JURY**

Response: The prosecution did not withhold any admissible evidence from the jury. The prosecution provided the defense an opportunity to see the government's evidence before trial. This is standard operating procedure. The trial judge ruled on a number of evidentiary issues during trial, and excluded evidence that was not relevant or admissible under the Federal Rules of Criminal Procedure and the Federal Rules of Evidence, which govern all federal trials. Those rulings are subject to review on appeal by the Fifth Circuit Court of Appeals and the United States Supreme Court. This procedure is what distinguishes a trial at law from a street fight or free-for-all. Deciding guilt or innocence according to established rules is what makes this a civilized country.

**Allegation:**    **THE JUDGE KEPT FROM THE JURY ALDRETE'S CLAIM THAT HIS FRIENDS HAD CONSIDERED A "HUNTING PARTY" TO GO SHOOT SOME BORDER PATROL AGENTS**

Response: These allegations were addressed by the district court. *Vol. VII, pp. 215-217.* The admissibility of testimony is committed to the discretion of the trial judge, based on the Federal Rules of Evidence and other legal precedent, and is subject to review by the Court of Appeals. Beyond that, the government cannot comment other than to say that the defendants received a fair and thorough trial and will have full opportunity to have their case reviewed on appeal.

**Allegation:**     **A DEPARTMENT OF HOMELAND SECURITY MEMO DATED MAY 15, 2005, SHOWS THAT THE TWO AGENTS DID GIVE A PROMPT, COMPLETE, ORAL REPORT TO SUPERVISORS WHO WERE ACTUALLY PRESENT ON FEBRUARY 17, 2005.  THE SUPERVISORS DECIDED NOT TO MAKE A WRITTEN REPORT**

Response: The evidence demonstrated that no supervisors were on the scene during the shooting.  Two supervisors arrived after the shooting.  Field Operations Supervisor Jonathan Richards arrived after the shooting, after all but two other agents were already on the scene. *Vol. X, p. 209.*   The second supervisor, Robert Arnold, arrived shortly after Richards. *Vol. X, p. 216; Vol. XI, p. 72.*  Radio transmissions admitted at trial corroborated this testimony. Richards was not aware there had been a shooting, *Vol. X, p. 225,* and no one reported the shooting to him. Supervisor Richards first learned of the shooting when he was interviewed about the incident by the Inspector General agent in mid-March, about a month after the shooting. *Vol. X, p. 239.* Supervisor Arnold first learned of the shooting in mid-March, when he was told two agents were soon to be arrested for it. *Vol. XI, p. 78.*  Both Ramos and Compean admitted in their testimony at trial that they did not report the shooting as required.

Ramos admitted that he knew Border Patrol policy required him to report a shooting within an hour. *Vol. XIII, pp. 18-19.*  He had been a firearms instructor and a member of the evidence recovery team responsible for investigating shootings. *Vol. XIII, pp. 19-20, 84.*  Compean also knew he was required to report the shooting and he did not. *Vol. XIV, pp. 169-170.*

**Allegation:**     **THESE AGENTS WERE SENTENCED TO TOO MUCH TIME IN FEDERAL PRISON**

Response:  Congress determined the penalties imposed on Ramos and Compean by setting the punishment for discharging a firearm during a crime of violence at a mandatory minimum of ten years (in addition to any other sentence imposed). Title 18, United States Code section 924(c)(1)(A)(iii).  Congress did not make an exception for law enforcement officers.  Instead, Congress specifically debated the issue and determined that no exception should be made and that the law should apply to officers who misuse their privilege to carry a firearm.

**Allegation:**     **SINCE THE TRIAL, JURORS HAVE STATED THAT THEY WERE COERCED BY THE FOREPERSON INTO RENDERING A GUILTY VERDICT**

Response:  Because an appeal is pending, we cannot directly comment on the content or legal implication of possible juror statements.  However, we can clarify a few facts.  On March 8, 2006, the jurors were polled in open court immediately after announcing their verdicts and all said without hesitation or equivocation that the verdicts were theirs.  Ramos and Compean filed motions for new trials based on juror affidavits in October 2006.  The government responded and the District Court denied their motion.

