**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  07-0506 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel, respectfully submits this

motion for partial summary judgment against Defendant U.S. Department of Justice ("DOJ").[1]

As grounds therefor, Judicial Watch states as follows:

**MEMORANDUM OF LAW**

**I.    Introduction**.

On January 24, 2007, Judicial Watch sent a FOIA request to DOJ seeking access to the

following records:

> a.    Communications between DOJ and any/all officers, agencies
> and/or representatives of the Government of Mexico concerning
> Osbaldo Aldrete-Davila, a Mexican national who testified in the
> prosecution of U.S. Border Patrol Agents Ignacio "Nacho"
> Ramos and Jose Alonso Compean over a shooting incident in
> Texas on February 17, 2005.
>
> b.    Communications between DOJ and the U.S. Department of
> State and/or the Department of Homeland Security (and its
> subordinate agencies) concerning Osbaldo Aldrete-Davila,

---

[1]    This motion for partial summary judgment is against DOJ only.  The parties
submitted a joint stipulation of partial dismissal as to Defendant U.S. Department of State on
October 26, 2007.  On October 5, 2007, the Court granted Defendant U.S. Department of
Homeland Security's motion for an *Open America* stay.

a Mexican national who testified in the prosecution of U.S. Border Patrol Agents Ignacio "Nacho" Ramos and Jose Alonso Compean over a shooting incident in Texas on February 17, 2005.

c.    The participation of DOJ personnel in coordinating, facilitating and/or approving the lawful entry(ies) of Osbaldo Aldrete-Davilla into the United States (reportedly for the last time in February 2006). Mr. Aldrete-Davilla reportedly entered the United States lawfully (with the approval of the U.S. Government) to obtain medical treatment, meet with federal investigators and to testify in court in El Paso, Texas.

d.    Any/all agreements, deals, promises, settlements, grants, understandings, memoranda and/or letters granting any form of immunity to Osbaldo Aldrete-Davilla.

e.    Records detailing the terms and conditions permitting Osbaldo Aldrete-Davilla to lawfully enter the United States.

Judicial Watch's FOIA request was received by DOJ on January 29, 2007 at the latest. Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), DOJ was required to respond to Judicial Watch's request by February 26, 2007. As of March 16, 2007, DOJ failed to respond in any fashion to Judicial Watch's January 24, 2007 FOIA request, and Judicial Watch filed this lawsuit.

In a letter dated June 15, 2007, William G. Stewart, II, the Assistant Director of DOJ's EOUSA Freedom of Information and Privacy Staff, asserted that release of the records sought by Judicial Watch would violate 5 U.S.C. § 552a of the Privacy Act and §§ (b)(6) and (b)(7)(C) of FOIA and thereby refused to conduct a search for responsive records. During the preliminary injunction hearing conducted by the Court on July 23, 2007, DOJ reiterated that it had not searched for records responsive to Judicial Watch's January 24, 2007 FOIA request. DOJ based its refusal on the Privacy Act and exemptions (b)(6) and (b)(7)(C) of FOIA and a purported lack

of public interest in the case.  On September 24, 2007, the Court denied Judicial Watch's request for a preliminary injunction.

## II.    Argument.

### A.    Summary Judgment Standard.

In FOIA litigation, as in all litigation, summary judgment is appropriate only when the pleadings and declarations demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Anderson v.  Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c).  In FOIA cases, the agency decisions to "withhold or disclose information under FOIA are reviewed *de novo* by this court." *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 256 (D.D.C. 2004).  In reviewing a motion for summary judgment under FOIA, the court must view the facts in the light most favorable to the requestor.  *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). For an agency to prevail, it must "prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978).

### B.    DOJ Has A Duty to Search.

FOIA mandates that government agencies make "reasonable efforts to search" for records responsive to a FOIA request.  5 U.S.C. § 552(a)(2)(E)(ii)(c); s*ee Ginarte v. Mueller*, 496 F. Supp. 2d 68, 69 (D.D.C. 2004).  The law of the D.C. Circuit regarding the reasonableness of an agency's FOIA search is clear.  In responding to a FOIA request, an agency is required to show that it made "a good faith effort to conduct a search for the requested records, using methods that can be reasonably expected to produce the information requested." *Nation Magazine v. United*

3

*States Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. United States Dep't. of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

The burden of persuasion as to the reasonableness of a search falls on the agency. *McGhee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983) ("the agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation."). Any affidavit(s) submitted by the agency describing its search for documents must be "relatively detailed and non-conclusory, and . . . submitted in good faith." *Safecard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Additionally, if the reasonableness of a search is challenged, as in this case, an agency must "demonstrate 'beyond a material doubt' that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).

It is uncontested that DOJ has not conducted a search for records responsive to Judicial Watch's January 24, 2007 FOIA request. Nor has DOJ submitted any "relatively detailed, non-conclusory" affidavits. Rather, DOJ asserts, without ever having looked for records, that all of the records sought by Judicial Watch are *per se* exempt under the Privacy Act and FOIA privacy exemptions. This assertion is simply incorrect as a matter of law.

DOJ's assertion that it can unilaterally declare all the records responsive to Judicial Watch's FOIA *per se* exempt is not only contrary to the overall purpose of FOIA, it is contrary to the law of this Circuit. First, permitting an agency to refuse to search based on no more than the agency's own assertion that the records – in their entirety – are exempt, turns FOIA on its head.

The purpose of FOIA is to foster openness and accountability in government – to let the people know what their Government is up to. *See Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1118 (D.C. Cir. 2004); *see also U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772-73 (1989).[2]  DOJ's proposition would permit government agencies to hold all of the cards by simply asserting blanket exemptions to entire records, files, or databases. A requester's ability to challenge this blanket assertion is severely limited at best.  Without having the benefit of knowing what types of information are included in the records, a requester has little recourse.  In fact, unless the Court granted *in camera* review, thereby burdening the Court with the agency's obligation, the requester has no meaningful opportunity to challenge the agency's blanket assertion of exemption.

Second, the D.C. Circuit has cautioned against permitting an agency to presume or assume that all of its records are per se exempt.  In *Church of Scientology v. IRS*, 792 F.2d 146, 151-52 (D.C. Cir. 1986), the Court rejected the Internal Revenue Service's ("IRS") blanket assertion that it was not required to search beyond a very limited scope because all of the information was exempt under FOIA Exemption 3 as "return information."  The Court held that the IRS' "contention would be justified only if, as a matter of law, all information in IRS files is return information.  That is unquestionably not so."  *Id.* at 151.  The Court further held that the "District Court erred in accepting the IRS' blanket assertion that all the information responsive to the Church's request ... was exempt from disclosure."  *Id.* at 152.

---

[2]     FOIA provides a framework of liberal disclosure for agency records and "provides that all documents are available to the public unless specifically exempted by the Act itself." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973) (footnote omitted).  Exemptions from disclosure "***must be construed narrowly***, in such a way as to provide the maximum access consonant with the overall purpose of the Act." *Id.* (emphasis added).

This Court also has rejected agencies' assertions of unilateral blanket exemptions. In *Santos v. DEA*, 357 F. Supp. 2d 33, 38 (D.D.C. 2004), the Court rejected the Drug Enforcement Agency's ("DEA") blanket assertion that all of the records requested by the plaintiff were exempt as criminal investigatory records. The Court held:

> While it may be that documents requested by the plaintiff are subject to categorical exemptions applicable to investigatory files of third parties that would justify nondisclosure, ***the Court cannot apply a blanket exemption to an investigatory record,*** especially where the agency fails to put forth a sufficiently detailed description of the documents withheld and the exemptions to which the documents correspond.

*Id.* (emphasis added) (internal citations omitted).

DOJ cannot assert that *all* of the records in its files are subject to privacy exemptions without having made any effort to even look for responsive records. Additionally, DOJ has not submitted any detailed descriptions of the records at issue in this case. In fact, DOJ has not provided anything more than a belated denial letter laden with conclusory statements of exemption.

## C.    The Privacy Exemptions Are Inapplicable As a Matter of Law.

DOJ's blanket refusal to search for responsive records is based on a misapplication of the Privacy Act and privacy exemptions §§ (b)(6) and (b)(7)(C) of FOIA. First, the Privacy Act applies ***only*** to citizens of the United States or to aliens lawfully admitted for permanent residence. 5 U.S.C. § 552a(a)(2).[3] Osbaldo Aldrete-Davila is a Mexican national and has not been lawfully admitted to the U.S. for permanent residence. Therefore, the Privacy Act does not apply to him. Second, the FOIA privacy exemptions relied on by DOJ do not apply to Mr.