**Allegation:**     **RAMOS WAS IMPROPERLY PLACED IN THE GENERAL PRISON POPULATION WHERE HE WAS BEATEN.**

Response: Ramos was processed into the federal prison system in much the same manner as other former law enforcement officers who are convicted of crimes and currently serving sentences in prison.  As a general

matter, the Federal Bureau of Prisons (BOP) determines the appropriate institution in which to house inmates based on information from many sources, including the courts, the probation office, the U.S. Marshals Service and the prisoner. There are some inmates who, based on their backgrounds and other characteristics, have difficulty functioning in the general population. The BOP has the ability to segregate such offenders from other inmates. When inmates arrive at the institution to which they have been designated, as a part of the intake screening process, staff discuss with inmates the living conditions in segregation and in general population. The decision to segregate is based on the totality of the circumstances and necessarily limits the prisoner's freedom of movement, recreation, visitation, and communication. As such, whenever it is possible to do so safely, inmates are housed in the general population.

In this case, Compean, through his counsel, requested to be separated from the general prison population, and he was. In response to BOP's inquiry, Ramos' counsel indicated in a letter that Ramos did not want to suffer any of the "punitive consequences" of segregation and that he preferred to be housed in the general population. The Federal Bureau of Prison's objective is to ensure that all of its more than 195,000 inmates are housed safely and securely and provided appropriate programs and services, including appropriate medical care.

**Allegations:    THE GOVERNMENT WOULD NOT RELEASE THE TRANSCRIPT OF THE TRIAL WITHOUT WHICH THE BORDER PATROL AGENTS COULD NOT APPEAL**

<u>Response</u>: The United States Attorney's Office has no involvement in the preparation of the trial transcript and made it available to the public soon after it was received. Indeed, our office requested an expedited copy of the trial transcript from the court reporter on October 17, 2006, even though the government did not plan to bring an appeal. The transcript was received from the court reporter on Friday, February 9, 2007, and as a public service, we posted it to our website by Tuesday, February 13, 2007.

The ability of Ramos and Compean to appeal has no relation to the prosecution receiving a copy of the transcript. The former agents had the same ability to order the transcript from the court reporter as the prosecution.

**Allegation:    THE GOVERNMENT DENIED RAMOS AND COMPEAN'S FREEDOM PENDING APPEAL**

<u>Response</u>: The district court properly applied the law enacted by Congress, which mandated the agents' detention pending appeal after they were convicted of crimes of violence. On February 22, 2007, the Court of Appeals for the Fifth Circuit affirmed the District Court's ruling, No. 06-51489.

**Allegation:    ALDRETE HAS BEEN SUBSEQUENTLY ARRESTED FOR SMUGGLING MORE DRUGS INTO THE UNITED STATES, BUT THE GOVERNMENT WILL NOT PROSECUTE HIM**

<u>Response</u>: Our office aggressively prosecutes drug offenders every day in court. If we had a provable case against Aldrete, we would prosecute him. There have been allegations about subsequent drug activity by Aldrete. As of today, to our knowledge there has been no arrest or indictment of Aldrete for any drug activity. As a general matter, U.S. Attorneys' offices do not comment on pending investigations. Moreover, because

some evidence evaluated by the trial court has been placed under seal and the appeal in this case is currently pending, we cannot comment specifically on the facts alleged by some in the media and Congress.  But, to be clear, the immunity provided to Aldrete extended only to offenses committed on February 17, 2005.  In conjunction with law enforcement agencies that investigate crimes, this office vigorously enforces the nation's laws, and will continue to do so.  If we obtain information that gives us a provable case of criminal activity by Aldrete, we will prosecute him.