---

[3]    Section § 552a(a)(2) of the Privacy Act defines "individual" as a "citizen of the United States or an alien lawfully admitted for permanent residence."

Davila for at least three reasons: (1) any privacy intrusion implicated by the release of the records is *de minimis*; (2) DOJ has already made Mr. Davila a nationally-known figure; and (3) the public interest outweighs any privacy concerns of Mr. Davila.[4]

### 1.    The Privacy Interests in This Case Are *De Minimis*.

FOIA's privacy exemptions require a balancing of competing considerations. Asserting that information is private is not enough to withhold the information from a requestor. Rather, Exemption 6 permits withholding information contained in certain types of files when disclosure would "constitute a clearly unwarranted invasion of personal privacy." Exemption 7(C) permits withholding law enforcement information, "but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6) and (7)( C ). Therefore, it is not enough for DOJ to simply assert generic privacy interests. It is essential that DOJ demonstrate that release of the withheld information will constitute a "clearly unwarranted invasion of privacy" or an "unwarranted invasion of privacy."[5]

The first step in determining whether FOIA privacy exemptions apply is "whether their disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest. If no

---

[4]    It is not a foregone conclusion that FOIA's privacy exemptions inherently apply to non-citizens. In *National Archives and Records Admin. v. Favish*, 541 U.S. 157, 172 (2004), the U.S. Supreme Court held that "in the case of Exemption 7(C), the [FOIA] statute requires us to protect, in the proper degree, the personal privacy of *citizens* against the uncontrolled release of information compiled through the power of the state." (Emphasis added). The opinion uses the term "citizen" or "citizens" no less than nine times.

[5]    The D.C. Circuit has also made it necessary for DOJ to demonstrate the "causal relationship between the disclosure and the threatened invasion of privacy." *National Ass'n of Ret. Federal Employees v. Horner*, 978 F.2d 873, 878 (D.C. Cir. 1989). DOJ has provided no such demonstrations.

significant privacy interest in implicated, FOIA demands disclosure." *National Ass'n of Ret.*

*Federal Employees v. Horner*, 978 F.2d 873, 874 (D.C. Cir. 1989). In this case, the information

sought for release, other than Mr. Davila's name, which DOJ has already admitted and released,

is not the type of information typically withheld as private. Judicial Watch is not seeking

information such as Mr. Davila's "place of birth, date of birth, date of marriage, employment

history, [or] comparable data." *Id.* at 875. Rather, the information sought by Judicial Watch

revolves around the actions and communications of DOJ. Any privacy interest Mr. Davila has in

such information is *de minimis* at best.

### 2.    DOJ Has Already Made Mr. Davila a Nationally Known Figure.

It is extraordinary that DOJ is asserting the privacy rights of Mr. Davila as the reason for

refusing to search for, segregate, and produce responsive records because it is DOJ itself that has

made Mr. Davila a very publicly known person. *See* Supplemental Affidavit of Meredith L. Di

Liberto Affidavit ("Suppl. Di Liberto Affidavit ") at ¶ 6, Exhibit 2 (Docket Entry No. 18). First,

DOJ admitted in its July 19, 2007 opposition to Judicial Watch's application for injunctive relief

that the individual whose privacy it sought to protect is Mr. Davila. Defendants United States

Department of Justice's and Defendant United States Department of States's Opposition to

Plaintiff's Application For Injunctive Relief ("Defs' Opp.) at 7. This, in and of itself, is highly

unusual -- the agency naming the individual it seeks to protect. Unlike other cases in which the

agency refused to confirm or deny the existence of records, DOJ has not only disclosed Mr.

Davila's identity and the fact that it possesses records about Mr. Davila, but it also has disclosed

substantial information about Mr. Davila.[6]  DOJ should not be allowed to claim a privacy exemption for an individual who DOJ itself has made public.

The D.C. Circuit has addressed the issue and held that "the government may not rely on a FOIA exemption to withhold information that has been 'officially acknowledged' or is in the 'public domain.'" *Davis v. DOJ*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (quoting *Afshar v. DOJ*, 702 F.2d 1125, 1130-34 (D.C. Cir. 1983)).  DOJ has been very public with information about Mr. Davila.  *See* Suppl. Di Liberto Affidavit at ¶ 5-6 (Docket Entry No. 18).  DOJ has publicly acknowledged that Mr. Davila entered the United States illegally with a van load of illegal drugs. *See id.,* Exhibit 2.  DOJ has publicly acknowledged that Mr. Davila was shot by a U.S. Border Patrol Agent attempting to flee back to Mexico.  *Id.*  DOJ has acknowledged that it went to Mexico to find Mr. Davila.  *Id.*  DOJ has publicly acknowledged that Mr. Davila was offered immunity to testify against two Border Patrol agents in a federal trial.  *Id.*  DOJ has publicly acknowledged that Mr. Davila broke his immunity agreement.  *See* February 16, 2007 CNN Transcript, attached as Exhibit 1.  DOJ had publicly acknowledged that it has not prosecuted Mr. Davila for illegally crossing the border, smuggling drugs, or breaking his immunity deal.  *See* Suppl. Di Liberto Affidavit at ¶ 5-6.  These facts, among others, have been publicly acknowledged by DOJ on numerous occasions and appear in publicly available written form as well.  In fact, DOJ has waged a very public media campaign regarding the shooting incident,

---

[6]      *See e.g., Judicial Watch v. U.S. Dep't of Homeland Security*, 2007 U.S. Dist. LEXIS 70446, *10, n.5 (Sept. 24, 2007); *Mays*, 234 F.3d at 1327-28 (DEA never publicly acknowledged whose identity it was protecting); *Santos*, 357 F. Supp. 2d at 35 (DEA would neither confirm nor deny the existence of third-party records); *Romero-Cicle v. DOJ*, 2006 U.S. Dist. LEXIS 84077, * 13-14 (D.D.C. Nov. 20, 2006) (DOJ never publicly acknowledged whose identity it was protecting, just the types of information being redacted).

including numerous references to Mr. Davila, his criminal activity and his role in DOJ's federal prosecution against the two U.S. Border Patrol agents. *Id.* at ¶ 4, Exhibit 1.  Quite simply, it is too late for DOJ's concern for Mr. Davila's privacy -- DOJ has already laid bare Mr. Davila's personal information.[7]

### 3.     The Public Interest Clearly Outweighs Any Privacy Concerns.

Even if Mr. Davila's privacy interests had not been eviscerated by DOJ and constituted more than a *de minimis* intrusion, and Judicial Watch asserts they are not, the public interest in this case clearly outweighs any such privacy concerns.  In addition to demonstrating that the privacy exemptions apply, DOJ must also demonstrate that any invasion of privacy caused by the release of the withheld information would constitute either a "clearly unwarranted invasion of privacy" or an "unwarranted invasion of privacy."  The U.S. Supreme Court has held that the question of whether an invasion of privacy is warranted goes directly to "the nature of the requested document and its relationship to the 'basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *U.S. Dep't of Justice v. Reporter's Committee For Freedom*, 489 U.S. 749, 772 (1989).  In other words, the public interest in the withheld information is directly linked to the determination of whether the privacy invasion is warranted.  *See Horowitz v. Peace Corps.*, 428 F.3d 271, 278 (D.C. Cir. 2005).

This case clearly presents a situation in which the public interest warrants any invasion of privacy, however slight, that might result.  The information Judicial Watch seeks in this case goes right to the heart of opening official DOJ action to the light of public scrutiny.  The records

---

[7]     The courts have upheld Exemption 7(C) privacy withholdings for the purpose of "not being associated unwarrantly with alleged criminal activity," *Stolt-Nielsen*, 480 F.Supp. 2d at 180, Mr. Davila's criminal involvement has been publicly well documented by DOJ.

sought by Judicial Watch will help answer questions surrounding DOJ's official activities namely, whether and/or how DOJ cooperated with other U.S. government agencies in prosecuting two U.S. Border Patrol Agents, whether and/or how DOJ cooperated with the Government of Mexico in the prosecution of U.S. law enforcement officers, and whether and/or how DOJ regularly offers immunity agreements to illegal drug-smugglers to aid in the prosecution of U.S. law enforcement officers. These questions primarily involve information about DOJ, not information about private third parties. In fact, as demonstrated above, the activities of the individual involved here – Mr. Davila – are already public, for the most part. The remaining withheld information focuses on official DOJ activities.

"Official information that sheds light on an agency's performance of its statutory duties falls squarely within [the] statutory purpose [of FOIA]." *Reporters Committee* at 773.