**Allegation:**    **THE DRUG SMUGGLER WAS AWARDED A GREEN CARD OR OFFERED PERMANENT RESIDENT STATUS IN EXCHANGE FOR HIS TESTIMONY**

Response: Aldrete was not given a green card or offered permanent resident status in the United States.  As is common practice in investigations and law enforcement operations that require assistance from persons not legally residing in the United States, immigration officials obtained "paroles" or fixed term, limited use documents that permitted Aldrete to enter the United States.  In this case, Aldrete was permitted to enter the United States for medical treatment associated with the removal of the bullet, a key piece of evidence in the case, as well as to help prepare for and provide testimony at trial in El Paso.  To the best of our knowledge, the last time he was legally allowed to enter the United States was in February 2006, to testify at trial.

**Allegation:**    **ILLEGAL ALIENS DO NOT HAVE ANY CONSTITUTIONAL RIGHTS**

Response: The United States Supreme Court has held that the Constitution protects all persons in the United States whether they are here legally or illegally.  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).   It is a violation of the Fourth Amendment to shoot an unarmed person who poses no threat to the shooter.  *Tennessee v. Garner*, 471 U.S. 1 (1985).  This law applies regardless of immigration status.  *Zadvydas*, 533 U.S. at 693.

**Allegation:**    **AGENT RAMOS WAS BORDER PATROL AGENT OF THE YEAR**

Response: Agent Ramos has never received any formal recognition or award for being the Border Patrol Agent of the year.  In fact, he has been arrested on at least three occasions for domestic abuse and was formally suspended by the U.S. Border Patrol on two occasions. *Vol. IV, pp. 3-22.*

EXHIBIT 3

Testimony
*United States Senate Committee on the Judiciary*
<u>**Hearing to Examine the Prosecution of Ignacio Ramos and Jose Compean**</u>
**July 17, 2007**

**The Honorable Johnny Sutton**

STATEMENT OF JOHNNY SUTTON
UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF TEXAS
UNITED STATES DEPARTMENT OF JUSTICE
BEFORE THE COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE
CONCERNING "A HEARING TO EXAMINE THE PROSECUTION OF
IGNACIO RAMOS AND JOSE COMPEAN"
PRESENTED ON
JULY 17, 2007

Chairman Leahy, Senator Specter, and members of the Committee, thank you for the invitation to discuss the importance of enforcing the rule of law, even against those who are sworn to uphold the laws and the Constitution of the United States.

The prosecution of Jose Compean and Ignacio Ramos has been the subject of widespread media attention and heated debate. This prosecution, however, was not about illegal immigration, illegal drug smuggling, or supporting agents who patrol the border. It was about upholding the law, plain and simple, a duty which our Nation's federal prosecutors take very seriously. The overwhelming majority of federal agents and police officers represent the best of America, and they show it every day through their bravery, dedication, and self-sacrifice. But experience has shown us that occasionally some law enforcement officers will step over the line and commit crimes. And when lawmen break the law we must hold them to account.

There has also been some debate—brought on in part by this case—about enforcing gun laws that were passed by the Congress. The fact is that it is a crime to discharge a firearm during a crime of violence, and we will continue to bring those charges where the law and the evidence warrant.

After a two-and-a-half week trial, at which they were represented by four experienced and capable attorneys, Jose Compean and Ignacio Ramos were found guilty by a jury of 11 counts of assault, violation of civil rights, use of a firearm during a crime of violence, and obstruction of justice. Since their convictions, it has been clear that some individuals do not understand the facts of the case, while others are merely concerned with using it to make a point about some other issue, such as illegal immigration. While these convictions are currently on appeal—meaning the case is still a pending matter—I would like to set the record straight by discussing the ample facts already in the public record, but I will be limited to discussing only information in the public record.

The facts of what occurred near Fabens, Texas, on February 17, 2005, can be found in the trial record, the transcript of which I have posted on the website of the U.S. Attorney's Office for the Western District of Texas. As in all trials, some of the facts were uncontested, others were hotly disputed. Not surprisingly, the defendants maintained, as they continue to maintain, that their actions were justified. I believe—as the jury concluded after hearing the testimony of agents at the scene, the drug smuggler who was shot, and the defendants themselves—that the agents shot at and struck an unarmed, fleeing drug smuggler; that they deliberately failed to report the shooting as they were required to do; that

they destroyed evidence to cover up their actions; and that they did these things willfully and in violation of the laws they were sworn to uphold.