### 4.    DOJ's Failure to Provide a Segregability Analysis.

In addition to its overall failure to search or provide a detailed affidavit identifying the responsive records it is withholding, DOJ also has failed to conduct a segregability analysis. FOIA requires agencies to disclose "all reasonably segregable information ... after redaction or deletion of the exempt materials." 5 U.S.C. § 552(b). Only information that is "inextricably intertwined with exempt portions" need not be disclosed. *See Mead Data Center v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). The D.C. Circuit held that the "segregability requirement limits claims of exemption to discrete units of information; to withhold an entire document, all units of information in that document must fall within a statutory exemption." *Billington v. U.S. Dep't of Justice,* 233 F.3d 581, 586 (D.C. Cir. 2000). Even when the parties

themselves do not address segregability, the court must raise it *sua sponte*. *See Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

DOJ has not performed a segregability analysis of the records responsive to Judicial Watch's FOIA.   DOJ's failure is compounded by the fact that it is asserting a blanket exemption based on a refusal to search.  This Court held that, "the Court errs if it 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof."  *Stolt-Nielson Transportation Group, LTD v. USA*, 480 F. Supp. 2d 166, 182 (D.D.C. 2007); *see also Perry-Torres v. Dep't of State*, 2006 U.S. Dist. LEXIS 71258, *9 (D.D.C. Sept. 29, 2006) ("Indeed 'the focus of FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.'") (quoting *Mead Data Center*, 566 F.2d at 260).

DOJ cannot, of course, perform a segregability analysis until it performs a search for responsive records.  DOJ must be required to conduct a search for responsive records and release all non-exempt portions thereof.

Generally, a privacy exemption "'permits the Government to withhold only the specific information to which it applies [*i.e.*, third party identifying information], not the entire page or document in which the information appears.'" *Dixon v. DOJ*, 2005 U.S. Dist. LEXIS 37796, * 10 (D.D.C. Sept. 22, 2005) (quoting *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000). Ordinarily, Exemptions 6 and 7(C) are applied to names, driver's licence numbers, social security numbers, agency contact names and numbers, home addresses, dates of birth and e-mail addresses.  *See Brunetti v. FBI*, 357 F. Supp. 2d 97, 106 (D.D.C. 2004); *see also Stolt-Nielsen*, 480 F. Supp. 2d at 179.  As described by this Court, these are, in the ordinary course, discrete

units of information, easily redacted. *See Dixon*, 2005 U.S. Dist. LEXIS 37796 at * 10; *see also*

*Trans-Pacific Policing Agreement* , 177 F.3d at 1027. Therefore, it is highly unlikely that the

records responsive to Judicial Watch's request are exempt in their entirety.

**III.    Conclusion.**

Judicial Watch respectfully requests that the Court grant its motion for partial summary

judgment against DOJ and order DOJ to search for and produce all non-exempt responsive

records by a date certain and a *Vaughn* index of any and all responsive records subject to a claim

of exemption.

Dated: November 9, 2007                          Respectfully submitted,

                                                 JUDICIAL WATCH, INC.

                                                  /s/ Meredith L. Di Liberto
                                                 D.C. Bar No. 487733
                                                 Paul J. Orfanedes
                                                 D.C. Bar No. 429716
                                                 Suite 500
                                                 501 School Street, S.W.
                                                 Washington, DC 20024
                                                 (202) 646-5172

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  07-0506 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to LCvR 56.1,

submits the following Statement of Material Facts as to Which There is No Genuine Issue:

1. On January 24, 2007, Judicial Watch sent a FOIA request to DOJ seeking access

to the following records:

    a. Communications between DOJ and any/all officers, agencies and/or representatives of the Government of Mexico concerning Osbaldo Aldrete-Davila, a Mexican national who testified in the prosecution of U.S. Border Patrol Agents Ignacio "Nacho" Ramos and Jose Alonso Compean over a shooting incident in Texas on February 17, 2005.

    b. Communications between DOJ and the U.S. Department of State and/or the Department of Homeland Security (and its subordinate agencies) concerning Osbaldo Aldrete-Davila, a Mexican national who testified in the prosecution of U.S. Border Patrol Agents Ignacio "Nacho" Ramos and Jose Alonso Compean over a shooting incident in Texas on February 17, 2005.

1

    c.      The participation of DOJ personnel in coordinating, facilitating and/or approving the lawful entry(ies) of Osbaldo Aldrete-Davilla into the United States (reportedly for the last time in February 2006). Mr. Aldrete-Davila reportedly entered the United States lawfully (with the approval of the U.S. Government) to obtain medical treatment, meet with federal investigators and to testify in court in El Paso, Texas.

    d.      Any/all agreements, deals, promises, settlements, grants, understandings, memoranda and/or letters granting any form of immunity to Osbaldo Aldrete-Davila.

    e.      Records detailing the terms and conditions permitting Osbaldo Aldrete-Davila to lawfully enter the United States.

*See* Complaint (Docket Entry No. 1).

    2.      Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), DOJ was required to respond to Judicial Watch's request by February 26, 2007. *See* Affidavit of Meredith L. Di Liberto ("Di Liberto Aff.") ¶ 5 (Docket Entry No. 14).

    3.      As of March 16, 2007, DOJ failed to respond in any fashion to Judicial Watch's January 24, 2007 FOIA request and Judicial Watch filed this lawsuit. *See* Di Liberto Aff. ¶ 6 (Docket Entry No. 14).

    4.      In a letter dated June 15, 2007, William G. Stewart, II, the Assistant Director of DOJ's EOUSA Freedom of Information and Privacy Staff, asserted that release of the records sought by Judicial Watch would violate 5 U.S.C. § 552a of the Privacy Act and §§ (b)(6) and (b)(7)(C) of FOIA. *See* Di Liberto Aff., Exhibit 1 (Docket Entry No. 14).

    5.      On July 9, 2007, Judicial Watch moved for a preliminary injunction, seeking to

enjoin DOJ from continuing to withhold responsive records and seeking an order of the Court

requiring DOJ to search for and produce responsive records.  *See* Plaintiff's Application for

Injunctive Relief (Docket Entry No. 14).

      6.     On September 24, 2007, the Court denied Judicial Watch's request for a

preliminary injunction.  *See* September 24, 2007 Memorandum and Opinion (Docket Entry No.

19).

      7.     DOJ has not conducted a search for records responsive to Judicial Watch's

January 24, 2007 FOIA request.  *See* Di Liberto Aff., Exhibit 1 (Docket Entry No. 14).

Dated: November 9, 2007               Respectfully submitted,

                                           JUDICIAL WATCH, INC.

                                          /s/ Meredith L. Di Liberto
                                         D.C. Bar No. 487733
                                       Paul J. Orfanedes
                                       D.C. Bar No. 429716
                                       Suite 500
                                       501 School Street, S.W.
                                       Washington, DC 20024
                                       (202) 646-5172

EXHIBIT 1

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Off ┊ ? Help

Search ┊ Research Tasks ┊ Get a Document ┊ Shepard's® ┊ Alerts

History ┊ 🖨

Source:  News & Business > Combined Sources > News, All (English, Full Text) ⓘ
Terms:  CNN & transcript & "February 16, 2007"  (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*House Votes Against War Plan; President Bush Dismisses House Vote; Fighting Insurgents in Iraq CNN February 16, 2007 Friday*

Copyright 2007 Cable News Network
All Rights Reserved.

**CNN**

**SHOW:** LOU DOBBS TONIGHT 6:00 PM EST

**February 16, 2007** Friday

**TRANSCRIPT:** 021601CN.V19

**SECTION:** NEWS; International

**LENGTH:** 8076 words

**HEADLINE:** House Votes Against War Plan; President Bush Dismisses House Vote; Fighting Insurgents in Iraq

**BYLINE:** Lou Dobbs, Andrea Koppel, Suzanne Malveaux, Jamie McIntyre, Arwa Damon, Kitty Pilgrim, Lisa Sylvester, Bill Tucker, Christine Romans, Bill Schneider

**GUESTS:** Ed Rollins, Robert Zimmerman

**HIGHLIGHT:**

For the first time since the war in Iraq began, the House of Representatives has challenged the authority of the president to conduct this war. The vote, mostly along party lines, with 17 Republicans joining with Democrats. President Bush dismisses the non- binding resolution and focuses on what he expects will be Democratic efforts to cut off funding for the war. Even though Baghdad may now be relatively quiet, U.S. troops outside the city are under constant threat. There is more evidence of a possible government cover-up in the case of two Border Patrol agents who shot and wounded an illegal alien Mexican drug smuggler and who are now in prison for doing so.

**BODY:**

LOU DOBBS, HOST: Tonight, underage drinking in this country is putting billions of dollars in the pockets of liquor companies, and those companies now being criticized for marketing alcohol to our youth.