The facts are these: On that February afternoon, Border Patrol Agent Jose Compean observed a light blue van leaving the area near the U.S.–Mexico border where movement had been detected. He called out the activity on his radio and Border Patrol Agent Oscar Juarez began following the van. Aware that he was being followed, the driver of the van, Osvaldo Aldrete Davila, changed course in Fabens and drove back toward the river and Mexico. At about that time, Border Patrol Agent Ignacio Ramos joined the pursuit and took the lead position behind Aldrete's van. The agents suspected the van contained a load of illegal drugs, and the flight and pursuit reached high speeds until the van got to a drainage canal and levee, which run parallel to the river. Aldrete abandoned the van, ran into the ditch, and began climbing up its south side, where Agent Compean confronted him brandishing a shotgun. Aldrete kept moving up toward Compean, holding up his empty hands. Witness testimony established that Aldrete did not have a gun or weapon in his hands. By then, Ramos and Agent Juarez were on foot on the north side of the canal. As Ramos moved into the canal to cross in pursuit, someone yelled, "Hit him," and Compean swung his shotgun to strike Aldrete in the head. Aldrete and Agent Juarez testified that Compean lost his footing and fell. Aldrete darted around Compean, ran out of the canal, up and over the levee and across the flat, open vega toward the river. Compean recovered, ran after Aldrete, drew his pistol, and fired numerous times at the fleeing Aldrete. He stopped once to change the magazine. Meanwhile, Ramos reached the south side of the canal, ran across the levee, drew his pistol, and fired once. At no time did either agent call routine warnings to other agents on the scene that Aldrete was armed or dangerous. Ramos's shot struck Aldrete in the buttocks. The bullet, which the defendants stipulated was a match to Ramos's gun, was later removed from Aldrete's leg. Aldrete fell to the ground near the river and waited for agents to arrest him. Although Compean admitted that he believed Ramos's shot had hit Aldrete, they did not pursue Aldrete. Instead, they holstered their weapons and walked back toward the levee and canal. When the agents never came, Aldrete made his way across the river. While walking back toward the canal with Ramos, Compean picked up some of their empty shell casings, and—according to his own testimony—threw them into the canal, thus destroying evidence of the shooting. At trial, Compean could not explain why he did this.

Another agent, Arturo Vasquez, testified that Compean later showed him nine empty casings, and calculated that he had left five more at the scene. Vasquez said he collected five more casings at the scene, threw them into the drainage ditch, and notified Compean by cell phone. Compean denied showing Vasquez the empty casings, but admitted he asked Vasquez to pick up the casings remaining at the scene. When supervisors arrived at the scene after the shooting, neither Compean nor Ramos reported they had fired their weapons, as they knew they were required to do. Shortly after the shooting, agents discovered that the van contained over 700 pounds of marijuana. In writing up the report of the pursuit and seizure, Compean omitted any reference to the shooting by himself and Ramos.

The significant fact disputed by defendants was whether Aldrete appeared to be armed after he eluded Compean and ran across the vega toward the river. Ramos testified that Aldrete turned back toward them as he ran and that he believed Aldrete had a gun in his left hand. Compean testified that after Aldrete got away from him and ran toward the river, Aldrete turned back toward them and pointed something black and shiny. Their testimony was not credible for several reasons. First, if it were true, there was no reason for Compean and Ramos to alter evidence at the scene by disposing of the casings and not report the shooting. A prompt investigation would have cleared them. Second, neither of them acted as if or said things at the time that indicated they believed Aldrete was armed. Neither agent shouted routine warnings to others that the suspect was armed. After the shooting, Compean