We'll have a special report tonight, ""The War Within"."

And also tonight, U.S. attorney Johnny Sutton says he would have loved to put an illegal alien drug smuggler behind bars instead of those two Border Patrol agents he did put behind bars. It is now clear that he had every opportunity to do exactly that.

We'll have that report.

And is the Department of Homeland Security so mismanaged it poses a risk to our nation's security? That agency under fire from the congressional committee that oversees its operations.

(BEGIN VIDEO CLIP)

REP. BENNIE THOMPSON (D), HOMELAND SECURITY CHAIRMAN: I grade them a C minus, and that's being very generous.

(END VIDEO CLIP)

ANNOUNCER: This is LOU DOBBS TONIGHT, news, debate and opinion for Friday, February 16th.

Live in New York, Lou Dobbs.

DOBBS: Good evening, everybody.

For the first time since the war in Iraq began, the House of Representatives has challenged the authority of the president to conduct this war. The vote, mostly along party lines, with 17 Republicans joining with Democrats. President Bush dismisses the non- binding resolution and focuses on what he expects will be Democratic efforts to cut off funding for the war.

Andrea Koppel tonight reports on the House Democrats' successful first challenge to the president's policy to wage war.

Suzanne Malveaux tonight reports from the White House on the president's aggressive reaction to the House vote. President Bush essentially daring the Congress to try to cut funds. And Jamie McIntyre reporting from the Pentagon on joint security operations in Baghdad which appear to be keeping the peace, at least for now.

We begin with Andrea Koppel on Capitol Hill -- Andrea.

ANDREA KOPPEL, **CNN** CONGRESSIONAL CORRESPONDENT: Lou, the outcome was never in doubt, and Democrats say it is a first step towards forcing President Bush to change course in Iraq.

(BEGIN VIDEOTAPE)

REP. NANCY PELOSI (D-CA), HOUSE SPEAKER: Two hundred and forty- six. The nays are 182. The concurrent resolution is accepted without objection, a motion to reconsider is laid upon the table.

KOPPEL (voice over): For the first time since the war began, the House of Representatives told President Bush no. A big victory for Democrats.

PELOSI: It was a bipartisan, non-binding resolution that should send a very clear and firm message to the president of the United States that the American people spoke in November that they wanted a new direction in Iraq.

KOPPEL: The resolution has no force of law, but it did have the support of 17 Republicans who joined Democrats in opposing the president's troop plan.

REP. WALTER JONES (R), NORTH CAROLINA: I am proud the be part of this resolution. Debate has never hurt anyone.

KOPPEL: Republican leaders said the resolution would hurt troop morale and warned it was just the first step toward cutting off funds to the troops.

REP. JOHN BOEHNER (R), MINORITY LEADER: The Democrats in the House and Senate intend to tie the president's hands when it comes to the conduct of war in Iraq. And that's why we want a vote in the House and Senate that says that we will not leave. The United States Congress will not cut funding for our troops in harm's way.

KOPPEL: The Republicans' case seemed to gather steam after Democrat John Murtha, who oversees the Pentagon's budget, repeated a pledge this week to tie future funding for the war to, among other things, troop readiness.

REP. VITO FOSSELLA (R), NEW YORK: Some now talk about a slow- bleed strategy to cut off funding to our troops. I ask, if we surrender this battlefield, which battlefield will our enemy choose next? Will it be New York? Will it be Los Angeles? Will it be Washington, D.C.?

(END VIDEOTAPE)

KOPPEL: Tomorrow the Senate will vote on whether to take up the same non-binding measure that just cleared the house. Until now, the Senate has been tied up in procedural knots on just what language and how many resolutions they'll debate on the Senate floor -- Lou.

DOBBS: Andrea, thank you.

Andrea Koppel from Capitol Hill.

President Bush looking past that House vote today. The president on the offensive, pushing his agenda and essentially challenging Congress to try to stop funding for this war in Iraq.

Suzanne Malveaux has the report from the White House -- Suzanne.

SUZANNE MALVEAUX, **CNN** WHITE HOUSE CORRESPONDENT: Well, Lou, it's definitely a symbolic blow to the White House. The president has said numerous times, look, it's OK, go ahead, to express your displeasure here by passing a non-binding resolution, but there is an "I dare you" factor here.

The president essentially saying to members of Congress, I dare you to pass a binding resolution that would actually cut funting to the troops. We got a statement from the press secretary today on this resolution saying, "The resolution is non-binding, soon Congress will have the opportunity to show its support for the troops in Iraq by funding the supplemental appropriations request the president has submitted and which our men and women in combat are counting on."

So what is his next move? President Bush, of course, trying to prove, Lou, that is ultimately going to work, that they are making progress inside of Iraq.

Today, he hosted the new American ambassador to Iraq, Ryan Crocker, here at the White House. He also picked up the phone, got on the phone with Iraq's prime minister, Nuri al-Maliki, to talk about what is happening there.

He said there is some progress being made. That you have Iraqi troops moving, that they are close to some sort of oil revenue-sharing deal.

President Bush from earlier today.

(BEGIN VIDEO CLIP)

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES: It should give people here in the United States confidence that this government knows its responsibilities and is following through on those responsibilities.

(END VIDEO CLIP)

MALVEAUX: And Lou, so, essentially the White House and the president desperately looking for evidence, trying to convince the American people that he is working towards trying to make this Iraq plan work -- Lou.

DOBBS: Suzanne, thank you.

Suzanne Malveaux from the White House.

The U.S. military is reporting some positive results, as they put it, from the new security crackdown in Baghdad. But it is certainly too soon to say whether things are really better or whether militants are simply waiting out the new security approach.

Jamie McIntyre reports.

(BEGIN VIDEOTAPE)

JAMIE MCINTYRE, **CNN** SR. PENTAGON CORRESPONDENT (voice over): After only a few days, the U.S. military says the joint U.S.-Iraqi security operation in Baghdad appears to be working, but conceded that may simply be because militia groups are keeping their powder dry.

MAJ. GEN. JOSEPH FIL, U.S. ARMY: There's an air of suspense throughout the city. Expectations, if you will. And we believe there's no question about it, that many of these extremists are -- are laying low.

MCINTYRE: Among those lying low is believed to be anti-American Shia cleric Muqtada al-Sadr, who is now thought to be in Iran and whose Mehdi army is suspected in much of the anti-Sunni violence.

ROBERT GATES, DEFENSE SECRETARY: I don't think he went there for a vacation. I think they are very concerned about the -- this operation.

MCINTYRE: Gates says he fully expected the violent elements would go to ground and that the strategy is designed to take advantage of that.

GATES: Can we and the Iraqis provide enough security so that the economic development, improvements in governance, political reconciliation can all begin to make real progress in Iraq?

MCINTYRE: Part of that job will fall to the man President Bush has nominated as U.S. ambassador to Iraq, Ryan Crocker.

BUSH: I was telling the ambassador that I had a visit today with Prime Minister Maliki, via secure (INAUDIBLE). I was pleased that he is meeting benchmarks that he has set out for his government.

MCINTYRE: Those benchmarks include sending more Iraqi troops to Baghdad, giving them more robust rules of engagement, and committing $10 billion in Iraqi money for reconstruction.

(END VIDEOTAPE)

MCINTYRE: But you know, Lou, success in Iraq is a relative thing. An Iraqi military spokesman touted the fact that in the Baghdad morgue, only 10 bodies had shown up overnight, compared to the usual 40 or 50. That, he insisted, was a big reduction in terror in Baghdad -- Lou. DOBBS: Absolutely. And ultimately, the most important measure.

Thank you very much.

Jamie McIntyre, from the Pentagon.

Even though Baghdad may now be relatively quiet, U.S. troops outside the city are under constant threat. Our troops patrolling the streets of Diyala trying to keep the peace. The missions there taking a toll not just physically, but emotionally.

Arwa Damon reports from Baquba.

(BEGIN VIDEOTAPE)

ARWA DAMON, **CNN** CORRESPONDENT (voice over): Any door could be booby-trapped, a sniper in any building, a roadside bomb in any pile of trash. Surviving is about controlling fear and staying alert.

It's always in the back of your mind what could happen. But you try not to think of that right when you're out working.

UNIDENTIFIED MALE: Are you talking to me, sir?

UNIDENTIFIED MALE: How far down on the route?

DAMON: In a single morning, these soldiers held a brief memorial for one soldier and learned four more of their battalion had been killed. The toughest lessons of war are learned on the job.

UNIDENTIFIED MALE: I used to say I was ready to come over here, but when you get here it's different than what you think it's going to be here.