acknowledged to two other agents that he shot at the driver, but he never said anything about Aldrete possessing a gun, seeing something shiny in Aldrete's hand, or that he or Ramos were ever in danger. Immediately following the shooting, Ramos encountered an agent near the abandoned van, but made no mention of the shooting or having been in fear for his life. It was not until a month later, after he was arrested, that Compean for the first time mentioned that he thought he saw something shiny in Aldrete's hand as he ran toward the river. Third, their belated claims that Aldrete possessed a weapon as he ran simply were not plausible given the other evidence. It was undisputed that Aldrete's hands were empty as he crossed the drainage canal. Compean was the last agent between him and the river. If Aldrete possessed a gun, the time for him to draw it was when he was confronted by Agent Compean, not after he had broken free and was nearly to Mexico in a full sprint. Once Aldrete got past Compean he had no need to brandish a firearm.

On those facts, my office had an obligation to prosecute Agents Compean and Ramos. I know that we demand much of Border Patrol agents. They have difficult jobs, they work in harsh conditions in isolated areas, and they encounter dangerous people, some of whom will not hesitate to cause them harm. I admire Border Patrol agents and as I have said many times in recent months, I believe they are American heroes. But the sad fact is, a small percentage of law enforcement agents—including some Border Patrol agents—cross the line. When Border Patrol agents go wrong, as I believe Compean and Ramos did, faithfulness to the rule of law requires us to bring them to justice.

The facts of this case stand on their own, and they make it clear that this prosecution was not about immigration policy or aggressive drug enforcement. My office has aggressively prosecuted criminal immigration violations throughout my term. Data from the Department of Justice indicates that the Western District of Texas is one of the busiest districts in the Nation, and has been for some time. Of the approximately 6,000 defendants my office prosecuted for felony offenses last fiscal year, about 35 percent were charged with drug offenses and almost 53 percent were charged with immigration violations. With Operation Streamline in our Del Rio Division—as well as the Border Patrol's Yuma Sector—we have one of the only "zero tolerance" programs for illegal entrants along the Southwest Border. We have prosecuted more than 20,000 defendants since November 2005 for misdemeanor entry without inspection in Del Rio. In support of federal law enforcement officers, since I took office in November 2001, I have prosecuted approximately 98 defendants for assaulting federal officers. Many of those include assaults on Border Patrol agents.

Much has been made of the fact that my office gave use immunity to Osvaldo Aldrete Davila, an illegal alien and drug smuggler. The fact is, because of the unlawful conduct of Compean and Ramos surrounding the seizure of Aldrete's load, and because they did not arrest him after they shot him, we did not have and could not obtain enough reliable, admissible evidence to prosecute him for his drug load. Without his assistance or cooperation, we also did not have enough evidence to prosecute Compean and Ramos for their crimes. We made the difficult decision to give him use immunity so that we could obtain the bullet from his leg and secure his testimony about the shooting. Since we would not be able to successfully prosecute him for the drug crime, I believe we were giving up very little; something we did not have and could not get: crucial evidence to prosecute him. Although we cannot now prosecute him for the events of February 17, 2005, I can assure you that if we develop sufficient evidence to prosecute him for offenses on other dates I intend to do so.

There has been much talk lately about a second load of marijuana, or the "October load." Aldrete's alleged involvement in a second load is the subject of an ongoing investigation. For reasons that should be obvious, I cannot discuss an ongoing investigation. I can say this: we presented to the trial judge and the defense the information we then possessed about the so-called October load. The judge evaluated the information and ruled it was not relevant to the issues in the trial of Compean and

Ramos. Whether our advocacy and the judge's determination were sound will be decided by the Court of Appeals.

Some critics have claimed that all drug smugglers like Aldrete carry guns, and that my prosecution of Agents Compean and Ramos had a chilling effect on other Border Patrol agents, causing them to fear using their firearms. I believe both assertions are mistaken. From January 2004 through March 2005, there were 155 drug seizures at the Fabens Border Patrol Station, totaling over 43,000 pounds of marijuana. In none of those seizures was a gun found. Over the longer period between October 1, 2001, and February 15, 2006, the Fabens Border Patrol Station reported the seizure of only one firearm from a total of 496 drug seizures, totaling more than 131,000 pounds of marijuana. This is not to say Border Patrol agents' jobs are not difficult and dangerous, or that drug smugglers are never armed, but it is inaccurate and misleading to assert that all drug smugglers are armed. The fact is that drug mules in El Paso almost never carry guns.