UNIDENTIFIED MALE: Before I came over here I took for granted a lot -- family, you know, luxuries of life. Then you come over here and it's -- it's crazy.

DAMON (on camera): Here on the base, a poignant reminder of those who have fallen in the battle for Diyala. While no one who fought with them will ever forget them, commanders say the toughest part is talking to their families and worrying about how they will fare.

They say the two most common questions from loved ones are, "Did my son die alone?" and "Was he in pain?"

UNIDENTIFIED MALE: Take a couple of shots at it. It didn't turn out to be anything.

DAMON (voice over): The troops don't like to talk about it, but they admit privately that the mission here takes a massive emotional and mental toll. They say people back home can't understand. But what they share creates a bond between soldiers unlike any other.

UNIDENTIFIED MALE: We're like brothers. You know, we fight together, we move around together. We go through a lot of hardships together. So that type of environment fosters, you know, that bonding between -- between the people in our unit.

DAMON: A bond strengthened with time.

UNIDENTIFIED MALE: This is my second tour. I feel better safe -- you know, kind of being trained up a little bit. And the ones that are being here for the first time is -- it ain't easy.

DAMON: It's not easy, but they do it, even if some have doubts in the mission. They say they do it for each other.

Arwa Damon, **CNN,** Baquba, Iraq.

(END VIDEOTAPE)

DOBBS: And later here tonight, we'll be introducing you to a citizen soldier whose bravery in Iraq earned him the Bronze Star for valor.

Up next, more evidence of a possible government cover-up in the case of two Border Patrol agents in prison for shooting an illegal alien Mexican drug smuggler.

That special report coming up.

And ahead, is management of the Department of Homeland Security so fouled up it's putting our national security and your safety at risk?

That report.

And critics say liquor companies make billions of dollars selling to underage drinkers and they encourage children and teenagers to drink.

We'll have that report tonight on ""The War Within"."

Stay with us.

DOBBS: Tonight, more evidence of a possible government cover-up in the case of two Border Patrol agents who shot and wounded an illegal alien Mexican drug smuggler and who are now in prison for doing so. The Justice Department says it has -- it had no choice but to prosecute those two agents for the shooting, in part because it had no evidence against the drug smuggler. But newly-released **transcripts** from the agents' trial clearly demonstrates that those claims by the Justice Department are flatly wrong.

Casey Wian reports.

(BEGIN VIDEOTAPE)

CASEY WIAN, **CNN** CORRESPONDENT (voice over): After former Border Patrol agents Ignacio Ramos and Jose Compean were sentenced to 11 and 12 years in prison for shooting an illegal alien Mexican drug smuggler, U.S. attorney Johnny Sutton held a press conference. He defended his decision to prosecute the agents and give Oscar Aldrete- Davila immunity for

smuggling about 750 pounds of marijuana across the Texas border.

JOHNNY SUTTON, U.S. ATTORNEY: We have no evidence -- if someone has some evidence that this van driver, that this illegal alien committed a crime, I would be happy to have it, because I would be happy to put this guy in prison for as long as we possibly can.

WIAN: Trial **transcripts** reveal there was plenty of evidence that Aldrete-Davila in fact had been transporting marijuana that day and again several months later.

T.J. BONNER, PRESIDENT, NATIONAL BORDER PATROL COUNCIL: The **transcripts** have actually weakened the government's case. It shows the behind-the-scenes maneuverings of the Justice Department. It shows that the Justice Department clearly knew that Aldrete-Davila was not just a small-time drug dealer, but a big-time cartel member who smuggled numerous times.

WIAN: Aldrete-Davila admitted to another Border Patrol agent, a friend of the family, that he was smuggling a load of dope the day he was shot. That admission came several days before prosecutors gave Aldrete-Davila immunity. Also, a Homeland Security Department investigator testified at the trial that the smuggler violated the terms of his immunity agreement. And the **transcripts** show prosecutors knew Aldrete-Davila was connected to a second drug-smuggling attempt.

BONNER: They had him in custody. He was in a federal courtroom and would have been a very simple matter to have one of the U.S. marshals put the cuffs on him and lead him out, charge him with those offenses. And they failed to do that.

WIAN: In fact, prosecutors worked diligently to keep the jury from hearing anything about Aldrete-Davila's drug-smuggling history.

SUTTON: If someone has evidence that Aldrete has committed a crime, and we'd be happy to prosecute.

WIAN: To this day, the government continues to target the agents, not the smuggler.

(END VIDEOTAPE)

WIAN: A spokesman for former agent Compean's family tells us the Justice Department is now opposing a motion to release the agents on bond pending their appeal. It's a change from the government's position a few weeks ago when they did not oppose an earlier effort to allow the agents to remain free on bond -- Lou.

DOBBS: This Justice Department, Casey, it seems, has a lot to answer for, as does the Department of Homeland Security. Clearly lying to members of Congress. Congress outraged at that fact. The inconsistencies in what Johnny Sutton has said about this case and what the **transcript** and the record is now demonstrating are very wide extremes, indeed.

WIAN: Absolutely. And there are those who believe the only way the truth is ever going to come out in this case is if an independent counsel with subpoena powers is appointed to look into it and uncover those secret documents -- Lou.

DOBBS: I cannot imagine this Justice Department, this president, this Congress giving full weight to that -- to creating a special investigator for this. Maybe and hopefully I'm wrong, but there has been so much obfuscation, so much distortion in this case, and such an utter disregard for justice and fairness, that it's -- it's breathtaking.

WIAN: It sure is. We will point out, though, that I believe the number is 82 members of

Congress have now supported a resolution or a bill that would -- that would at least congressionally pardon these two agents. So support is growing -- Lou.

DOBBS: And while we do not know what is in that sealed evidence, this broadcast is taking every legal effort to get that evidence unsealed and hopefully find more of the truth in this case.

Casey Wian, thank you very much.

WIAN: You're welcome.

DOBBS: Tonight, a federal judge has cleared the way for television bounty hunter Dwayne "Dog" Chapman's extradition to Mexico. The reality show host faces charges of illegal detention in a case that catapulted him to broader fame.

In 2003, he caught Andrew Luster, an heir to the Max Factor fortune, who then fled to Mexico to avoid trial on rape charges. Chapman brought Luster back to the United States, where he's now serving 124-year prison term. If Chapman were to be convicted of illegal detention in Mexico, he would face as little as a fine of several hundred dollars or as much as four years in prison.

Coming up here next, a new front in the war within creating new customers. We have a special report tonight on liquor companies targeting children, targeting teenagers, and why.

And mismanagement at the federal level. Imagine that. A report tonight on the lack of oversight and financial control at a department many call a sham, the Department of Homeland Security.

And the president's free hand on free trade may not be quite so free as it has been. We'll be talking about that challenge to the president's authority.

Stay with us.

DOBBS: The White House tonight campaigning to convince Congress to renew the president's so-called Fast Track trade power. But some in Congress say, not so fast. The days of free-wheeling presidential trade deals that are disastrous for American workers and their families are over.

Kitty Pilgrim reports.

(BEGIN VIDEOTAPE)

KITTY PILGRIM, **CNN** CORRESPONDENT (voice over): President Bush loves to sign free trade agreements, but Barney Frank, chairman of the House Financial Services Committee, says the president's free hand in free trade may soon be over.

REP. BARNEY FRANK (D), FINANCIAL SERVICES CHAIRMAN: The chances of an extension of trade promotion authority going through are quite slender at this point. Unless there is some change in the attitude of many who are its advocates.

PILGRIM: Frank says free trade has come at a high cost to American workers. Three million manufacturing jobs lost, and he blames Republicans for being deceitful about the American economy.

FRANK: I tell my Republican friends, keep telling the American people about how good the economy is, because the disparity between what you tell them is happening and what they

feel themselves makes them even angrier.

PILGRIM: Under Fast Track, Congress cannot change a free trade agreement but can only vote yes or no. The administration has signed deals with Chile, Singapore, Australia, Morocco, El Salvador, Honduras, Bahrain, Guatemala, the Dominican Republic, Costa Rica, Nicaragua and Oman since 2002.

A free trade agreement with South Korea would be the largest trade deal since NAFTA, and the White House is trying to get the deal done by the time Fast Track expires. But Max Baucus, chairman of the Senate Finance Committee, says American workers need to be protected in these deals. "We must also consider Fast Track in the context of America's growing unease over globalization, international trade, and outsourcing."

In the Democratic-controlled Congress there is little chance Fast Track will be renewed when it expires in June.

(END VIDEOTAPE)

PILGRIM: A trade promotion authority barely passed in the House in 2002. Only a few dozen Democrats supported the plan. Now, in a Democratic-controlled Congress, there is scant possibility that there will be an extension of the president's powerful Fast-Track authority -- Lou.