I would like to respond directly to the unfounded and irresponsible allegations that I, as United States Attorney, or the prosecutors on my staff, are vindictive toward or that we persecute Border Patrol agents. During approximately the last six years, there were at least 14 reported shootings by Border Patrol agents in the El Paso Sector. In three of these shootings, the agents killed the suspects. In each of those shootings, the Border Patrol agent was cleared and the shooting ruled justified. None of these agents were prosecuted or even disciplined, because their actions were reasonable under the circumstances. If recent events in El Paso are any indication, Border Patrol agents have not stopped using their weapons. I am aware of at least two reported shootings by Border Patrol agents in El Paso within the last month. One of those shootings has already been cleared and one remains under review. The fact is, Border Patrol agents are thoroughly trained in the use of deadly force. By design, the law accords great deference to agents, recognizing that they must often make split-second, life-or-death decisions under great stress. As a general rule, if an agent has any reasonable basis for fearing for his immediate safety or the safety of another, use of deadly force is justified. However, agents having no fear of imminent harm who intentionally shoot at an unarmed, fleeing suspect, and then cover up the shooting, should be prosecuted. Requiring law enforcement officers to obey the law is not unreasonable and is not a deterrent to the use of deadly force when lives are at risk.

Some have argued that the mandatory prison sentences imposed on Compean and Ramos are unduly harsh. Reasonable people can disagree about punishment. Sentencing issues and the appropriate allocation of discretion in sentencing decisions have been the subject of much litigation, legislation and Sentencing Guidelines amendments for the last 20-plus years. Charging decisions at the Department of Justice are made in accordance with the long-standing policy that we pursue the most serious, readily-provable offense or offenses that are supported by the facts of the case. In my district, the process begins when an agent or officer presents the facts to a line Assistant United States Attorney (AUSA), who evaluates whether there is sufficient, admissible evidence to make a prosecutable case. If there is sufficient evidence to prove beyond a reasonable doubt that the defendant committed a federal crime, then the line AUSA will consider whether it is appropriate to actually file a case. The line AUSA will decide if a federal interest needs to be vindicated and allocating resources on the prosecution is warranted and appropriate. Often the chief of the division will review the case and approve the indictment. This process is completely independent of the procedure for administrative punishment of Border Patrol agents; the Border Patrol makes its own decisions about whether to pursue administrative sanctions against its agents.

Compean and Ramos were charged with unlawfully using their firearms during a crime of violence, a violation of 18 U.S.C. section 924(c). While we have chosen not to prosecute this statute in some cases, for specific reasons, we have also charged it in a number of other cases involving crimes committed by law enforcement officers. For example, we charged a Crystal City, Texas, police officer

with violating 924(c), because he jammed the barrel of his gun into the mouth of a handcuffed arrestee and caused significant injury to the mouth. We charged four San Antonio police officers with multiple violations of section 924(c) because they had their service weapons available to guard loads of what they believed to be cocaine. We charged a Balcones Heights, Texas, police officer with violating 924(c), based on his possession of his weapon when he raped a woman after removing her from her vehicle after a traffic stop. And these are just cases from my district.

A few more examples: In the Southern District of Mississippi, a deputy sheriff was charged with violating 924(c) after shooting an unarmed victim in the back when the individual stopped and raised his hands to surrender after a high-speed chase. In the Western District of New York, three Buffalo police detectives were charged and convicted of 924(c) violations after executing search warrants based on false or misattributed information, stealing property, and then inflicting bodily injury on the occupants. These charges were based on the fact that they unlawfully used and carried firearms in the commission of a crime. In the District of Puerto Rico, a police sergeant was charged after shooting at and wounding two motorcyclists who were speeding. In the Western District of Tennessee, four Memphis police officers were charged after using their guns to rob drug dealers of their drugs and money for personal gain. Juries appear to have weighed these charges carefully, convicting the defendants of the offense in some cases and acquitting in others. There seems little doubt, however, that Compean and Ramos used their firearms.