DOBBS: Well, Max Baucus saying clearly he wants it. He thinks it's necessary.

And I can't believe that anyone, Republican or Democrat, in this Congress doesn't look out among their constituents and see what has happened to them as a result of that litany of deals you put out there. I mean, those were just stupid one-sided deals that have cost jobs. And is anybody noticing?

Thirty consecutive years of trade deficits. A record $5 trillion trade debt. I mean, these people are out of their cotton-picking minds.

PILGRIM: It seems so. More deals than ever in this period of time.

DOBBS: I love the fact the vice president telling the manufacturers today they've really got to get up there and use that lobbying money on Congress and really went -- save the day for Fast- Track authority. And those elites in business and politics, they'll probably do just that.

I happen to believe that your report suggests there's reason for some hope here that this Congress, this Democratically-led Congress may actually stand up to that immense lobbying power, but all we can say at this point is we'll see.

PILGRIM: That's right.

DOBBS: Kitty, thank you very much.

Kitty Pilgrim.

Time now for some of your thoughts.

Shane in Arizona, "Dear Lou, rather than waste time on a non- binding resolution, why doesn't our Congress do something productive, like a binding resolution to secure our border?"

Martha in Pennsylvania, "President Bush said if we have temporary cards for everyone from

Mexico and let everybody in, that way then there would be no illegal ones. My husband said if you follow that logic, if we leave all of our possessions outside and let anyone take what they wanted, then we'd have no robbers."

I think your husband's got a hold of a pretty good parallel.

Send us your thoughts to loudobbs.com. More of those thoughts coming up here later.

And each of you whose e-mail is read here receives a copy of my book, "War on the Middle Class."

Up next, our panel, some of the best political analysts the country. And "The War Within," our special report on drug abuse, addiction. Every day, thousands of our children and teenagers have their first drink. Liquor companies say they don't target those kids. Critics say those liquor companies are making billions of dollars from them.

And the Department of Homeland Security is to provide security for all of us, of course. But how can it do that when it can't even run its own operations internally?

We'll have a report on dubious financial policies, practices, lack of contractor oversight, and what is, by most assessments, a dysfunctional department.

Also tonight, remember the outrage when we first broke the story last year about a Middle Eastern company buying up our ports? We have some major new developments to report to you tonight.

And stranded motorists in Pennsylvania, they are furious. They say they should have been warned about those perilous conditions on an interstate highway.

Those stories and a lot more coming right up.

Stay with us.

DOBBS: Motorists trapped on a Pennsylvania highway for as much as 20 hours expressing their outrage tonight. National guardsmen and fire crews carried supplies to travelers stranded by that massive Valentine's Day storm which brought a 50-mile stretch of Interstate 78 to a complete stand still.

Several major highways in Pennsylvania were kept closed today. That in order that road crews could clear up to what turned out to be six inches of ice. Many drivers were frustrated that they were allowed on the road at all. State police didn't close entrance ramps to I-78 until seven hours after the storm hit, and they are hearing about it.

The Department of Homeland Security should be renamed, it appears, the Department of Homeland Insecurity. The agency is plagued by issues of poor management, low morale and shaky finances and a total lack of accomplishment. One lawmaker said he would give the agency a grade of C minus and he said that grade is generous. Lisa Sylvester has the report.

(BEGIN VIDEOTAPE)

LISA SYLVESTER, **CNN** CORRESPONDENT (voice-over): The Government Accountability Office has placed the Department of Homeland Security on a high-risk list because of mismanagement. In four years, the department has never had a clean financial statement.

REP. BENNIE THOMPSON, (D) HOMELAND SECURITY COMMITTEE: The second largest government agency in Washington can't balance the check book is an indictment on the

department in itself.

SYLVESTER: he chair of the House Homeland Security Committee bluntly says, DHS is wandering aimlessly toward an uncertain destination. The DHS inspector general blasted the agency for lousy oversight of contractors and a recent survey on morale found the department's employees scored at the bottom of the list of all government workers. JOHN GAGE, AMERICAN FED. OF GOVERNMENT EMPLOYEES: There is just a lack of communications between management and -- and employees. Plus, in certain instances like our Border Patrol, they don't feel that management backs them up.

SYLVESTER: Part of the dysfunction will be blamed on growing pains. The department is a relatively new agency. Secretary Michael Chertoff acknowledged the shortcomings.

MICHAEL CHERTOFF, SECRETARY OF HOMELAND SECURITY: Physical constraints, shortages of money for training and the fact that we are working people very hard does have an impact on morale.

SYLVESTER: But critics also point to a lack of focus. For example, Chertoff on Friday, was promoting economic prosperity in Mexico while problems dogged the agency at home.

CHERTOFF: The future of all of the neighbors of North America rests in promoting mutual security, but also in promoting mutual economic prosperity.

SYLVESTER: The Department of Homeland Security has prioritized other issues, including creating a guest-worker program for Mexican citizens, while many U.S. security needs remain unaddressed.

(END VIDEOTAPE)

SYLVESTER (on camera): Lawmakers in a series of hearings have pointed out DHS agencies are having trouble rolling out current programs like U.S. Visit, a 9/11 reform initiative. The U.S. Citizenship and Immigration Services has a crushing workload. Still, the Bush administration wants a program to legalize millions of illegal aliens, and that could conceivably drown that DHS agency. Lou?

DOBBS: Drown it. It deserves a fate that would be, perhaps, terminal in terms of the size of its scope and responsibilities which frankly it's not meeting. And I think the reference to the Border Patrol within homeland security sex is exact. That agency is absolutely demoralized.

What in the world is Secretary Chertoff doing in Mexico talking about economic prosperity? He is at least in title the homeland security secretary, right?

SYLVESTER: That is an excellent question. He is, indeed. His title is homeland security. That's why many people are wondering why is he suddenly on this bandwagon talking about economic prosperity not even in this country, but in another country.

DOBBS: Mexico, Mexico. I would love to see the number -- and let's do this. Let's find out the number of minister or secretary- level meetings that have been held between the government of Canada, the government of Mexico. Let's find out where this -- this administration, let's demonstrate where this administration's head is actually focused, if we could. We'll, of course -- we'll get a number of people on that little -- on that little mission.

Lisa, thank you very much. I don't know what to say after this. I mean this department is a -- it's just a sham to call it homeland security. That's all there is to it.

As Bennie Thompson is both learning and demonstrating. Thank you very much.

Another homeland security issue we're following here tonight. The sale by Dubai Ports World of its U.S. ports operations. Tonight that sale has cleared, we are pleased to tell you, its last hurdle. It's a story we broke on this broadcast a year ago. We've reported on this story extensively. Bill Tucker has the story tonight. Bill?

BILL TUCKER, **CNN** CORRESPONDENT: Lou, the deal is done. Dubai Ports World has reached an agreement to sell its U.S. operations to AIG Global, the way cleared for the deal to be finalized when AIG agreed to make a $40 million investment in infrastructure improvements at the Port of Newark's container terminal and then pay an additional $10 million to the Port Authority of New York/New Jersey.

That $10 million to be invested in a rail project at the Port of Newark terminal. AIG released a statement saying it looks "forward to a long and successful partnership with the Port Authority and to ensuring that the Port of Newark container terminal is the best-in- class operation."

The terminal will be operated by P&O North America and I want to make sure and clarify a statement from last night that I made, P&O North America will be owned by AIG Global, an American company. Lou, the final sale is undisclosed. There have been discussions perhaps maybe a billion dollars for the total in the U.S. operation of DPW, but no one involved in this will confirm or deny that price.

DOBBS: The issue is control of those ports, those operations, and it is -- it is gratifying to hear it's been resolved. When as late as last night it appeared it might not be resolved.

TUCKER: That's right.

DOBBS: Thank you very much. Bill Tucker.

Now, our special report, "The War Within." shocking numbers tonight about underage drinking in this country. Alcohol is not an illegal drug in this country, so it's often easily available to our young people, and critics charges that liquor companies, in fact, are making billions of dollars on kids.

Christine Romans has the report.

(BEGIN VIDEOTAPE)

CHRISTINE ROMANS, **CNN** CORRESPONDENT (voice-over): Every day an estimated 13,000 children and teenagers take their first drink. Dr. Michael Rich.

DR. MICHAEL RICH, CHILDREN'S HOSPITAL, BOSTON: The average age now of taking a first drink for boys is around 11. And for girls is around 13.

ROMANS: For companies that make, distribute, and sell alcohol, that's a new customer.