The Congress has been clear that it wants to reduce gun violence and that there should be strict punishment for defendants who commit crimes using firearms, and section 924(c) gives prosecutors a strong tool to accomplish that goal. In fact, the ten-year sentence for using a firearm during the commission of a crime of violence was set by the Congress, and under the statute, that sentence increases depending on the role of the firearm in the offense, with an increased penalty if the firearm is brandished and another if the firearm is discharged. The Congress did not create an exception in 924(c) for law enforcement officers who use a gun in the commission of a crime.

The prosecution of Compean and Ramos was about our commitment to the rule of law and about two former law enforcement officers who committed serious crimes. An honest reading of the facts of this case shows that Compean and Ramos deliberately shot at an unarmed man in the back without justification, destroyed evidence to cover it up, and lied about it. A jury heard the facts and voted to convict. Faithfulness to the rule of law required me to bring this case.

Additional information is included in the document "Setting the Record Straight" which has been posted on my office's website since April and is attached as an appendix to this testimony. Thank you again for the opportunity to testify, and I look forward to answering the Committee's questions.

EXHIBIT 4

Warning   A nonimmigration who accepts unauthorized employment is subject to
deportation.
Important. Retain this permit in your possession, *you must surrender it when you
leave the U.S.* Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form. To
remain past this date, without permission from Department of Homeland Security
authorities, is a violation of the law.
Surrender this permit when you leave the U.S.:
   - By sea or air, to the transportation line;
   - Across the Canadian border, to a Canadian Official;
   - Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school, see
"Arrival-Departure" on page 2 of Form I-2) prior to surrendering this permit.

Record of Changes

212 (d)(5)

| | |
|---|---|
| | Departure Record |
| Port: | |
| Date: | |
| Carrier: | |
| Flight # / Ship Name: | |

Multiple entries per IAP Mullins
Christopher Sanchez Special Agent Badge #143

---

Departure Number

820299399 11

Department of
Homeland Security

CBP I-94A (11/04)
Departure Record

PAROLED UNTIL 04/15/2005
PURPOSE PUBLIC
INTEREST
EUP/BOA 03/16/05 #2035
(PORT) (DATE) (OFFICE)

Family Name
ALDERETE AVILA
First (Given) Name                    Birth Date (Day Mo Yr)
OSBALDO                               20 09 80
Country of Citizenship
MEXICO

20050316 US-VISIT          MULTIPLE

See Other Side                        STAPLE HERE

(1)

deportation.

**Important** Retain this permit in your possession; you must *surrender it* when you *leave the U.S.* Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. Official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

Record of Changes

Port:

Date:

Carrier:

Flight # / Ship Name:

Departure Record

8253398882

Department of Homeland Security

CBP I-94A (11/04)
Departure Record

**PURPOSE**

Family Name
ALDRETE DAVILA

First (Given) Name
OSVALDO

Country of Citizenship
MEXICO

Birth Date (Day Mo Yr)
20 09 80

20050506 US-VISIT

SINGLE USE

STAPLE HERE

See Other Side

②

Warning   A nonimmigration who accepts unauthorized employment is subject to
deportation.
Important  Retain this permit in your possession; *you must surrender it when you
leave the U.S.* Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form.To
remain past this date, without permission from Department of Homeland Security
authorities, is a violation of the law.
Surrender this permit when you leave the U.S.:
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school, see
"Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

**Record of Changes**

A 79190 H/77   MEDICAL
               HUMANITARIA
NUPRO JED BP CBP VENEZIA G

Port:                              Departure Record

Date:

Carrier:

Flight # / Ship Name:

---

Departure Number

82700787 7  1  PAROLED UNTIL SEP 01, 200

              PURPOSE  HUMANITARIA

Department of
Homeland Security        MEDICAL.