RICH: From a business standpoint, they have a deep interest in reaching people early and effectively so that they grab them and hold on to them before they can migrate to try other brands.

ROMANS: According to research published by the Center on Addiction and Substance Abuse at Columbia University, almost one out of every five drinks sold, is consumed by an underage drinker. And $22.5 billion of alcohols is sales came from underage drinking in 2001.

SUSAN FOSTER, NATIONAL CENTER ON ADDICTION AND SUBSTANCE ABUSE: The industry's

interests are antithetic to the public health.

ROMANS: Three former U.S. surgeon generals say the industry has a conflict of interest in its advertising and marketing. Quote, "The alcohol industry stands to gain at least a half a trillion dollars in cash revenues over the next decade from teens and so-called pathological drinkers."

The industry flatly rejects such analysis. The companies say they, in fact, spend millions each year fighting underage drinking. Industry trade group, the Distilled Spirits Council said, quote, "Any amount of underage drinking is too much."

But blasted the charge that underage drinkers contribute so much to industry sales. A beer industry spokesman called such math inflated and dubious.

FOSTER: Of course the industry is going to deny this, because of the profound financial issue that's at stake. I mean, they are going to fight any attempt to eat into that $22.5 billion they get every year in drinking just from kids.

ROMANS: Regardless of the corporate profits, health experts say, teen drinking is a pediatric crisis.

(END VIDEOTAPE)

ROMANS (on camera): These industry groups deny marketing to children. The spirits industry group, Lou, says the Columbia University research that found so much of their sales reliant on underage drinkers is quote, "badly flaw advocacy data masquerading as research."

DOBBS: And what would they suggest the number is?

ROMANS: The government -- industry spokesman pointed me to a government number that is more like 12.3 percent -- or teenagers are consuming 12.3 percent of the alcohol in this country.

That's still an awful lot of alcohol.

DOBBS: So an eighth of their profits and revenues, then, are coming from people who shouldn't even be drinking, our youth.

ROMANS: They weren't disclose specifically what their revenues are tied to children. They say they don't market to children, that they get the alcohol from parents and friends, that they are not selling to children. But, indeed, I mean, doctors and people who study this say ...

DOBBS: Really, let's be clear. We're only beginning this special report, the series of these special reports on "The War Within." We're going to be looking at every aspect of addiction and alcohol abuse. Drug abuse, and drug addiction in this country. Every aspect of it. From the border with Mexico, to your local bar that's serving underage drinkers.

And we're -- if you're in the liquor industry, you might as well know one thing right now -- you're more than welcome to come on here and defend your conduct and defend the numbers. We invite you to be here. Because we're not kidding. We're going after this issue, because millions of lives are being torn apart, and too many people are simply ignoring the issue.

And Christine, as always, thank you for reporting on the issue and enlightening us further. Thank you.

That brings us to the subject of our poll tonight. Are you outraged to find that roughly 20 percent of alcohol in the United States is sold to underage drinkers? Yes or no. Cast your vote at loudobbs.com. The results coming up here later.

And coming up Monday, we continue our coverage on the war on drugs and addiction "The War Within." We'll be telling you about some big financial backers of a national drive to legalize marijuana.

And we'll be telling you why that's happening, and we're going to be telling you just exactly what's at stake. Whatever your politics, because I think you're going to be surprised.

And just ahead, some of the best political analysts anywhere. And Ricky Martin and President Bush, they were the best of friends, but apparently, that was only a gesture on the part of Ricky Martin.

Also coming up next, an unassuming local cop and member of the Army National Guard, turns into a quick-thinking hero in Iraq. Stay with us for that, a great deal more.

DOBBS: Pop star Ricky Martin has a new message for the president. It's not pretty. At a recent concert in Puerto Rico, the 35-year-old singer stuck up his middle finger when he mentioned the president's name during a rendition of one of his songs, defending the gesture later, he said it was meant to show his criticism of the Iraq War.

Just about five years ago, the president and the -- and the entertainer shared the stage together. Back then Ricky Martin was a headliner at the inauguration ball for George W. Bush.

Joining me now, some of the very best political analysts anywhere, Ed Rollins, Republican strategist, former White House political director, Robert Zimmerman, Democratic strategist, Democratic National Committee member, and from Washington, our own senior political analyst, Bill Schneider. Bill, good to have you here.

BILL SCHNEIDER, **CNN** POLITICAL ANALYST: Thank you.

DOBBS: And, Robert, the vote was clear in the House. A nonbinding resolution has passed. What's the impact?

ROBERT ZIMMERMAN, DEMOCRATIC STRATEGIST: Well, I think the significance is extraordinary. Both in the number of Republicans who voted for it. Seventeen, coming from many moderate and conservative regions in the country, and conservative districts that are traditionally very Republican. I think the significance of this vote is not just that it was bipartisan, but at the beginning of the first step, of holding this administration accountable.

DOBBS: A nonbinding resolution. Does that really hold anybody accountable?

ZIMMERMAN: It does, because the next focus is how the funding is being spent. Thirty percent of our troops are on the second and third tour of duty without a break, and the army, according to the former chief of staff of the army is reaching its breaking point.

ED ROLLINS, REPUBLICAN STRATEGIST: I've read the Constitution many times and I haven't seen anywhere the subcommittee chairman, John Murtha is the commander in chief of our forces and I think that's the next step, he wants to write in the language that basically he decides who goes and who goes and what armament and I think that's the next step.

I'm very pleased that only 17 Republicans defected. And I still think we're very geographically divided. a plurality and majority of the members from the South supported

this. This was a northeast Democrat bill with Californians which is what gave them the margin and the rest of it basically was pretty much even.

SCHNEIDER: Well, Lou, actually, those Republicans, the 17 Republicans, admittedly, that's a small number, but interestingly they were from all over the country, they were from North Carolina, Virginia, Tennessee, as well as the Northeast. Florida.

DOBBS: Right.

SCHNEIDER: A number of states, Texas, Ron Paul that voted for George Bush, in fact, 14 of the 17 districts were carried by Bush, most of them were conservatives they were not moderates, only four of them got elected by close margins last year. I think it suggests the anti-war sentiment is widespread. It's not limited just to Democrats ...

ROLLINS: But they are not go to defect when it comes to cutting off financial supports to the troops.

ZIMMERMAN: But that's not the debate and I think the Republican leadership was engaging in deceitful tactics by trying to make it the debate. The issue is not the Congress playing the role of commander in chief, the issue is the Congress demanding the military follow its own standards and its own provisions making sure the soldiers go into battle with the proper armament and equipment to do the job and they get proper break periods between the battle.

ROLLINS: That has never been part of this debate, this debate has been about the president's decision to send the 21,000 more troops there, all the Democratic rhetoric over the last two days has been pull the troops back and bring them back home and obviously the next portion is really what's going to count and I promise you, I don't believe those 17 republicans are going to be supportive.

ZIMMERMAN: I think ...

DOBBS: I'm sorry.

ZIMMERMAN: I think you are going to find a very different dynamic in this part of the debate, and that's going to be seeing Republicans and Democrats come together and say, before we give the Maliki government more money, we want to make sure they are doing their job. We want to make sure they are building a coalition.

DOBBS: Lou, there's another party to be heard. It's not just Democrats and Republicans. There's also the public. People are very frustrated and that's what really drove this Democratic resolution, Democratic-sponsored resolution.

The public is very angry, because they believe they voted to curb the president's war policy in Iraq, and that Congress is there to stand up to President Bush. And that is one reason why they did that, at least with the nonbinding resolution, and it may go further.

DOBBS: And the reaction, and I'm sure there will be a similar reaction if, indeed, the Senate tonight or tomorrow morning passes its nonbinding resolution. The president today saying basically, make my day.

ZIMMERMAN: Yeah.

DOBBS: You know, it resonated with "bring it on" and his reaction to that vote.

ZIMMERMAN: Yeah.

ROLLINS: He needs to be careful with his rhetoric. I don't think the 60 votes are there to basically cut off cloture. I think the Democrats will spend a long weekend, along with the Republican colleagues. I don't think Reid can count the votes and I think the end of the day they'll go come before the weekend is over. And there won't be resolution.

ZIMMERMAN: What you're saying is the Republican leadership and President Bush are trying to block a debate and a vote about whether the Congress and the Senate in particular supports this escalation of the troops. That by itself is a despicable tactic.

SCHNEIDER: I think it's interesting that the president and some other Republicans are really try to goad the Democrats, Lou, as you just said, to make my day. They are saying, you really want to oppose this war, vote to defund the war. They are trying to throw the Democrats on the defensive.