CBP I-94 A (11/04)       YSL-ELH 06-01-05 #0717
Departure Record
                         (PORT) (DATE) (OFFICE)

Family Name
ALDRETE DAVILA
First (Given) Name                  Birth Date (Day Mo Yr)
OSVALDO                             20, 09, 80
Country of Citizenship
MEXICO

20050601 US-VISIT  REQUIRES ENTRY

See Other Side                      STAPLE HERE

③

**Warning** A nonimmigration who accepts unauthorized employment is subject to deportation.

**Important** Retain this permit in your possession; *you must surrender it when you leave the U.S.* Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. Official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

**Record of Changes**

□ 212(D)(4)(A) ☒ 212(D)(5) PORT PUBLIC INTEREST
ADDRESS IN US 1200 GOLDEN KEY #230, EL PASO, TX 79925
ELP ONLY ☒ Y □ N HQ AUTHORIZED MULTIPLE ENTRY
A# 079 490 417

Port:
Date:
Carrier:
Flight # / Ship Name:

Departure Record

---

Departure Number

**838317105 11**

Department of Homeland Security

CBP I-94A (11/04)
Departure Record

PAROLED UNTIL Nov 14, 2005
PURPOSE Public Interest
VSL/ELP 09/14/05 01255
(PORT) (DATE) (OFFICE)

Family Name
**ALDERETE DAVILA**
First (Given) Name
**OSVALDO**
Birth Date (Day Mo Yr)
**20 09 80**
Country of Citizenship
**MEXICO**

20050915 US-VISIT    SINGLE USE

See Other Side    STAPLE HERE

(4)

See Other Side    ENGLISH    STAPLE HERE

Departure Number

441089909 10

PAROLED UNTIL
DECEMBER 15, 2005

PURPOSE
PUBLIC BENEFIT

Immigration and
Naturalization Service
I-94
Departure Record

Jay C. Gonz

ELP/10.7/05 SKC

(PORT)    (DATE)    (OFFICE)

MULTIPLE ENTRY

14. Family Name
ALDRETE DAVILA

15. First (Given) Name
OSVALDO

16. Birth Date (Day/Mo/Yr)
200380

17. Country of Citizenship
MEXICO

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

Warning - A nonimmigrant who accepts unauthorized employment is subject to
deportation.

Important - Retain this permit in your possession; you must surrender it when you
leave the U.S. Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form. To
remain past this date, without permission from immigration authorities, is a
violation of the law.
Surrender this permit when you leave the U.S.:
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school,
see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

Record of Changes

212 (d) (5)
A79 190 417

Departure Record

Port:
Date:
Carrier:
Flight #/Ship Name:

U.S. Government Printing Office

(5)

Departure Number

**441141178 10**

PAROLED UNTIL
**MARCH 31, 2006**

PURPOSE
**PUBLIC BENEFIT**

Immigration and
Naturalization Service
**I-94**
Departure Record

**ELP 1/24/06 SAC**

(POE)        (DATE)        (OFFICE)

## MULTIPLE ENTRY

14. Family Name
**A L D R E T E - D A V I L A**

16. Birth Date (Da/Mo/Yr)
**2 0 0 9 8 0**

15. First (Given) Name
**O S V A L D O**

17. Country of Citizenship
**M E X I C O**

See Other Side.                ENGLISH                **STAPLE HERE**

Warning - A nonimmigrant who accepts unauthorized employment is subject to
deportation.
**Important** - Retain this permit in your possession; *you must surrender it when you
leave the U.S.* Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form. To
remain past this date, without permission from immigration authorities, is a
violation of the law.
Surrender this permit when you leave the U.S.:
   - By sea or air, to the transportation line;
   - Across the Canadian border, to a Canadian Official;
   - Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school,
see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.
                    Record of Changes

**212 (d) (5)**
**A79 190 417**

                                        Departure Record

Port:

Date:

Carrier:

Flight #/Ship Name:

For sale by the Superintendent of Documents, U.S. Government Printing Office
                    Washington, D.C. 20402

6