Nancy Pelosi said they are not going to do that. They are not going to vote to withhold funds from the troops, because that would be too politically controversial. But they are talking about other things they can do, beyond a nonbinding resolution, those could be very controversial. We'll see if the Democrats divide over those tactics.

ZIMMERMAN: Bill's point is absolutely on target. Democrats are not going to be on the defensive. This is not about cutting the funds for our troops, rather it's about protecting our troops.

DOBBS: When you say the Democrats aren't going to be on the defensive, it sounds a bit defensive, if I may say.

ZIMMERMAN: Watch the debates, you'll see we'll be on the offensive.

ROLLINS: The Democrats are never on the defensive.

DOBBS: John Murtha, he says he's going to introduce legislation within the president's plan. He's not messing around here. He's saying there won't be -- there will be such severe rules, put in place and standards, that there will be no way to -- to take on Iran, to deploy more troops. Is he ahead of Speaker Pelosi on this?

ROLLINS: Well, he certainly is, and the bottom line is he's maybe ahead of a lot -- a lot of the Democrats, too. I think the reality is, the -- John has been out front on this war from the beginning and I think at the end of the day, he's going to find -- he certainly is the subcommittee chairman, he can certainly probably markup what he wants, but I think he's going to have a hard time getting a majority of Democrats to vote what he's talking about.

ZIMMERMAN: I think you are seeing Jack Murtha speaking not just for the mainstream of America, but his sentiment is being reflected by a bipartisanship commission of Democrats and Republicans. We are not talking about anything but making sure our government follows the procedures.

DOBBS: You make it sound like the Republicans have joined a coalition of the willing here. Bill, let me turn to you, there's considerable talk and at least one report today that JEB Bush is pointing people toward Mitt Romney at this early stage. Are you surprised by that?

SCHNEIDER: Well, he's the governor, Mitt Romney was the head of the governors' association, he feels loyal to Romney, some of his staff people, JEB Bush's, are working for Romney. No, I think he wants someone who has executive experience.

Let me tell you something, if JEB Bush's name were not JEB Bush, he would probably be

running for president and might very well be a very top commander for the Republican nomination, because he was a pretty successful governor of Florida and a Republican was just elected to succeed him in a very Democratic year, the misfortune is his name is Bush.

ROLLINS: I agree with that and he's probably one of the best of the Bushes. The bottom line though is that Governor Crist who was obviously not hand picked by Bush is for McCain, or a lot of his people are for McCain, and there's a lot of people who are basically in Palm Beach and other parts of the state that are for Giuliani. I think it would be a very competitive state and I don't know who is going to win it at this point in time.

ZIMMERMAN: That's my dream ticket, Mitt Romney and JEB Bush. I want a Bush on the republican ticket.

DOBBS: With that, you'll also have another wish come true.

ZIMMERMAN: Hillary ...

DOBBS: Nancy Pelosi, Democratic leadership, said it would be a five-day-a-week Congress and this coming week it will be, they will be off for five days to celebrate Presidents ' Day.

ZIMMERMAN: But the difference is the democratic congress began their work January 4th, the Republicans waited until the beginning of February.

DOBBS: And more importantly, they actually got an agenda through.

ROLLINS: It's been a hard month for them and everybody else gets Monday off, but they get the week off.

DOBBS: The real hard times are for the American people right now, it seems to me the people in Washington have it relatively easy, if I may say. Gentlemen, thank you very much. Bill Schneider, Ed Rollins, Robert Zimmerman.

A reminder now to vote on our poll. Are you outraged to find that roughly 20 percent of alcohol in the United States is sold to underage drinkers? Yes or no. Cast your vote at loudobbs.com. We'll have the results coming up in just a few moments.

We'll be right back with "Heroes."

DOBBS: And now, our weekly tribute to the men and women who serve this nation in uniform, "Heroes." We introduce you tonight to Sergeant Philip Rand, U.S. Army National Guard. Sergeant Rand received the Bronze Star with valor for his role in repelling an Iraqi insurgent attack. Bill Tucker has his story.

(BEGIN VIDEOTAPE)

TUCKER (voice-over): On a frigid winter morning, Sergeant Philip Rand patrols the streets of Bridgewater, Massachusetts. He's a local cop, and a member of the Army National Guard.

SGT. PHILIP RAND, BRONZE STAR WINNER: Motor vehicle stop, Plymouth Street.

TUCKER: An occasional traffic stop breaks up the long hours of his overnight shift in this peaceful college town. It's not anything like the front lines of Iraq, where he volunteered to serve three years ago.

RAND: Here I was, I was 32, 33 years old. Been on the police department a bunch of years. Had experienced the Marine Corps training. I decided at that time that if I could do one thing,

it would be bring one of these kids home alive.

TUCKER: His unit helped support the operations of forward operating base Abu Ghraib. Sergeant Rand drove convoy trucks and helped maintain the armory. On April 2nd, 2005, more than 60 insurgents attacked the base. A critical, high-caliber machine gun in one of the towers jammed. Rand and another guardsman jumped in a vehicle to replace it.

RAND: So we got rockets coming in, mortars coming in, small arms fire and tracers going over the top of the pickup truck, no armor, and we made it to the armory. We loaded up some weapons and took them out to the tower and I had to climb up on top of the fighting position. And obviously you see my size. Standing up in the open. About 35, 40 feet up in the air. I could feel that 200 sets of eyeballs looking at me, and they said that's a real juicy target.

TUCKER: Sergeant Rand and others restored the gunner position, repelling the insurgents and their suicide bombs.

RAND: If that heavy machine gun hadn't been up, they would have been able to drive right in on us and taken us out and a lot of other people.

TUCKER: For his bravery, Sgt. Rand was awarded the Bronze Star with valor, an unexpected honor, he said, for actions he thought they would never have to take.

RAND: I never expected to be in that position. I thought I was just going in to make some coffee.

TUCKER: Bill Tucker, **CNN.**

(END VIDEOTAPE)

DOBBS: Outstanding.

Just ahead, more of your thoughts. The results of tonight's poll. Stay with us. We'll be right back.

DOBBS: Results of our poll tonight. Eighty-seven percent of you say you're outraged to find that roughly 20 percent of alcohol in this country is sold to underage drinkers.

Time now for more of your thoughts. Joanne in Florida. "I listen to our president speak about beefing up border security in Afghanistan. He says they need more troops, better training and vehicles for mobility and helicopters for better surveillance. Gee, what great ideas. Why don't we use them in El Paso, too."

And Ralph in New York. "Here we go again. Iran is supplying weapons to Iraq militias. Bad intelligence is what got us into this war. How could Americans believe anything this administration says?"

And finally tonight a new addition to the LOU DOBBS TONIGHT family. Angela Ramos, production assistant, giving birth February 2nd to Jordyn Christina Ramos. Jordan weighing in at a health seven pounds, seven ounces. We are delighted to say both mom and baby doing just great. We couldn't be happier. Congratulations and welcome.

Thanks for being with us tonight. Please join us here tomorrow. Among the topics we're covering, science versus religion. A landmark decision this week putting the issue of evolution in our classrooms back under the national spotlight.

What should our children learn? What should they be taught?

Please join us for all of that, a lot more. For now, for all of us here, thanks for watching. Have a great weekend. Goodnight from New York. THE SITUATION ROOM begins now with Wolf Blitzer in Las Vegas. Wolf?

TO ORDER A VIDEO OF THIS **TRANSCRIPT,** PLEASE CALL 800-**CNN**-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.voxant.com

**LOAD-DATE:** February 17, 2007

Source:   News & Business > Combined Sources > **News, All (English, Full Text)** ⓘ
Terms:   **CNN & transcript & "February 16, 2007"**  (Edit Search | Suggest Terms for My Search)
View:   Full
Date/Time:   Friday, November 9, 2007 - 2:40 PM EST

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

 LexisNexis®   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUDICIAL WATCH, INC.             )
                                          )
                  Plaintiff,        )     Civil Action No.  1:07-cv-00506 (RJL)
                                          )
v.                                      )
                                          )
U.S. DEPARTMENT OF HOMELAND   )
SECURITY, *et al.*,               )
                  Defendants.   )
_____)

**[PROPOSED] ORDER**

Upon consideration of Plaintiff's Motion For Partial Summary Judgment, any opposition

thereto, and the entire record herein, it is hereby

ORDERED that:

1.     Plaintiff's motion is GRANTED.

2.     Defendant U.S. Department of Justice shall search for and produce all non-exempt

responsive records by _____, 2007 and a *Vaughn* index of any and all

responsive records subject to a claim of exemption.

SO ORDERED.


DATE:_____               _____
                                      The Honorable Richard J. Leon
                                      United States District Judge