## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  07-0506 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| Defendants. | ) | |
| _____ | ) | |

### ERRATA

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel, respectfully submits this

errata regarding Plaintiff's Reply to Department of Justice's Opposition to Plaintiff's Motion for

Partial Summary Judgment [Docket No. 37], which was filed on May 9, 2008.  Plaintiff

inadvertently omitted a page from Exhibit C of the Affidavit of Christopher J. Farrell, which was

filed as an attachment to the aforementioned reply.  The entire affidavit is being submitted with

this errata.

Dated: May 12, 2008                     Respectfully submitted,

                                        JUDICIAL WATCH, INC.

                                         /s/ Jason B. Aldrich
                                        D.C. Bar No. 495488
                                        Paul J. Orfanedes
                                        D.C. Bar No. 429716
                                        Suite 500
                                        501 School Street, S.W.
                                        Washington, DC 20024
                                        (202) 646-5172

                                        *Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  07-0506 (RJL) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF CHRISTOPHER J. FARRELL

Christopher J. Farrell, being duly sworn, hereby states as follows:

1.      My name is Christopher Farrell.  I am over eighteen years of age, of sound mind, and am fully competent to make this affidavit.  I also have personal knowledge of the factual statements contained herein.

2.      Judicial Watch, Inc. is a non-profit organization headquartered in Washington, D.C.  I currently am employed by Judicial Watch, Inc. as the Director of Investigations and Research.  I have served in this capacity at Judicial Watch, Inc. since approximately 1999 and, in the course of carrying out my duties and responsibilities as Director of Investigations and Research have made and received responses to hundreds of Freedom of Information Act (FOIA") requests.

3.      I am familiar with Plaintiff's January 24, 2007 FOIA request to Defendant Department of Justice ("DOJ") and I understand that it is the subject matter of the above-captioned litigation.

4.      In the course of assisting Plaintiff in preparing its reply to Defendant DOJ's opposition to Plaintiff's motion for partial summary judgment, I located the attached document

styled "Department of Homeland Security Office of Inspector General – Report of Investigation

on Ignacio Ramos & Jose Compean, et al." ("ROI").  *See* Exhibit A.  This document is available

to the public and may be found at the following website:

http://www.dhs.gov/xoig/assets/OIG_foia_RamosCompean.pdf

      5.      Though the ROI is partially redacted, it contains the following statements

concerning Osvaldo Aldrete-Davila:

> That day, following the interview, the DHS OIG made arrangements with CBP to obtain a limited Border Crossing Card (BCC) for Aldrete-Davila to enter the United States, for the purpose of being examined by medical doctors at the William Beaumont Army Medical Center (WBAMC), Fort Bliss, El Paso, Texas, in order to see if the bullet could be safely removed for forensic examination. DHS OIG agents transported Aldrete-Davila into the United States to the WBAMC.

> Colonel _____, M.D., examined Aldrete-Davila and determined that the bullet could be safely removed.  Aldrete Davila was taken to surgery where Colonel _____ removed the bullet and immediately turned it over to DHS OIG agents.

> ...

> After removing the bullet and examining the damage to Aldrete-Davila's _____ WBAMC physicians provided Aldrete-Davila with the appropriate post-operative care to monitor the healing of the wound and the damaged _____ to determine if a future surgical procedure could be conducted to _____.

> ...

> On March 17, 2005, DHS OIG agents submitted the bullet extracted from Aldrete-Davila's leg to the Texas Department of Public Safety (DPS), Crime Laboratory, _____, Texas, for analysis.

*See* ROI, attached as Exhibit A, at 8-9.

      6.      In response to Plaintiff's January 24, 2007 FOIA request to Defendant Department

of Homeland Security ("DHS"), Plaintiff on May 9, 2008 came into possession of additional

2

documents that reveal a great deal of personal information about Mr. Davila. One of these is a e-mail dated December 8, 2005. Attached to this e-mail is a Memorandum of Activity ("MOA") that discusses funding for Mr. Davila's operation, and lists the dates and locations of Mr. Davila's urology and orthopedics appointments for an 8 month period in 2005. *See* Exhibit B.

7.    A second document received today by Plaintiff from Defendant DHS in response to its January 24, 2007 FOIA request is another MOA that discusses the time, date, and location of an October 2005 urology appointment that Mr. Davila failed to attend. This second MOA also discusses money owed to Mr. Davila by Defendant DHS. *See* Exhibit C.

8.    A third document received today by Plaintiff from Defendant DHS in response to its January 24, 2007 FOIA request is a February 16, 2006 e-mail discussing Mr. Davila's X-rays and the location of his bullet wound. *See* Exhibit D.

9.    A fourth document received today by Plaintiff from Defendant DHS in response to its January 24, 2007 FOIA request consists of copies of the border crossing cards received by Mr. Davila allowing him passage into the United States. Several of these cards state that the purpose of Mr. Davila's entry into the United States is the "public interest" or the "public benefit." *See* Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 9, 2008 in Washington, D.C.

_____
Christopher J. Farrell

# EXHIBIT A

Department of Homeland Security
Office of Inspector General
Report of Investigation on Ignacio Ramos & Jose Compean, et al.

**Trial Transcript Records**

Former Border Patrol agents Ramos and Compean were convicted by a jury in a public trial, and the trial transcript is not in Office of Inspector General's (OIG) possession. Requests for the trial transcript should be submitted to: William G. Stewart, II, Acting Assistant Director, FOIA/Privacy Unit, Executive Office for United States Attorneys, Department of Justice, Room 7300, 600 E Street, N.W. Washington, DC 20530-0001. Alternatively, a copy of the trial transcript may be obtained from the Clerk of the U.S. District Court for the Western District of Texas at the following address: 219 United States Courthouse, 511 East San Antonio Avenue, El Paso, TX 79901.

**Report of Investigation**

Following is the Report of Investigation compiled by the OIG Office of Investigations in the matter of Border Patrol Agents Ignacio Ramos and Jose Compean, et al. Included are three of the report's exhibits – Exhibit 46 (arrest of Ignacio Ramos), Exhibit 47 (arrest and sworn statement of Jose Alonso Compean), and Exhibit 48 (interview of Mr. Compean).

The OIG redacted these records because records pertaining to a third party generally cannot be released absent express authorization and consent of the third party, proof that the subject of the request is deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest, and that significant public benefit would result from disclosure of the requested records. Since Mr. Compean and Mr. Ramos were prosecuted and convicted of violating federal laws while on duty as federal employees, this office has determined there is clear demonstration of public interest in disclosing the misconduct of these two former agents as reflected in the OIG Report of Investigation.

Although the FOIA generally mandates disclosure of agency records, it exempts certain records and information from public disclosure. Each exemption invoked on these records, and the information to which it pertains, is briefly discussed below. Additionally, the exemption(s) cited for withholding records or portions of records are marked below.

| Freedom of Information Act, 5 U.S.C. § 552 | | | Privacy Act, 5 U.S.C. § 552a |
|---|---|---|---|
| ☐ 552(b)(1) | ☐ 552(b)(4) | ☐ 552(b)(7)(B) | ☒ 552a(j)(2) |
| ☒ 552(b)(2) | ☐ 552(b)(5) | ☒ 552(b)(7)(C) | ☐ 552a(k)(2) |
| ☐ 552(b)(3) | ☐ 552(b)(6) | ☐ 552(b)(7)(D) | ☐ 552a(k)(5) |
| | ☒ 552(b)(7)(A) | ☒ 552(b)(7)(E) | ☐ Other: |

OIG redacted from the enclosed documents, names and identifying information of third parties and employees, other than the names of the two Border Patrols agents who were convicted, to protect the identities of these individuals. OIG also redacted personal information relating to Mr. Ramos and Mr. Compean that was not directly related to their conduct under investigation. Absent a Privacy Act waiver, the release of such information concerning other individuals named in these records would result in an unwarranted invasion of personal privacy in violation of the Privacy Act, 5 U.S.C. § 552a. The information excised is also exempt from disclosure pursuant to sections (b)(6) and (b)(7)(C) of the Freedom of Information Act, 5 U.S.C. § 552.

### Exemption 6, 5 U.S.C. § 552(b)(6)

Exemption 6 allows withholding of "personnel and medical files and *similar files* the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6)(emphasis added). Exemption 6's protection applies to files that can be identified as referring to a particular individual. The Exemption applies to OIG investigative records which can be considered "similar files" under Exemption 6. Names and initials of lower level employees, non-agency employees, and private citizens in these reports are exempted from public disclosure under Exemption 7C, and also qualify for withholding under Exemption 6 because disclosure of such names or identifying information "would amount to a clearly unwarranted invasion of the privacy of *any* person." Additionally, personal information relating to Mr. Ramos and Mr. Compean that was not directly related to their conduct under investigation was redacted, as well as information concerning medical treatment. Exemption 6 clearly applies to medical procedures and medical photographs described and/or contained in these reports, as well as employees' and private citizens' names, signatures, and initials.

### Exemption 7C, 5 U.S.C. § 552(b)(7)(C)

Exemption 7C protects from public disclosure "records or information compiled for law enforcement purposes . . . [if disclosure] could reasonably be expected to cause an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The OIG invokes Exemption 7C relative to the redaction of the identities of OIG Special Agents, investigative assistants, complainants, witnesses, third parties mentioned or referenced during the conduct of the investigation (with the exception of Mr. Compean and Mr. Ramos), personal information relating to Mr. Ramos and Mr. Compean that was not directly related to their conduct under investigation, and any other information (such as geographical locations) which could reasonably be expected to identify such individuals.

### Exemption 7A, 5 U.S.C. § 552(b)(7)(A)

In conjunction with Exemption 7(C), OIG is also asserting Exemption 7(A) of the FOIA, 5 U.S.C. § 552 (b)(7)(A), for statements and other evidentiary records pertaining to the three witnesses who received proffer letters of immunity. Although criminal action was not initiated due to the immunity they received, there are administrative proceedings

pending against these individuals; therefore, OIG invokes Exemption 7(A) of the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (b)(7)(A) for these records. Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."

As a general rule, Exemption 7(A) may be invoked so long as the law enforcement proceeding involved remains pending and active, or so long as an enforcement proceeding is fairly regarded as prospective or as preventative. Courts have recognized specific harm that disclosure of records and information can cause to an enforcement proceeding, including the premature release of witness statements and of potential documentary evidence. Exemption 7(A)'s protection extends to interference with not only criminal enforcement proceedings, but also with civil and/or administrative enforcement proceedings. Thus, in situations where enforcement proceedings are pending or active, the courts consistently allow agencies to withhold records under Exemption 7A.

**Consultation with Bureau of Customs and Border Protection**

With respect to the Bureau of Customs and Border Protection (CBP) law enforcement policies contained in the OIG Report of Investigation at pages 17, 18, 19, 20 and 21, OIG consulted with CBP as required under DHS regulations. These regulations require DHS agencies to determine, for records that originated with another DHS agency, whether the originating agency is better able to determine whether the record is exempt under the FOIA. If so, then the record must be referred to the other agency. In general, the agency that originated a record is presumed best able to determine whether to disclose it. *See* 6 C.F.R. § 5.4(c)(2).

OIG consulted with CBP on the above-referenced policies, and CBP advised OIG to redact CBP's policies pursuant to Exemptions (b)(2) and (b)(7)(E). 5 U.S.C. §§ 552 (b)(2), (b)(7)(E). Notations in the redacted report specifically identify the sections so redacted, as "Released in Part per consultation with USCBP".

**Exemption 2, 5 U.S.C. § 552(b)(2)**

Exemption (b)(2) of the FOIA protects from mandatory disclosure, documents "related solely to the internal personnel rules and practices of an agency." Exemption (b)(2) covers two distinct categories of records, the "high" (b)(2) and the "low" (b)(2) categories. Under the "high 2" approach to Exemption 2 of the FOIA, government information is exempted if: (1) the information falls within the language of the exemption -- that is, it relates to the "internal personnel rules and practices" of the agency and is "predominantly internal"; and (2) its disclosure would risk circumvention of federal statutes or regulations. Law enforcement policy information redacted upon request of CBP falls under the "high" (b)(2) category because disclosure of such information would "benefit those attempting to violate the law and avoid detection." OIG

4

is also asserting "low" (b)(2) for redactions to employees' signatures, initials, the serial numbers for Mr. Compean's and Mr. Ramos' weapons, and their booking numbers.

**Exemption 7E, 5 U.S.C. § 552(b)(7)(E)**

In conjunction with Exemption (b)(2), CBP also asserts Exemption (b)(7)(E) for the redacted information. Exemption (b)(7)(E) protects all law enforcement information that "would disclose techniques and procedures for law enforcement investigation or prosecution, or would disclose guidelines for law enforcement investigations or prosecution if such disclosure could reasonably be expected to risk circumvention of the law." The redacted CBP policy information falls within the protection of this Exemption and allows the agency to safeguard this sensitive law enforcement information because disclosure of such information would risk circumvention of federal statutes or regulations.

*Office of Inspector General*
*Office of Investigations*

**U.S. Department of Homeland Security**
Washington, DC 20528



## Homeland Security

NOV 2 1 2006

MEMORANDUM FOR:    Traci Lembke, Director
                               Office of Professional Responsibility
                               U.S. Immigration and Customs Enforcement

FROM:                      Elizabeth M. Redman
                               Assistant Inspector General for Investigations

SUBJECT:                Ignacio Ramos & Jose Compean, et al., Border Patrol Agents
                               U.S. Customs and Border Protection
                               (b)(7)c TX

CASE NUMBER:        I05-CBP-ELP-07117

Attached is our Report of Investigation (ROI) on the above subjects.

The ROI is furnished for whatever action you consider appropriate. A reply is requested within 30 days. Please destroy the ROI upon disposition of this matter.

Should you have any questions regarding the ROI, you may call me at (202) 254-4100, or a member of your staff may call Deputy Assistant Inspector General for Investigations-West, John Laferty, at (202) 254-4300.

Attachment

# DEPARTMENT OF HOMELAND SECURITY
## OFFICE OF INSPECTOR GENERAL

## REPORT OF INVESTIGATION

I05-CBP-ELP-07117



THIS REPORT CONTAINS SENSITIVE LAW ENFORCEMENT MATERIAL.  IT MAY NOT BE
LOANED OUTSIDE YO̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲N CONNECTION WITH OFFICIAL
AGENCY ACTION, NO ̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲̲AY BE COPIED OR DISTRIBUTED
WITHOUT THE KNOWLEDGE AND CONSENT OF THE INSPECTOR GENERAL

REDACTED FOR PUBLIC RELEASE

*Office of Inspector General - Investigations*
**U.S. Department of Homeland Security**

**REPORT OF INVESTIGATION**



**Homeland Security**

| Case Number: | I05-CBP-ELP-07117 |
|---|---|
| Case Title: | Ignacio Ramos & Jose Compean, et al. |
| | Border Patrol Agents |
| | U.S. Customs and Border Protection |
| | (b)(7)c , TX |
| Report Status: | Final |
| Alleged Violation(s): | Assault with a Deadly Weapon; Obstruction of Justice; Civil Rights |

## SYNOPSIS

This investigation was initiated on March 4, 2005, based upon receipt of information from the Office of Internal Audit (OIA), U.S. Border Patrol (BP), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown Border Patrol Agent (BPA) while attempting to illegally cross into the United States on February 17, 2005, near ⬚(b)(7)c⬚, Texas.

The DHS Office of Inspector General (OIG) investigation found that Aldrete-Davila had actually entered the United States (illegally) to drive a van loaded with 743 pounds of marijuana to a "stash house" located in or near the ⬚(b)(7)c⬚, TX. When BPAs spotted Aldrete-Davila and attempted to stop the van that he was driving, he attempted to flee back to Mexico, first in the van and then on foot after BPA Jose Alonso Compean tried to hit him in the head with the butt of a shotgun. Our investigation disclosed that BPAs Compean and Ignacio Ramos, also known as (AKA) "Nacho," both shot at Aldrete-Davila with their duty pistols as he ran on foot back to Mexico, with Ramos hitting Aldrete-Davila once in the buttocks. Compean and Ramos did not report the shooting as required by BP regulations, and instead covered up the crime scene by removing the spent shell casings that were ejected from their pistols during the shooting. Our investigation determined that BPAs (b)(7)c ⬚(b)(7)c⬚, and (b)(7)c knew about the shooting, but did not report it as required, destroyed evidence, and/or made false statements to the DHS OIG during the investigation of the incident.

| *Reporting Agent* | | | *Distribution:* | |
|---|---|---|---|---|
| Name: ⬚ (b)(7)c | Signature: (b)(7)c | | El Paso Field Office | Original |
| Title: Special Agent | Date: 11/20/06 | | | |
| *Approving Official* | | | Headquarters | cc |
| Name: James E. Smith | Signature: (b)(7)c, (b)(2)Low | | Component(s) | cc |
| Title: Special Agent In Charge | Date: 11/20/06 | | Other | cc |

**IMPORTANT NOTICE**

This report is intended solely for the ⬚ ...ty, or any entity receiving a copy directly from the Office of Inspector General. This report remai... part, outside the Department of Hom... will be determined by the Office of I... administrative penalties.

REDACTED FOR PUBLIC RELEASE

...and no secondary distribution may be made, in whole or in ...ffice of Inspector General. Public availability of the report ...ed disclosure of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

Ramos and Compean were both arrested pursuant to federal warrants, after which they were both placed on indefinite suspension without pay. A Federal Grand Jury indicted Ramos on seven charges and Compean on nine charges related to the shooting and the subsequent cover up and destruction of the crime scene. After a two-week Federal jury trial, the jury found Ramos and Compean guilty of assault with a dangerous weapon, assault with serious bodily injury, discharge of a firearm in commission of a crime of violence, tampering with an official proceeding, and deprivation of rights under color of law. The jury found Ramos and Compean not guilty of assault with intent to commit murder, and aiding and abetting.

On October 19, 2006, the Honorable Kathleen Cardone, U.S. District Judge, Western District of Texas, sentenced Ramos to 11 years and 1 day of incarceration and sentenced Compean to 12 years of incarceration.

On October 26, 2006, the CBP forwarded letters of proposed removal (termination) to Ramos and Compean.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property o[_____]y distribution may be made, in whole or in part, outside the Department of Homeland Security, w REDACTED FOR PUBLIC RELEASE r General. Public availability of the report will be determined by the Office of Inspector General [_____] this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

**Case Title Continued:**

[ (b)(7)c ] Border Patrol Agent, GS 1896-12;

[ (b)(7)c ] BPA, GS 1896-11;

[ (b)(7)c ] BPA, GS 1896-11;

[ (b)(7)c ], BPA, GS 1896-11;

[ (b)(7)c ] BPA, GS 1896-9;

[ (b)(7)c ], BPA, GS 1896-11;

[ (b)(7)c ] Field Operations Supervisor; GS 1896-13;

[ (b)(7)c ], BPA, GS 1896-11;

[ (b)(7)c ], BPA, GS 1896-11;

All assigned to the CBP, BP Station in [ (b)(7)c ], TX

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, by the recipient, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

REDACTED FOR PUBLIC RELEASE

INV FORM-08

# REPORT OF INVESTIGATION

## DETAILS

On March 3, 2005, [ (b)(7)c ], a U.S. citizen, telephonically contacted [ (b)(7) ] [ (b)(7)c ], a BPA stationed in [ (b)(7)c ], Arizona. [ (b)(7)c ] informed [ (b)(7)c ] that [ (b)(7) ] close friend, [ (b)(7)c ], had advised that [ (b)(7)c ] (Aldrete-Davila) had been shot by BPAs. [ (b)(7)c ] traveled to Mexico from [ (b)(7)c ], Texas on that same day, and found Aldrete-Davila at [ (b)(7)c ] home in [ (b)(7)c ], [ (b)(7)c ], Mexico. [ (b)(7)c ] contacted BPA [ (b)(7)c ] again and subsequently turned over the telephone to Aldrete-Davila, enabling Aldrete-Davila to speak with BPA [ (b)(7)c ]. (Exhibit 1)

When Aldrete-Davila initially spoke to [ (b)(7)c ] on March 3, 2005, Aldrete-Davila [ (b)(7)c ] and family members were in the immediate area and Aldrete-Davila did not want them to hear that he had been shot while smuggling marijuana into the United States. Therefore, Aldrete-Davila lied to [ (b)(7)c ] during their initial conversation. Aldrete-Davila told [ (b)(7)c ] that BPAs shot him when he attempted to return to Mexico after illegally entering the United States on the afternoon of February 17, 2005. (Exhibit 1)

That same day, March 3, 2005, BPA [ (b)(7)c ] immediately reported the incident orally and in writing to his superiors in accordance with BPA firearms policy. These reports were forwarded to the BP Office of Internal Audit (OIA), El Paso Sector. (Exhibit 1)

During the first week of March 2005, BPA [ (b)(7)c ] contacted [ (b)(7) ] friend, BPA [ (b)(7)c ], to request if [ (b)(7) ] knew about a shooting incident in the BP El Paso Sector. [ (b)(7)c ] told [ (b)(7)c ] that [ (b)(7) ] had not heard of any shooting incident. DHS OIG agents would later interview [ (b)(7)c ] who confirmed that [ (b)(7) ] had spoken to [ (b)(7)c ]. [ (b)(7)c ] also told the DHS OIG that BPA [ (b)(7)c ] denied any knowledge of a shooting incident in the BP [ (b)(7)c ] in February 2005 when [ (b)(7) ] had asked [ (b)(7)c ] about an unreported shooting incident based on [ (b)(7)c ] telephone call. The investigation would later find that [ (b)(7)c ] knowingly lied to [ (b)(7)c ] about [ (b)(7) ] knowledge of the shooting incident on February 17, 2005. During the interview of [ (b)(7)c ] also informed DHS OIG agents that Ramos, Compean, and [ (b)(7)c ] referred to themselves as "the drug shift" and would allegedly allow illegal aliens to enter the United States so they could focus on drug smugglers. (Exhibits 2 and 3)

On March 4, 2005, the OIA informed the DHS OIG of the allegation that Aldrete-Davila, a Mexican national, was shot by an unknown BPA while attempting to illegally cross into the United States, on or about February 17, 2005, near [ (b)(7)c ], Texas. (Exhibit 1)

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property... REDACTED FOR PUBLIC RELEASE ...dary distribution may be made, in whole or in part, outside the Department of Homeland Security... ...ctor General. Public availability of the report will be determined by the Office of Inspector Gene... ...of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

## REPORT OF INVESTIGATION

From March 4, 2005 to March 10, 2005, the DHS OIG attempted to telephonically contact Aldrete-Davila at the Mexican telephone numbers provided by BPA [(b)(7)c] in [(b)(7)c] reports to the BP, but could not reach Aldrete-Davila at those telephone numbers.

On March 7, 2005, the DHS OIG obtained El Paso Sector BP radio transmission recordings from 1:00 p.m. to 5:00 p.m. for the [(b)(7)c] Station, because the incident purportedly occurred in the [(b)(7)c] [(b)(7)c], Texas, area. The DHS OIG did not find any radio transmission recordings involving a pursuit or discharge of firearms. (Exhibit 4)

After several days of not being able to reach Aldrete-Davila, the DHS OIG left messages for BPA [(b)(7)c] to contact the DHS OIG. On March 10, 2005, [(b)(7)c] telephonically contacted the DHS OIG. [(b)(7)c] informed the DHS OIG that [(b)(7)] had told Aldrete-Davila to report the shooting incident to the U.S. Consulate in Ciudad Juarez, Chihuahua, Mexico, or to the Mexican authorities. [(b)(7)c] advised that when [(b)(7)c] and [(b)(7)c] tried getting Aldrete-Davila to report the incident, he (Aldrete-Davila) finally told them the truth, that he had been smuggling marijuana on the day he was shot. Aldrete-Davila told them that he feared that if he reported the incident, he would be prosecuted by the Mexican and/or the United States government. BPA [(b)(7)c] stated that [(b)(7)] checked the Border Patrol Enforcement Tracking System (BPETS) and found that there had been one reported drug seizure in the BP El Paso Sector on February 17, 2005, which occurred in the jurisdiction of the [(b)(7)c] Station, not that of the [(b)(7)c] Station. [(b)(7)c] also informed the DHS OIG that Aldrete-Davila had told [(b)(7)] that his friends had wanted to "put together a hunting party" to shoot some BPAs in revenge for shooting Aldrete-Davila, but Aldrete-Davila refused. The DHS OIG requested that BPA [(b)(7)c] have [(b)(7)c] contact Aldrete-Davila and to have him contact the DHS OIG as soon as possible. [Agent's Note: Aldrete-Davila would later inform the DHS OIG that he did not want to go on the "hunting party" because he did not wish for innocent BPAs to be hurt for the action of the unknown agents.] (Exhibit 5)

When this reported threat information was provided to the DHS OIG, El Paso Field Office, the identities of the BPAs involved in this incident (Ramos and Compean) were as yet unknown. The DHS OIG Headquarters was immediately informed, followed by the BP El Paso Sector, of this purported threat against BPAs. This resulted in the BP putting out a BOLO (Be-On-Look-Out) for Mexican gangs looking to kill Federal Agents along the U.S./Mexican border. (Exhibit 5)

On March 11, 2005, Aldrete-Davila contacted the DHS OIG. Aldrete-Davila stated that the bullet was still in his leg, but he was not willing to cooperate with the investigation because he thought it was simply a ruse to get him to cross into the United States, where he could be prosecuted for smuggling the load of marijuana. Aldrete-Davila subsequently agreed to meet with DHS OIG at the U.S. Consulate General, Ciudad Juarez, Chihuahua, Mexico, and cooperate with this investigation, once he was provided with a letter from the United States Attorney's Office (USAO), assuring that he would not be prosecuted for his involvement in transporting the illegal drug load. (Exhibit 6)

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, Office of Inspector General. This report remains the property of the Department of Homeland Security, and in part, outside the Department of Homeland Security will be determined by the Office of Inspector General administrative penalties.

REDACTED FOR PUBLIC RELEASE

...tity receiving a copy directly from the Office of ...ndary distribution may be made, in whole or in ...pector General. Public availability of the report ...e of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

On that same date, upon request by the DHS OIG, OIA provided radio transmissions for the BP [(b)(7)c] Station, specifically for the 1:00 p.m. to 2:00 p.m. time frame on February 17, 2005; copies of the paperwork concerning the seizure of 743 pounds of marijuana; and BP [(b)(7)c] Station duty roster for February 17, 2005. After reviewing the radio transmissions and documents, the DHS OIG initially identified the following agents as having taken part in the marijuana seizure: Ramos, Compean, [(b)(7)c], and [(b)(7)c]. (Exhibits 7 - 10)

On that same date, the DHS OIG interviewed [(b)(7)c], U.S. International Boundary and Water Commission (IBWC) concerning the boundaries of land owned and controlled by IBWC. [(b)(7)c] informed DHS OIG agents that the land directly adjacent to the Rio Grande River is U.S. government land, which is controlled by the IBWC. [(b)(7)c] advised that the boundaries of U.S. government land extend from the center point of the Rio Grand River to the northern toe of the levee on the U.S. side of the Rio Grande River. (Exhibit 11)

Investigation found that Aldrete-Davila was shot just before he reached the Rio Grande River and therefore, based on [(b)(7)c] information, the incident occurred on federal property. As such, the federal government had jurisdiction for investigating the incident.

On March 15, 2005, the DHS OIG contacted [(b)(7)c] of [(b)(7)c] Texas, who on February 17, 2005, had been contacted by the BP [(b)(7)c] Station to tow the van driven by Aldrete-Davila from the top of the drainage ditch to the BP [(b)(7)c] Station. [(b)(7)c] personally showed DHS OIG agents where he had picked up the van. [(b)(7)c] recalled seeing a BP vehicle with one BPA parked on top of the levee when he went to pick up the van. (Exhibit 12)

On March 16, 2005, DHS OIG and OIA agents visually, and with the aid of a metal detector, searched the levee and the vega for empty shell casings, but found none.

That same day, March 16, 2005, DHS OIG agents met with Aldrete-Davila and [(b)(7)c] [(b)(7)c], at the U.S. Consulate, Ciudad Juarez, Chihuahua, Mexico. DHS OIG agents provided Aldrete-Davila with a Letter of Limited Use Immunity from the USAO, Western District of Texas. After the letter was translated for Aldrete-Davila by a U.S. Consulate staff member, with the assistance of DHS OIG agents, Aldrete-Davila agreed to the terms of the Limited Use Immunity and was subsequently interviewed by DHS OIG agents. (Exhibit 13)

Aldrete-Davila told DHS OIG agents that he needed over $1,000.00 to pay for his [(b)(7)c] medical bills and to renew his Mexican government license equivalent to a commercial driver's license, without which he was not able to work. An acquaintance named [(b)(7)c] approached Aldrete-Davila and told him he could earn $1,500 to drive a load of drugs to a stash house in the United States. Aldrete-Davila agreed. Aldrete-Davila said that he was instructed where to cross the border into the United States, and was told where to find a gray van loaded with drugs. Aldrete-Davila was to drive

**IMPORTANT NOTICE**

This report is intended solely for the official use [of the ...] ... [...]ity receiving a copy directly from the Office of Inspector General. This report remains the prope[rty ...] REDACTED FOR PUBLIC RELEASE [...]ndary distribution may be made, in whole or in part, outside the Department of Homeland Securi[ty ...] [...]pector General. Public availability of the report will be determined by the Office of Inspector Ge[neral ...] [...]e of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

## REPORT OF INVESTIGATION

to the [ (b)(7)c ], where he would encounter another vehicle that would guide him to the stash house.

During the course of the investigation, DHS OIG agents interviewed Aldrete-Davila several times to obtain clarification and to receive other pertinent information. Relevant information gleaned in these interviews included: Aldrete-Davila showing the DHS OIG where he had crossed the international border when entering the U.S.; the route traveled in the van; his actions taken at the drainage ditch; the path he traveled on foot when running across the vega; and the location where he was shot. In addition, Aldrete-Davila provided Mexican documents to corroborate that he had been employed as a truck driver and that [ (b)(7)c ] had been hospitalized. (Exhibits 14 - 19)

Aldrete-Davila stated that when he drove into the [ (b)(7)c ], he noticed that he was being followed by BPAs, at which time he panicked and started driving back towards Mexico. Aldrete-Davila advised that he was not familiar with the roads and the handling of the van. As a result, when he was driving on a dirt road ( [ (b)(7)c ] ), he lost control of the van when he attempted to turn on the dirt drag road that parallels the drainage ditch. The van ended up on the north bank of the drainage ditch with the front wheels hanging over the ditch. (Exhibit 20)

Aldrete-Davila stated that he exited the vehicle and immediately observed a BPA, later identified as Compean, on the north slope of the levee with a shotgun. Aldrete-Davila stated that he initially raised his hands to surrender, then jumped into the drainage ditch, ran through the knee-deep water and crossed over to the south side of the drainage ditch.

Aldrete-Davila attempted to climb out of the ditch when he observed Compean coming towards him, so he went back into the ditch. While running through the drainage ditch, Aldrete-Davila said he observed two to three other BPAs on the north side of the drainage ditch with their weapons drawn.

Aldrete-Davila stated that he began climbing out of the drainage ditch again when he was confronted by Compean pointing a shotgun at him and yelling at him in Spanish for him to stop and put his hands up. Aldrete-Davila said that he looked quickly behind him and observed the other BPAs with their weapons drawn and aimed at him. At that time, Aldrete-Davila stated he stopped and raised his hands to surrender with the palms open and facing Compean. Aldrete-Davila stated that he thought that one of the other BPAs on the north side of the drainage ditch was going to cross and put handcuffs on him. However, Aldrete-Davila, who understands some English, heard one of the agents from the north side of the drainage ditch yell, "Hit him!"

Shortly after hearing someone yell, "hit him," Aldrete-Davila told Compean in Spanish to not hit him. However, Compean took the shotgun away from his shoulder and attempted to strike Aldrete-Davila in the head with the butt of the weapon, but lost his balance and fell down. When Compean

**IMPORTANT NOTICE**

This report is intended solely for the official us[ ] | REDACTED FOR PUBLIC RELEASE | entity receiving a copy directly from the Office of
Inspector General. This report remains the pro[ ] | | econdary distribution may be made, in whole or in
part, outside the Department of Homeland Sec[ ] | | nspector General. Public availability of the report
will be determined by the Office of Inspector [ ] | | sure of this report may result in criminal, civil, or
administrative penalties.

INV FORM 08

## REPORT OF INVESTIGATION

attempted to hit him, Aldrete-Davila moved his body to avoid being hit, and then ran at an angle to his right, away from Compean.

Aldrete-Davila continued to run at a right angle from where the confrontation took place at the drainage ditch. Aldrete-Davila ran over the levee and into the vega. Aldrete-Davila said that he was about halfway through the vega when he heard multiple gunshots and could see the impact of the rounds in the dirt as he ran toward the border. Aldrete-Davila stated that there were multiple gunshots, then a very short silence, and then one last gunshot right before he reached the brush, near the north bank of the Rio Grande River.

Aldrete-Davila stated that he had nothing in his hands as he ran toward the international border. When asked if he possibly could have had a cellular telephone in his hands, Aldrete-Davila reiterated that his hands were empty. He advised there had been a cellular telephone in the van, but stated it was left behind. [Agent's Note: The Form I-44, Report of Apprehension or Seizure, completed by Jose Compean, noted that a cellular telephone was discovered inside the van.]

Aldrete-Davila stated that the last gunshot knocked him to the ground. Aldrete-Davila advised that he reached back with his left hand and felt blood. Aldrete-Davila advised that he observed two BPAs (the DHS OIG investigation later identified Ramos and Compean as the BPAs) standing in the middle of the vega and thought they were going to shoot him again. Aldrete-Davila said that he was on the ground long enough that the two BPAs could have run up and arrested him. However, Aldrete-Davila stated that he saw them instead holster their weapons and turn and walk back to the levee. [Agent's Note: Compean stated that he had observed Aldrete-Davila disappear into the bushes on the U.S. side of the Rio Grande River after Ramos shot his weapon.]

Aldrete-Davila advised that he got back up and started running again, but fell down two to three more times due to the bullet wound. As he approached the Mexican highway, Aldrete-Davila said a friend picked him up in a van and took him to a medical clinic in Mexico.

Aldrete-Davila cooperated with the investigation of the shooting incident, per the Letter of Limited Use Immunity provided to him by the USAO, Western District of Texas. As the Limited Use Immunity only pertained to the investigation of the shooting incident, Aldrete-Davila refused to provide information on the drug trafficking organization (DTO) that had hired him to smuggle drugs on February 17, 2005. Aldrete-Davila also advised that he did not want to provide information on the DTO for fear of what the DTO might do to him and/or his family, adding that the DTO knew where he and his family lived and worked.

That day, following the interview, the DHS OIG made arrangements with CBP to obtain a limited Border Crossing Card (BCC) for Aldrete-Davila to enter the United States, for the purpose of being examined by medical doctors at the William Beaumont Army Medical Center (WBAMC), Fort Bliss,

**IMPORTANT NOTICE**

This report is intended solely for the official u[...] Inspector General. This report remains the pr[...] part, outside the Department of Homeland Se[...] will be determined by the Office of Inspector[...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

[...] entity receiving a copy directly from the Office of [...] econdary distribution may be made, in whole or in Inspector General. Public availability of the report [...] sure of this report may result in criminal, civil, or

INV FORM 08

# REPORT OF INVESTIGATION

El Paso, Texas, in order to see if the bullet could be safely removed for forensic examination. DHS OIG agents transported Aldrete-Davila into the United States to the WBAMC. (Exhibits 21 - 22)

Colonel [(b)(7)c] M.D., examined Aldrete-Davila and determined that the bullet could be safely removed. Aldrete-Davila was taken to surgery where Colonel [(b)(7)c] removed the bullet and immediately turned it over to DHS OIG agents. Colonel [(b)(7)c] advised the DHS OIG that the bullet struck Aldrete-Davila [(b)(6)], traveled through [(b)(6)] [(b)(6)] [(b)(6)] coming to rest [(b)(6)] Colonel [(b)(7)c] stated that had the [(b)(6)], this would have killed Aldrete-Davila. (Exhibits 23 - 24)

Major [(b)(7)c], M.D., [(b)(7)c] examined Aldrete-Davila and advised that [(b)(6)] [(b)(6)], meaning [(b)(6)] [(b)(6)] (Exhibits 23 – 26)

After removing the bullet and examining the damage to Aldrete-Davila's [(b)(6)] WBAMC physicians provided Aldrete-Davila with the appropriate post-operative care to monitor the healing of the wound and the damaged [(b)(6)] to determine if a future surgical procedure could be conducted to [(b)(6)] (Exhibit 25)

Immediately following the surgical procedure at the WBAMC, the DHS OIG transported Aldrete-Davila to the Ysleta Port of Entry (POE), where [(b)(7)c] picked him up and transported him back into Mexico. [Agent's Note: Prior to trial, news surfaced that Aldrete-Davila had filed a tort claim against the U.S. Government.] (Exhibits 27 - 28)

On March 17, 2005, DHS OIG agents, OIA agents, BP El Paso Sector Evidence Team (SET) members and U.S. Department of State, Diplomatic Security Service (DSS) agents, scoured the site of the shooting incident, using metal detectors to look for casings and any other detectable evidence, but no evidence of the shooting was found.

On March 17, 2005, DHS OIG agents submitted the bullet extracted from Aldrete-Davila's leg to the Texas Department of Public Safety (DPS), Crime Laboratory, [(b)(7)c], Texas, for analysis. (Exhibit 29)

That same day, DHS OIG and OIA agents exchanged BP weapons with all of the BPAs that worked the day shift on February 17, 2005, but were unable to obtain the weapons for BPAs Ramos, Compean, and [(b)(7)c]. Ramos and [(b)(7)c] were on their regular days off and Compean was on annual leave. [Agent's Note: Before submitting the weapons for analysis, DHS OIG had to wait for the ballistic testing of the bullet to determine if it could have come from the same make and model of pistol used by the BP.]

**IMPORTANT NOTICE**

This report is intended solely for the official u... Inspector General. This report remains the p... part, outside the Department of Homeland Se... will be determined by the Office of Inspector... administrative penalties.

REDACTED FOR PUBLIC RELEASE

y entity receiving a copy directly from the Office of ...secondary distribution may be made, in whole or in ...Inspector General. Public availability of the report ...sure of this report may result in criminal, civil, or ...

INV FORM-08

# REPORT OF INVESTIGATION

Based on the radio transmissions from February 17, 2005, the last pertinent transmission came from [(b)(7)c], who requested that Sector "run" the license plate of the van that Aldrete-Davila had been driving. Furthermore, the tow truck driver ([(b)(7)c]) stated there was only one BPA at the scene, and that the agent was on the levee. [(b)(7)c] fit Aldrete-Davila's description of the BPA that confronted him at the drainage ditch, which was [_____(b)(7)c_____]. Therefore, based on this information, DHS OIG agents potentially identified [(b)(7)c] as the agent that was parked on the levee waiting for the tow truck and was also the possible shooter, or a witness to the shooting. (Exhibits 9 -10, 12, 20, and 30)

On the evening of March 17, 2005, DHS OIG and OIA agents went to the homes of [(b)(7)c], Compean, and Ramos. Compean and Ramos were not at their respective homes, but [(b)(7)c] was at [(b)(7)]residence. During this first interview of [(b)(7)c] stated that [(b)(7)]knew nothing about a shooting, but identified Ramos and Compean as the two BPAs that ran after Aldrete-Davila. (Exhibit 31)

On March 18, 2005, DHS OIG and OIA agents encountered Ramos at his residence and exchanged Ramos' duty weapon with another weapon. DHS OIG agents subsequently submitted Ramos' duty weapon to the Texas DPS Crime Laboratory for analysis. (Exhibit 32)

On that same date, [(b)(7)c] contacted the DHS OIG and stated [(b)(7)]had lied during his interview, that [(b)(7)c] had in fact heard gunshots and confirmed that it was Ramos and Compean who had chased Aldrete-Davila over the levee. The USAO Western District of Texas provided [(b)(7)c] a Proffer Letter for [(b)(7)]cooperation in the investigation. (Exhibit 31)

During the course of the investigation, [(b)(7)c] obtained an attorney and was subsequently interviewed several times in which [(b)(7)]would admit to providing false statements to the DHS OIG. [(b)(7)c] stated that [____]observed Compean attempt to hit Aldrete-Davila twice with the butt of his shotgun. [(b)(7)c] admitted that [(b)(7)]heard and observed Compean shooting his weapon, but did not observe Ramos shooting his weapon, nor could [(b)(7)] see Aldrete-Davila get shot because the levee blocked [____]view of the vega located on the south side of the levee. [(b)(7)c] never reported the shooting incident to BP supervisors, which [____]knew was a violation of the BP firearms policy. [(b)(7)c] advised that Compean and Ramos never said anything about seeing Aldrete-Davila with a weapon. (Exhibits 33 - 34)

On March 18, 2005, BPA [_____(b)(7)c_____] agreed to speak to DHS OIG agents and was also offered a Proffer Letter from the USAO through his defense attorney for [(b)(7)]cooperation with the investigation. [(b)(7)c] stated that [(b)(7)]had heard multiple gunshots and that Compean had told [(b)(7)]that he had fired his weapon several times, to include a magazine exchange. [(b)(7)c] advised that Compean had asked [(b)(7)] to look for five more casings at the scene of the incident. [(b)(7)c] stated that [(b)(7)]picked up five casings and disposed of them by throwing them into the drainage ditch. [(b)(7)c] advised that [(b)(7)c] informed Compean that [(b)(7)]had found the other five casings and threw them away. (Exhibit 35)

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security or any entity receiving a copy directly from the Office of Inspector General. This report remains the pro[____] REDACTED FOR PUBLIC RELEASE [____]condary distribution may be made, in whole or in part, outside the Department of Homeland Sec[____] [____]spector General. Public availability of the report will be determined by the Office of Inspector [____] [____]ure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

During the course of the investigation, [(b)(7)c] would later show the DHS OIG where [(b)(7)] found the five casings, which would corroborate where [(b)(7)c] said [(b)(7)] observed Compean shooting his weapon. [(b)(7)c] would also provide [(b)(7)] cellular telephone records to show when [(b)(7)] had contacted Compean to inform him that [(b)(7)] had found and disposed of the other five casings. (Exhibits 36 - 37)

On this same date, DHS OIG agents interviewed BPA [(b)(7)c] who stated that [(b)(7)] did not observe or hear any shooting. However, [(b)(7)c] stated that [(b)(7)] did observe a Hispanic male (i.e., Aldrete-Davila) running at a slow jog towards the Mexican highway. [(b)(7)c] said that [(b)(7)c] observed an unknown male exit a white car and go into the field and assist Aldrete-Davila to the highway where a blue minivan picked them up. [(b)(7)c] stated that Compean told [(b)(7)] that Aldrete-Davila had thrown dirt in his face when he was attempting to detain Aldrete-Davila. [(b)(7)c] advised that Compean and Ramos never mentioned that Aldrete-Davila had a gun or that they fired their weapons at Aldrete-Davila. (Exhibit 38)

On this same date, DHS OIG agents attempted to interview BPA [(b)(7)c], but the BP union steward that accompanied him, BPA [(b)(7)c], told [(b)(7)c] to refuse to answer any questions and consult with an attorney. (Exhibit 39)

During the course of the investigation, DHS OIG agents would interview [(b)(7)c] with [(b)(7)] defense attorney after [(b)(7)] was offered a Proffer Letter from the USAO. [(b)(7)c] initially provided false statements to the DHS OIG concerning [(b)(7)] full knowledge of the shooting incident on February 17, 2005. [(b)(7)c] would subsequently admit that [(b)(7)c] and Compean informed [(b)(7)] of the shooting incident. [(b)(7)c] stated that Compean told [(b)(7)] that he had tried to hit Aldrete-Davila with the butt of his shotgun and that he and Ramos fired their weapons at Aldrete-Davila. [(b)(7)c] advised the DHS OIG that Compean never told [(b)(7)] that Aldrete-Davila had a weapon or that he had something shiny that looked like a weapon. [(b)(7)c] acknowledged that [(b)(7)] had violated BP firearms policy by not reporting the shooting incident. (Exhibits 40 - 42)

On March 18, 2005, the Texas DPS Crime Laboratory informed the DHS OIG that the bullet recovered from Aldrete-Davila's leg had been fired from a .40 caliber Beretta pistol, serial number [(b)(2)Low], which was assigned to Ramos. (Exhibits 43 - 45)

Based on the above information, on March 18, 2005, the DHS OIG obtained arrest warrants for Ramos and Compean, following the presentation of a criminal complaint to U.S. Magistrate Judge Richard Mesa, who found probable cause that a crime had been committed. That same evening Ramos was arrested. Following his arrest, and after having been read the Miranda warning, Ramos refused to provide a statement, invoked his right to remain silent, and informed the DHS OIG that he had an attorney. (Exhibit 46)

**IMPORTANT NOTICE**

This report is intended solely for the official u[...] Inspector General. This report remains the pr[...] part, outside the Department of Homeland Sec[...] will be determined by the Office of Inspector [...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

entity receiving a copy directly from the Office of econdary distribution may be made, in whole or in Inspector General. Public availability of the report sure of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

Following the arrest of Ramos, Compean was arrested. Compean waived his Miranda Rights orally and in writing and provided a verbal and written statement to DHS OIG agents. (Exhibits 47 and 48)

Compean told DHS OIG that he had attempted to stop Aldrete-Davila at the drainage ditch after he (Aldrete-Davila) had exited his van. Compean stated that he had aimed his shotgun at Aldrete-Davila and told him in Spanish to stop and put his hands up. [Agent's Note: The Texas DPS Crime Lab found that Compean's shotgun was operational.] (Exhibit 49)

Compean advised that Aldrete-Davila did put his hands up and that he (Compean) did not observe any weapons or any other items in Aldrete-Davila's hands. While Aldrete-Davila walked out of the drainage ditch with his hands up, Compean stated that he heard someone yell, "Hit him!" In his statement to the DHS OIG, Compean said that he took the butt of the shotgun away from his shoulder and attempted to push Aldrete-Davila back into the drainage ditch. He explained he did this by turning the shotgun around, grasping the barrel with both hands and pushing straight down against Aldrete-Davila with the butt of the weapon. Compean denied that he ever tried to hit Aldrete-Davila with the butt of his shotgun. [Agent's Note: If Compean's described action was true, it would have meant he pointed the barrel of the weapon directly toward himself, while presenting the firing mechanism (trigger) to Aldrete-Davila.]

Compean said that when he attempted to push Aldrete-Davila back into the drainage ditch, he lost his balance and slipped into the ditch. After falling, Compean stated that Aldrete-Davila ran around him and over the levee. Compean advised that he recovered from his fall and ran after Aldrete-Davila. Compean stated that he caught Aldrete-Davila on top of the levee road and jumped on his back, which caused both of them to tumble down the south slope of the levee. [Agent's Note: Per statements and testimony by Aldrete-Davila, [(b)(7)c], Ramos and Compean, Compean slipped into the ditch. According to [(b)(7)c] Compean did not simply slip, but fell face-forward, in a downward incline position, into the ditch.]

Compean stated that he and Aldrete-Davila wrestled until Aldrete-Davila broke free and threw dirt in Compean's face. Compean said that Aldrete-Davila ran south toward the Rio Grande River, the international border. Compean stated that he observed Aldrete-Davila look back at him as he continued to "run away" and observed something shiny in Aldrete-Davila's left hand. Compean said that he initially thought it was a gun so he started shooting, to include a magazine exchange after his first magazine ran dry, or became empty.

Compean stated that his intent was to "kill" Aldrete-Davila because he thought he had a gun, even though Compean later recanted his original statement by stating he was "never really certain" that Aldrete-Davila had a gun. Compean advised that he stopped shooting at Aldrete-Davila because Aldrete-Davila continued to "run away" from him and it appeared that Aldrete-Davila was going to reach the river and cross into Mexico.

**IMPORTANT NOTICE**

This report is intended solely for the official us[...] Inspector General. This report remains the pro[...] part, outside the Department of Homeland Sec[...] will be determined by the Office of Inspector [...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

[...]ntity receiving a copy directly from the Office of [...]condary distribution may be made, in whole or in [...]spector General. Public availability of the report [...]ure of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

During the interview with DHS OIG agents, Compean said that he had been "standing" and shooting at Aldrete-Davila. Compean said that as he stopped shooting, Ramos ran up "next" to him, aimed in, and then fired one round at Aldrete-Davila. [Agent's Note: Compean and Ramos provided conflicting testimony later at their trial. Compean testified that he had been "kneeling" when he was shooting at Aldrete-Davila, and after he finished shooting, Ramos ran "past" him and fired one shot at Aldrete-Davila. Ramos testified that he had ran past Compean, who Ramos said was bloody and "flat" on his back, before he (Ramos) shot at Aldrete-Davila.]

Compean told the DHS OIG that he observed Aldrete-Davila limping and assumed that Ramos had indeed hit him with the last gunshot. Following the shooting, Compean stated that he picked up at least nine of his casings and then later asked BPA [(b)(7)c] to look for five more casings that he had not picked up. Compean acknowledged in his written statement that [(b)(7)c] had called and told him that [(b)(7)c] had picked up the other casings and thrown them away. Compean told the DHS OIG that he had thrown away the nine casings that he had found.

Compean advised the DHS OIG that he had told BPAs [(b)(7)c] and [(b)(7)c] that he thought Ramos might have hit Aldrete-Davila. During his testimony at trial, however, Compean stated he had only told [(b)(7)c] about the shooting and that he had never spoken with [(b)(7)c] about the shooting incident. Compean told the DHS OIG that he did not report the shooting because he thought he would get in trouble. (Exhibits 47 - 48)

On March 22, 2005, DHS OIG agents interviewed BPA [(b)(7)c] [(b)(7)c] stated that [(b)(7)] never heard gunshots or observed anyone shooting their weapons. While at the incident scene and then later back at the BP Station, [(b)(7)c] advised that Compean and Ramos never mentioned anything to [(b)(7)] about the shooting, being in fear of their lives, or that they had seen Aldrete-Davila with a weapon or something shiny in his hands. (Exhibits 50 and 51)

On that same date, DHS OIG agents interviewed Field Operations Supervisor (FOS) [(b)(7)c] [(b)(7)c] stated that none of the BPAs informed him of a shooting incident when [(b)(7)c] arrived at the scene on February 17, 2005. [(b)(7)c] said that Ramos told [(b)(7)] that Compean had attempted to grab or was doing a side-to-side movement with Aldrete-Davila when Compean slipped and fell to the ground, getting dirt in his eyes. (Exhibits 52 and 53)

While they were still at the incident scene, [(b)(7)c] that Compean informed [(b)(7)] that he was "OK" when [(b)(7)c] asked if he had been hurt. When the BPAs arrived back at the BP Station, [(b)(7)c] stated that [(b)(7)] specifically asked Compean if he had been assaulted. Compean replied that he had "not" been assaulted; just that dirt had been kicked up in his face when he fell to the ground. [(b)(7)c] further stated that neither Ramos nor Compean told [(b)(7)] that Aldrete-Davila had a weapon or that either of them had discharged their weapons. (Exhibits 52 and 53)

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security. This report remains the pr[...] part, outside the Department of Homeland Sec[...] will be determined by the Office of Inspector administrative penalties.

REDACTED FOR PUBLIC RELEASE

entity receiving a copy directly from the Office of Inspector General. Public availability of the report [...]sure of this report may result in criminal, civil, or

INV FORM-08

## REPORT OF INVESTIGATION

On March 23, 2005, DHS OIG agents interviewed Supervisory BPA [(b)(7)c] who stated that [(b)(7)] arrived at the scene just after [(b)(7)c] said that [(b)(7)] heard [(b)(7)c] ask Compean if he was all right, to which Compean replied that the driver (Aldrete-Davila) had kicked some dirt up in his face and he (Compean) had fallen down and hurt his hand. [(b)(7)c] said that Compean responded by saying, "No," when [(b)(7)c] asked if he needed any medical attention. [(b)(7)c] stated that [(b)(7)] was with [(b)(7)c] at the [(b)(7)c] Station when [(b)(7)c] again asked Compean if he had been assaulted. Compean replied that he was okay and that no assault had occurred. (Exhibit 54)

[(b)(7)c] noted that Ramos appeared nervous. [(b)(7)c] stated that [(b)(7)c] told Ramos to calm down because he was acting very nervous, like it was his first drug load seizure. [(b)(7)c] recalled that Ramos responded by saying, "It's been a long time." (Exhibit 54)

[(b)(7)c] advised that neither Ramos or Compean, nor any of the other BPAs, reported to [(b)(7)] or [(b)(7)c] that they had discharged their weapons. [(b)(7)c] also said that Ramos and Compean never mentioned that Aldrete-Davila had a weapon or that they had at any time been in fear of their lives. (Exhibit 54)

Ramos and Compean remained incarcerated until March 24, 2005. Following a detention hearing, the Honorable Richard Mesa, U.S. Magistrate Judge, Western District of Texas, set bond for Compean and Ramos at $15,000 and $35,000 respectively. As a condition for release, Judge Mesa ordered Ramos to attend anger management classes, even though Ramos' defense attorney, Steve Peters, advised the court that Ramos had attended anger management classes two years earlier. (Exhibit 55)

On March 25, 2005, the BP El Paso Sector suspended Ramos and Compean without pay. (Exhibit 56)

On March 29, 2006, DHS OIG agents interviewed [(b)(7)c], who was the [(b)(7)c] [(b)(7)c] on February 17, 2005. [(b)(7)c] told the DHS OIG that [(b)(7)c] did not observe or hear a shooting incident. [(b)(7)c] said that [(b)(7)] observed a Hispanic male (Aldrete-Davila) moving slowly towards the Mexican highway. [(b)(7)c] said that [(b)(7)] observed an unknown male get out of a white car and go out in the field to assist Aldrete-Davila to the highway. [(b)(7)c] said that [(b)(7)] then observed a blue minivan pull up next to the highway and Aldrete-Davila was placed inside the van, which then got back on the Mexican highway and proceeded west. (Exhibit 57)

[(b)(7)c] advised the DHS OIG that Compean and Ramos never told [(b)(7)] or [(b)(7)c] that Aldrete-Davila might have a gun or that they had discharged their weapons. [(b)(7)c] stated that [(b)(7)] would not have been walking around on top of the levee exposed, had [(b)(7)] been informed that Aldrete-Davila might have had a weapon. [(b)(7)c] stated that [(b)(7)] would have stayed in [(b)(7)] vehicle

**IMPORTANT NOTICE**

This report is intended solely for the official u... ...entity receiving a copy directly from the Office of Inspector General. This report remains the pr... ...econdary distribution may be made, in whole or in part, outside the Department of Homeland Se... REDACTED FOR PUBLIC RELEASE ...Inspector General. Public availability of the report will be determined by the Office of Inspector... ...osure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

## REPORT OF INVESTIGATION

and/or parked the vehicle on the north slope of the levee for better cover if [b)(7] had been told that Aldrete-Davila had, or may have had, a weapon. (Exhibit 57)

On April 8, 2005, DHS OIG agents interviewed BPA [b)(7)c], who was the last BPA to arrive at the scene of the shooting incident on February 17, 2005. Upon arriving at the scene, [b)(7)c] stated that [)(7] observed Compean and Ramos near the edge of the south side of the drainage ditch, which was where Compean had confronted Aldrete-Davila. [b)(7)c] said that Ramos and Compean told [b)(7)]they were fine when []()[had asked them if they were all right. [b)(7)c] advised that Ramos and Compean did not mention anything to [b)(7)c]about shooting their weapons, that Aldrete-Davila had a weapon, or that Compean had been assaulted. (Exhibit 58)

On April 13, 2005, a Federal Grand Jury, Western District of Texas, returned a true bill indicting Ramos and Compean on the following three counts: (Exhibit 59)

> Count One: Title 18 U.S.C. § 113(a)(1), Assault with Intent to Murder.
> Count Two: Title 18 U.S.C. § 113(a)(3), Assault with a Dangerous Weapon.
> Count Three: Title 18 U.S.C. § 113(a)(6), Assault with Serious Bodily Injury.

On April 18, 2005, the DHS OIG spoke to [b)(7)c] the BP El Paso Sector Injury Compensation Coordinator, to inquire if Compean or Ramos filed a Form CA-1, *Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation*. [b)(7)c]advised that [b)(7)]records disclosed that neither Ramos nor Compean had filed a Form CA-1 following the shooting incident on February 17, 2005. (Exhibit 60)

On September 28, 2005, a Federal Grand Jury, Western District of Texas, returned a true bill indicting Ramos and Compean on a superceding indictment with the additional counts: (Exhibit 61)

> Count Four: Title 18 U.S.C. § 924(c)(1)(A)(iii), Discharge of a Firearm in Relation to a Crime of Violence. [Charged against Ramos.]
> Count Five: Title 18 U.S.C. § 924(c)(1)(A)(iii), Discharge of a Firearm in Relation to a Crime of Violence. [Charged against Compean.]
> Count Six: Title 18 U.S.C. § 1512 (c)(1), Tampering with an Official Proceeding. [Charged against Compean.]
> Count Seven: Title 18 U.S.C. § 1512 (c)(2), Tampering with an Official Proceeding. [Charged against Compean.]
> Count Eight: Title 18 U.S.C. § 1512 (c)(2), Tampering with an Official Proceeding. [Charged against Ramos.]

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of the Inspector General. This report remains the property of Homeland Security and secondary distribution may be made, in whole or in part, outside the Department of Homeland Security by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General. Public disclosure of this report may result in criminal, civil, or administrative penalties.

REDACTED FOR PUBLIC RELEASE

INV FORM 08

# REPORT OF INVESTIGATION

On December 21, 2005, a Federal Grand Jury, Western District of Texas, returned a true bill indicting Ramos and Compean on a superceding indictment with the additional counts: (Exhibit 62)

> Count Nine: Title 18 U.S.C. § 242, Deprivation of Rights Under Color of Law. [Charged against Compean.]
> Count 10: Title 18 U.S.C. § 242, Deprivation of Rights Under Color of Law. [Charged against Ramos.]

On January 25, 2006, a Federal Grand Jury, Western District of Texas, returned a true bill indicting Ramos and Compean on a superceding indictment with the additional counts [Agent's Note: This third superceding indictment inserted these two additional counts as Counts 9 and 10 and moved the previous charges of Title 18 U.S.C. § 242 to Counts 11 and 12.] (Exhibit 63)

> Count Eleven: Title 18 U.S.C. § 1512(c)(1), Tampering with an Official Proceeding. [Charged against Ramos.]
> Count Twelve: Title 18 U.S.C. § 1512(c)(1), Tampering with an Official Proceeding [Charged against Compean.]

On February 21, 2006, the Federal trial against Ramos and Compean began at the U.S. Federal Courthouse, Western District of Texas, El Paso, Texas. The Honorable Kathleen Cardone, U.S. District Judge, presided over the trial. The trial lasted from February 21, 2006, to March 6, 2006. The jury deliberated until March 8, 2006. (Exhibit 64)

The jury returned the following verdict for Ramos:

*Not Guilty*: Count 1 – Assault with Intent to Commit Murder, and Aiding and Abetting.
*Guilty*: Count 2 – Assault with a Dangerous Weapon, and Aiding and Abetting.
*Guilty*: Count 3 – Assault with Serious Bodily Injury, and Aiding and Abetting.
*Guilty*: Count 4 – Discharge of a Firearm in Commission of a Crime of Violence.
*Guilty*: Count 8 – Tampering with an Official Proceeding.
*Guilty*: Count 9 – Tampering with an Official Proceeding.
*Guilty*: Count 12 – Deprivation of Rights under Color of Law.

The jury returned the following verdict for Compean:

*Not Guilty*: Count 1 – Assault with Intent to Commit Murder, and Aiding and Abetting.
*Guilty*: Count 2 – Assault with a Dangerous Weapon, and Aiding and Abetting.
*Guilty*: Count 3 – Assault with Serious Bodily Injury, and Aiding and Abetting.
*Guilty*: Count 5 – Discharge of a Firearm in Commission of a Crime of Violence.
*Guilty*: Count 6 – Tampering with an Official Proceeding.

**IMPORTANT NOTICE**

This report is intended solely for the official u... ...y entity receiving a copy directly from the Office of Inspector General. This report remains the p... REDACTED FOR PUBLIC RELEASE ...econdary distribution may be made, in whole or in part, outside the Department of Homeland Se... ...Inspector General. Public availability of the report will be determined by the Office of Inspector... ...sure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

*Guilty*: Count 7 – Tampering with an Official Proceeding.
*Guilty*: Count 8 – Tampering with an Official Proceeding.
*Guilty*: Count 10 – Tampering with an Official Proceeding.
*Guilty*: Count 11 – Deprivation of Rights under Color of Law.

Relating to Counts 11 and 12, the jury answered yes to two questions, which in effect enhanced these counts under the federal sentencing guidelines, allowing for the possibility of a life sentence. The questions were:

A) "Does the jury unanimously find that the acts of (Jose Alonso Compean, relating to count # 11, and Ignacio Ramos, relating to Count # 12) resulted in the injury of O.A.-D. (Osvaldo Aldrete-Davila) or the acts of (Jose Alonso Compean; Ignacio Ramos) included the use, attempted use or threatened use of a dangerous weapon?"

B) "Does the jury unanimously find that the acts of (Jose Alonso Compean, relating to count # 11, and Ignacio Ramos, relating to Count # 12) constituted an attempt to kill O.A.-D.?"

On October 19, 2006, the Honorable Kathleen Cardone, U.S. District Judge, Western District of Texas, sentenced Ramos to 11 years and 1 day of incarceration and sentenced Compean to 12 years of incarceration. (Exhibit 65)

## Applicable Border Patrol Policies

### Pursuit Policy

Investigation disclosed that Ramos and [(b)(7)c] pursued Aldrete-Davila from [(b)(7)c] Texas, to the levee, where they all went over the posted speed limits, which ranged from 10 mph to 55 mph, to include areas marked as "school bus" loading zones. [ ]

[(b)(2)High, (b)(7)e]                                              (Exhibits 66 – 70)

[(b)(2)High. (b)(7)e Released in Part per consultation with U.S. Customs and Border Protection (USCBP)]

IMPORTANT NOTICE

This report is intended solely for the official use of [ ] ty receiving a copy directly from the Office of Inspector General. This report remains the proper[ ] dary distribution may be made, in whole or in part, outside the Department of Homeland Security REDACTED FOR PUBLIC RELEASE ctor General. Public availability of the report will be determined by the Office of Inspector Gen[ ] of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

> (b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

> (b)(2)High, (b)(7)e

The two BP supervisors, [(b)(7)c] and [(b)(7)c], were never informed of [(b)(2)High, (b)(7)e] (b)(2)High, (b)(7)e (Exhibits 9 and 52 – 54)

Investigation disclosed that Ramos, [(b)(7)c], and the other BPAs were unaware of what was inside the van during the pursuit and they acknowledged that the van could have been loaded with undocumented aliens, to include women and children, and therefore might have caused a serious accident due to the sharp 90 degree turns and high speeds. Ramos and [(b)(7)c] did not know that drugs were inside the van until after the shooting. (Exhibit 30)

## **Use of Non-Deadly Force Policy**

Investigation disclosed that Compean encountered Aldrete-Davila on the south side of the drainage ditch and tried to hit Aldrete-Davila in the head once or twice with the butt of his shotgun.

The BP Use of Non-Deadly Force Policy states that [(b)(2)High, (b)(7)e]

> (b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

The policy states that the following are the non-deadly force devices authorized for use by officers in performing official duties

> (b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security ... entity receiving a copy directly from the Office of Inspector General. This report remains the pro... ...condary distribution may be made, in whole or in part, outside the Department of Homeland Sec... REDACTED FOR PUBLIC RELEASE ...nspector General. Public availability of the report will be determined by the Office of Inspector G... ...ure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

Investigation disclosed that Compean and Ramos had last qualified with OC spray and their CSBs in September of 2003. BP agents are required to qualify once a year.

Investigation found that Compean was carrying OC spray and a CSB on February 17, 2005. However, instead of using those authorized devices for non-deadly force, Compean chose to use his shotgun, which is intended to cause death or serious bodily injury, to hit Aldrete-Davila who had his hands raised and was attempting to surrender.

## Deadly Force Policy

(b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

In their statements to DHS OIG and/or during their testimony at trial, Compean, Ramos, and [(b)(7)c] stated that they did not observe any weapons or other items in Aldrete-Davila's hands when he was in the drainage ditch (i.e., Aldrete-Davila did not have the "means").

Compean and [(b)(7)c] stated that Aldrete-Davila attempted to surrender by putting his hands up. Compean stated that he was not certain Aldrete-Davila had a weapon when he (Compean) shot at him. Compean stated that Aldrete-Davila continued to "run away" from him when he (Compean) was shooting (i.e., Aldrete-Davila did not have the "intent"). Compean stated that his intent was to kill Aldrete-Davila. Compean added that Ramos also intended to kill Aldrete-Davila.

Even though Compean had stopped shooting because Aldrete-Davila continued to "run away" and was about to cross over into Mexico, Ramos shot and hit Aldrete-Davila in the buttocks.

## Firearms Policy

Investigation disclosed that Ramos and Compean fired their weapons at Aldrete-Davila who was unarmed and running away from the two BPAs. Ramos and Compean then did not report the shooting. Investigation found that [(b)(7)c] and [(b)(7)c] knew that Ramos and Compean had discharged their weapons and they ([(b)(7)c], and [(b)(7)c]) also failed to report the shooting. Furthermore, Compean and [(b)(7)c] destroyed the crime scene by removing casings without authority.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property REDACTED FOR PUBLIC RELEASE ndary distribution may be made, in whole or in part, outside the Department of Homeland Securit REDACTED FOR PUBLIC RELEASE pector General. Public availability of the report will be determined by the Office of Inspector Ge e of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

## REPORT OF INVESTIGATION

The Firearms Policy, concerning the reporting of shooting incidents, states,

(b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

Investigation found that Ramos, Compean, [ (b)(7)c ], and [(b)(7)c] violated the BP Firearms Policy. Specifically, Ramos and Compean discharged their BP weapons, while on duty, and never reported the shooting. [(b)(7)c] witnessed Compean discharge his firearm and never reported it. [ (b)(7)c ] heard the shooting and then was later advised by Compean that [(7)] had discharged [(b)(7)] weapon, but [ (b)(7)c ] did not report the shooting. [(b)(7)c] did not report the shooting incident after [ (b)(7)c ] informed [(b)(7)] that Compean had discharged his weapon and when Compean also told [(b)(7)c] that he and Ramos had discharged their weapons.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the ~~Inspector General. This report remains the pro~~ part, outside the Department of Homeland Secu will be determined by the Office of Inspector G administrative penalties.

REDACTED FOR PUBLIC RELEASE

entity receiving a copy directly from the Office of condary distribution may be made, in whole or in nspector General. Public availability of the report ure of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

## M-68 Handbook

The *Officer's Handbook: A Guide for Proper Conduct and Relationships with Aliens and the General Public*, commonly referred to as the M-68 handbook, is provided to BPAs at the BP Academy as a standard procedure and states

(b)(2)High, (b)(7)eReleased in Part per consultation with USCBP

## Reporting Allegations of Misconduct

The DHS OIG investigation discovered that former BP El Paso Sector Patrol Chief [(b)(7)c] had sent a memorandum to all BPAs in the BP El Paso Sector in August of 2004, concerning the reporting of allegations of misconduct. (Exhibit 75)

The memorandum stated that all BP employees must immediately report an allegation of misconduct and that they are subject to disciplinary action for failing to report allegations of misconduct. The memorandum instructed BPAs on how and to whom to report allegations of misconduct.

Investigation found that Ramos, Compean, [(b)(7)c] [(b)(7)c], and [(b)(7)c] had signed a roster in August of 2004, stating that they had read and understood this policy. [(b)(7)c] and therefore did not read this policy.

Investigation disclosed that Ramos, Compean, [(b)(7)c] violated this policy when they did not report the shooting incident and/or knew that the crime scene had been destroyed.

## Training History

Investigation found that Ramos and Compean had qualified with their respective BP issued Berettas on February 16, 2005, the day before the shooting incident. Ramos' score was 96% and Compean's score was 80%. The minimum passing score is 70%. (Exhibit 76)

During the qualification, Ramos, Compean, and the other BPAs who qualified with their weapons that day received training on deadly force and reporting shooting incidents.

**IMPORTANT NOTICE**

This report is intended solely for the official us~~e of the Department of Homeland Se~~ entity receiving a copy directly from the Office of Inspector General. This report remains the pro~~perty~~ ~~condary distribution may be made, in whole or in part, outside the Department of Homeland Sec~~ REDACTED FOR PUBLIC RELEASE ~~nspector General. Public availability of the report will be determined by the Office of Inspector G~~ ~~ure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

Training history for Compean disclosed that he had received the following training relevant to this investigation: Conspiracy Investigations, Integrity and Ethical Decision Making, EEO Taking Responsibility, and OC Spray/Baton training. (Exhibits 71 and 77)

Training history for Ramos disclosed that he had received the following training relevant to this investigation: Vehicle Pursuit Policy; Ethics Orientation; Firearms Instructor; Defensive Tactics; Crisis Negotiation; Vehicle Pursuit Refresher Training; EEO Taking Responsibility; and OC Spray/Baton Training. (Exhibits 71 and 77)

Investigation also found that Ramos had volunteered to be a member of the BP El Paso Sector Evidence Team (SET). Ramos attended and graduated from the Basic Field Evidence Technology Course in 1999 and helped process a shooting incident crime scene in the BP Fort Hancock Station's jurisdiction that same year. (Exhibit 78)

Based on the above training, Ramos was well trained in BP vehicle pursuit policies, yet he still violated that policy on February 17, 2005. As a Firearms Instructor, Ramos was not only aware of BP Firearms Policy, to include the Use of Deadly Force and Reporting Shooting Incidents, but taught these policies to other BPAs. As a member of the SET and by actively participating in the investigation of at least one shooting incident, Ramos knew what the SET would do and look for, had the incident been reported and had the SET responded to the shooting incident on February 17, 2005. Ramos also knew of the many other resources (i.e., the FBI, Sheriff's Office, Texas DPS Troopers, other BP Supervisors) that would have responded to the scene had he and Compean reported the shooting incident.

## History of Misconduct

During the course of the investigation, DHS OIG obtained the Official Personnel Files (OPFs) of the BPAs involved in this investigation. (Exhibit 79)

|  |
|---|
| (b)(7)c |

|  |
|---|
| (b)(7)c |

**IMPORTANT NOTICE**

This report is intended solely for the official us... | entity receiving a copy directly from the Office of Inspector General. This report remains the pro... | econdary distribution may be made, in whole or in part, outside the Department of Homeland Sec... REDACTED FOR PUBLIC RELEASE | Inspector General. Public availability of the report will be determined by the Office of Inspector ... | sure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

(b)(7)c

(b)(7)c

(b)(7)c charges against Ramos were dismissed after he completed 18 sessions of anger management classes. (b)(7)c

(b)(7)c

(b)(7)c

(b)(7)c

(b)(7)c

As previously stated, the BP El Paso Sector suspended Ramos and Compean without pay on March 25, 2005, due to events relating to this investigation. (Exhibit 56)

Ramos and Compean both appealed their suspensions to former BP El Paso Sector Chief (b)(7)c, which were both captured on audio recordings. (Exhibits 81 - 82)

During Ramos' suspension hearings, his defense attorney, Mary Stillinger, represented him and did not allow Ramos to provide a statement to (b)(7)c

During Compean's suspension hearing, he was represented by BP Union steward (b)(7)c. Compean told (b)(7)c that he did not report the shooting because he thought he would get into trouble. Compean further stated that he had told BP Field Operations Supervisor (FOS) (b)(7)c (b)(7)c that he was not assaulted. Throughout the hearing, Compean never mentioned that he saw something shiny and/or a weapon in Aldrete-Davila's hands. Compean admitted that he knew it was wrong to not report the shooting incident.

During the hearing, Compean advised (b)(7)c that he would have reported the shooting had he known Aldrete-Davila had been hit. However, during his earlier interview with DHS OIG, Compean stated that he had observed Aldrete-Davila limping after the shooting and assumed that Ramos had hit him. (Exhibit 82)

**IMPORTANT NOTICE**

This report is intended solely for the official us[...] Inspector General. This report remains the pro[...] part, outside the Department of Homeland Sec[...] will be determined by the Office of Inspector [...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

entity receiving a copy directly from the Office of [...] econdary distribution may be made, in whole or in [...] Inspector General. Public availability of the report [...] sure of this report may result in criminal, civil, or [...]

INV FORM-08

# REPORT OF INVESTIGATION

## Summary of Investigative Findings

### Ignacio Ramos and Jose Alonso Compean

The DHS OIG investigation disclosed that Ramos and Compean were experienced BPAs who were aware of BP firearms, deadly force, and non-deadly force policies, to include the reporting of shooting incidents and securing the scene.  Investigation found that Ramos and Compean were also aware of the resources that would have been called out to investigate the shooting incident on February 17, 2005, such as the BP Sector Evidence Team, FBI, and State, County, and/or Local law enforcement authorities, based on their respective training and experience in other reportable shooting incidents.  (Exhibits 78 and 83 – 92)

The DHS OIG investigation found that Ramos and Compean did not inform any of the other BPAs that they had observed Aldrete-Davila with a weapon or a shiny object in his hand.  During his suspension hearing, Compean did not mention to former BP Chief [ (b)(7)c ] that he believed Aldrete-Davila had a weapon or something shiny in his hand that could have been perceived to be a weapon.

The DHS OIG investigation found that no one, including Ramos, observed Aldrete-Davila assault Compean.  Furthermore, Compean had several opportunities to report that he had been assaulted to his supervisors, [ (b)(7)c ], but in fact denied he had been assaulted when asked.

During the trial, Ramos' and Compean's testimonies contradicted each other, whereas other BPAs testimonies and the evidence presented in court corroborated Aldrete-Davila's testimony.  As a result, the jury returned guilty verdicts on all counts, save for the count of attempted murder.

The Honorable Kathleen Cardone, U.S. District Judge, Western District of Texas, sentenced Ramos to 11 years and 1 day of incarceration and sentenced Compean to 12 years of incarceration.

On October 26, 2006, the CBP forwarded letters of proposed removal (termination) to Ramos and Compean.  (Exhibit 93)

In addition to the criminal statutes, the DHS OIG investigation found that Ramos violated the BP Pursuit Policy, Firearms Policy, Deadly Force Policy, and Reporting Allegations of Misconduct Policy.  DHS OIG found that Compean violated the BP Firearms Policy, the Deadly Force Policy, and the Use of Non-Deadly Force Policy.

**IMPORTANT NOTICE**

This report is intended solely for the official u... ... entity receiving a copy directly from the Office of Inspector General.  This report remains the pr... ...econdary distribution may be made, in whole or in part, outside the Department of Homeland Se... REDACTED FOR PUBLIC RELEASE ...Inspector General.  Public availability of the report will be determined by the Office of Inspector... ...sure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

(b)(7)c

Due to the immunity provisions of the Proffer letter provided to (b)(7)c by the U.S. Attorney's Office (USAO), Western District of Texas (b)(7)c will not be prosecuted; however, (b)(7)c provided multiple false statements to DHS OIG during the course of the investigation and in failing to report the shooting, obstructed and impeded a contemporaneous investigation of the facts surrounding the shooting for use in an official proceeding, each constituting violations of:

Title 18 U.S.C. § 1512 (c)(2), Tampering with an Official Proceeding.
Title 18 U.S.C. § 1001, False Statements.

In addition, the DHS OIG found that (b)(7)c committed numerous administrative violations, to include the BP Pursuit Policy, the Reporting Allegations of Misconduct Policy, and on two occasions the BP Firearms Policy.

(b)(7)c

Due to the immunity provisions of the Proffer letter provided to (b)(7)c by the USAO, (b)(7)c will not be prosecuted; however, (b)(7)c intentionally participated in the destruction of evidence when (b)(7) threw away the shell casings, and by failing to report the shooting, each of which obstructed and impeded a contemporaneous investigation of the facts surrounding the shooting for use in an official proceeding, each constituting violations of:

Title 18 U.S.C. § 1512 (c)(1), Tampering with an Official Proceeding.
Title 18 U.S.C. § 1512 (c)(2), Tampering with an Official Proceeding.

In addition, the DHS OIG found that (b)(7)c committed administrative violations, namely the BP Firearms Policy and the Reporting Allegations of Misconduct Policy.

(b)(7)c

Due to the immunity provisions of the Proffer letter provided to (b)(7)c by the USAO, (b)(7)c will not be prosecuted; however (b)(7)c provided multiple false statements to DHS OIG during the course of the investigation and in failing to report the shooting, obstructed and impeded a contemporaneous investigation of the facts surrounding the shooting for use in an official proceeding, each constituting violations of:

Title 18 U.S.C. § 1512 (c)(2), Tampering with an Official Proceeding.
Title 18 U.S.C. § 1001, False Statements.

**IMPORTANT NOTICE**

This report is intended solely for the official u[...] Inspector General. This report remains the pr[...] part, outside the Department of Homeland Se[...] will be determined by the Office of Inspector [...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

[...] entity receiving a copy directly from the Office of [...]econdary distribution may be made, in whole or in [...] Inspector General. Public availability of the report [...]osure of this report may result in criminal, civil, or

INV FORM-08

## REPORT OF INVESTIGATION

In addition, the DHS OIG found that [(b)(7)c] committed administrative violations, namely the BP Firearms Policy and the Reporting Allegations of Misconduct Policy.

[(b)(7)c]

The investigation disclosed that Compean, [(b)(7)c], and [(b)(7)c] stated that Ramos had advised [(b)(7)c] that Compean had been assaulted by Aldrete-Davila when he purportedly threw dirt into Compean's eyes. Compean alleged that [(b)(7)c] failed to file the necessary BP reports that he had been assaulted. However, his own statements, his own trial testimony, as well as statements and testimony of other BPAs contradicted Compean's allegation.

Subsequently, the DHS OIG investigation found no evidence to suggest that [(b)(7)c] had any knowledge of an assault on a BP agent, nor did [(b)(7)] have any knowledge of a reportable shooting incident that occurred on February 17, 2005. No evidence was found to suggest that [(b)(7)c] had engaged in any misconduct related to this, or any other, incident.

[(b)(7)c]

The DHS OIG investigation found no evidence to suggest that [(b)(7)c] had any knowledge of the reportable shooting incident that occurred on February 17, 2005, or had engaged in any misconduct related to this, or any other, incident.

[(b)(7)c]

The DHS OIG investigation found no evidence to suggest that BPA [(b)(7)c] had any knowledge of the reportable shooting incident that occurred on February 17, 2005, or had engaged in any misconduct related to this, or any other, incident.

[(b)(7)c]

The DHS OIG investigation found no evidence to suggest that BPA [(b)(7)c] had any knowledge of the reportable shooting incident that occurred on February 17, 2005, or had engaged in any misconduct related to this, or any other, incident.

[(b)(7)c]

The DHS OIG investigation found no evidence to suggest that BPA [(b)(7)c] had any knowledge of the reportable shooting incident that occurred on February 17, 2005, or had engaged in any misconduct related to this, or any other, incident.

**IMPORTANT NOTICE**

This report is intended solely for the official use [...] Inspector General. This report remains the pro[...] part, outside the Department of Homeland Sec[...] will be determined by the Office of Inspector [...] administrative penalties.

REDACTED FOR PUBLIC RELEASE

entity receiving a copy directly from the Office of [...] condary distribution may be made, in whole or in [...] nspector General. Public availability of the report [...] ure of this report may result in criminal, civil, or

INV FORM-08

# REPORT OF INVESTIGATION

(b)(7)c

The DHS OIG investigation found no evidence to suggest that BPA [ (b)(7)c ] had any knowledge of the reportable shooting incident that occurred on February 17, 2005, or had engaged in any misconduct related to this, or any other, incident.

**IMPORTANT NOTICE**

This report is intended solely for the official us[...]  entity receiving a copy directly from the Office of Inspector General. This report remains the pr[...]  econdary distribution may be made, in whole or in part, outside the Department of Homeland Sec  REDACTED FOR PUBLIC RELEASE  Inspector General. Public availability of the report will be determined by the Office of Inspector [...]  sure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

## EXHIBITS

NUMBER                                    DESCRIPTION

1.    Memorandum of Activity, dated March 4, 2005, Case Initiation.

2.    Memorandum of Activity, dated July 11, 2005, Interview with [_____(b)(7)c_____] on July 11, 2005.

3.    Memorandum of Activity, dated July 8, 2005, Interview of [_____(b)(7)c_____] on July 14, 2005.

4.    Memorandum of Activity, dated March 7, 2005, Receipt of Documents and Audiotapes from OIA.

5.    Memorandum of Activity, dated March 10, 2005, Interview of [_____(b)(7)c_____].

6.    Memorandum of Activity, dated March 11, 2005, Telephonic Interview of Osvaldo Aldrete-Davila.

7.    Memorandum of Activity, dated March 11, 2005, Documents from OIA.

8.    Memorandum of Activity, dated June 30, 2005, Sensor Hits.

9.    Memorandum of Activity, dated March 11, 2005, Transcript of Pertinent Audio from Border Patrol Radio Transmissions.

10.   Memorandum of Activity, dated February 14, 2006, Revised Transcript of [_(b)(7)c_] Border Patrol Radio Transmissions.

11.   Memorandum of Activity, dated March 11, 2005, Telephone Contact with [_(b)(7)c_]

12.   Memorandum of Activity, dated March 15, 2005, Location of Aldrete-Davila's Van.

13.   Memorandum of Activity, dated March 16, 2005, Personal Interview of Osvaldo Aldrete-Davila.

14.   Memorandum of Activity, dated April 14, 2005, April 14, 2005 Meeting with Aldrete-Davila.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General.  This report remains the prope[...] REDACTED FOR PUBLIC RELEASE [...]ndary distribution may be made, in whole or in part, outside the Department of Homeland Secur[...] pector General.  Public availability of the report will be determined by the Office of Inspector Ge[...]re of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

15.  Memorandum of Activity, dated June 1, 2005, Interview of Aldrete-Davila on June 1, 2005.

16.  Memorandum of Activity, dated June 24, 2005, Interview of Aldrete-Davila on June 24, 2005.

17.  Memorandum of Activity, dated May 23, 2005, Work and Medical Documents from Mexico.

18.  Memorandum of Activity, dated May 25, 2005, Documents from Mexico.

19.  Memorandum of Activity, dated June 22, 2005, Translation of Mexican Documents.

20.  Memorandum of Activity, dated March 28, 2005, Receipt of Pictures of Van and Marijuana.

21.  Memorandum of Activity, dated May 6, 2005, CIS Information on Aldrete-Davila.

22.  Memorandum of Activity, dated March 15, 2005, Other – Letter to Colonel [ (b)(7)c ] requesting medical assistance for Aldrete-Davila.

23.  Memorandum of Activity, dated March 16, 2005, Medical Treatment.

24.  Memorandum of Activity, dated October 5, 2005, Receipt of Certified Medical Records.

25.  Memorandum of Activity, dated October 12, 2005, Receipt of Outpatient Medical Records.

26.  Memorandum of Activity, dated May 4, 2005, New [ (b)(7)c ]

27.  Memorandum of Activity, dated May 23, 2005, Tort Claim.

28.  Memorandum of Activity, dated June 6, 2005, Medical Checkup on June 6, 2005.

29.  Memorandum of Activity, dated March 17, 2005, Submission bullet to Texas DPS Crime Lab.

30.  Memorandum of Activity, dated March 21, 2005, Records Review: Original Form I-44.

31.  Memorandum of Activity, dated March 18, 2005, Interview of [ (b)(7)c ]

**IMPORTANT NOTICE**

This report is intended solely for the official [ ] any entity receiving a copy directly from the Office of Inspector General. This report remains the [ ] secondary distribution may be made, in whole or in part, outside the Department of Homeland S[ REDACTED FOR PUBLIC RELEASE ]f Inspector General. Public availability of the report will be determined by the Office of Inspecto[ ]losure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

32.  Memorandum of Activity, dated March 18, 2005, Submission of Ignacio Ramos' 96D Brigadier semi-automatic pistol to the Texas DPS Crime Lab.

33.  Memorandum of Activity, dated April 25, 2005, 2nd Interview of [(b)(7)c]

34.  Memorandum of Activity, dated September 21, 2005, 3rd Interview of [(b)(7)c]

35.  Memorandum of Activity, dated March 18, 2005, Interview of [(b)(7)c]

36.  Memorandum of Activity, dated May 9, 2005, 2nd Interview of [(b)(7)c]

37.  Memorandum of Activity, dated May 18, 2005, Cellular Telephone Record of [(b)(7)c] [(b)(7)c]

38.  Memorandum of Activity, dated March 18, 2005, Interview of [(b)(7)c]

39.  Memorandum of Activity, dated March 18, 2005, Personal Interview of [(b)(7)c]

40.  Memorandum of Activity, dated April 15, 2005, Interview of [(b)(7)c]

41.  Memorandum of Activity, dated September 27, 2005, 3rd Interview of [(b)(7)c]

42.  Memorandum of Activity, dated January 24, 2006, Statement from [(b)(7)c]

43.  Memorandum of Activity, dated March 18, 2005, Texas DPS Crime Lab Results of Bullet Analysis.

44.  Memorandum of Activity, dated April 13, 2005, Ballistics Report.

45.  Memorandum of Activity, dated October 6, 2005, DPS Forensic Reports.

46.  Memorandum of Activity, dated March 18, 2005, Arrest of Ignacio Ramos.

47.  Memorandum of Activity, dated March 18, 2005, Arrest and Interview of Jose Alonso Compean: Sworn Statement.

48.  Memorandum of Activity, dated March 18, 2005, Oral Interview of Jose Alonso Compean.

49.  Memorandum of Activity, dated February 6, 2006, Texas DPS Crime Lab Analysis of Shotgun.

**IMPORTANT NOTICE**

This report is intended solely for the official use ... ntity receiving a copy directly from the Office of Inspector General. This report remains the prop ... condary distribution may be made, in whole or in part, outside the Department of Homeland Secu ... REDACTED FOR PUBLIC RELEASE ... spector General. Public availability of the report will be determined by the Office of Inspector G ... ure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

50.  Memorandum of Activity, dated March 22, 2005, Second Interview of [ (b)(7)c ].

51.  Memorandum of Activity, dated September 20, 2005, Third Interview of [ (b)(7)c ].

52.  Memorandum of Activity, dated March 22, 2005, Interview of [ (b)(7)c ]

53.  Memorandum of Activity, dated June 3, 2005, 2nd Interview of [ (b)(7)c ] and Receipt of BP Firearms Policy.

54.  Memorandum of Activity, dated March 23, 2005, Interview of [ (b)(7)c ]

55.  Memorandum of Activity, dated March 24, 2005, Detention Hearing.

56.  Memorandum of Activity, dated March 30, 2005, Suspension of Ramos and Compean.

57.  Memorandum of Activity, dated March 29, 2005, Personal Interview of [ (b)(7)c ]

58.  Memorandum of Activity, dated April 8, 2005, Interview of [ (b)(7)c ].

59.  Memorandum of Activity, dated April 13, 2005, Grand Jury Indictment.

60.  Memorandum of Activity, dated April 15, 2005, Form CA-1 Query.

61.  Memorandum of Activity, dated September 28, 2005, Superceding Grand Jury Indictment.

62.  Memorandum of Activity, dated December 21, 2005, 2nd Superceding Grand Jury Indictment.

63.  Memorandum of Activity, dated January 25, 2006, 3rd Superceding Grand Jury Indictment.

64.  Memorandum of Activity, dated March 8, 2006, Trial.

65.  Memorandum of Activity, dated October 19, 2006, Sentencing of Ramos and Compean.

66.  Memorandum of Activity, dated April 29, 2005, Border Patrol Pursuit Policy.

67.  Memorandum of Activity, dated February 17, 2006, Photos and Mileage.

68.  Memorandum of Activity, dated May 16, 2005, Receipt of GIS Maps.

**IMPORTANT NOTICE**

This report is intended solely for the official use of [ ]ty receiving a copy directly from the Office of Inspector General. This report remains the proper[ ]dary distribution may be made, in whole or in part, outside the Department of Homeland Security REDACTED FOR PUBLIC RELEASE ector General. Public availability of the report will be determined by the Office of Inspector Gen[ ]s of this report may result in criminal, civil, or administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

69.  Memorandum of Activity, dated April 11, 2005, GIS Satellite Photos of Incident Site.

70.  Memorandum of Activity, dated February 17, 2006, Placement of Vehicles on February 17, 2005.

71.  Memorandum of Activity, dated February 17, 2006, Information on Border Patrol Asp Baton and OC Spray.

72.  Memorandum of Activity, dated May 23, 2005, Reporting Assaults/Use of Non-Deadly Force.

73.  Memorandum of Activity, dated March 31, 2005, Receipt of the CBP Interim Use of Force and Firearms Guidelines.

74.  Memorandum of Activity, dated April 12, 2005, Records Review: M-68 Officer's Handbook.

75.  Memorandum of Activity, dated April 12, 2005, Records Review: BP Memo – Report Allegations of Misconduct.

76.  Memorandum of Activity, dated March 17, 2005, Firearms Qualification Scores.

77.  Memorandum of Activity, dated September 28, 2005, Receipt of Training Histories for Ramos and Compean.

78.  Memorandum of Activity, dated October 3, 2005, Receipt of Sector Evidence Team Reports and Training Material.

79.  Memorandum of Activity, dated May 12, 2005 Receipt of Official Personnel Files (OPFs).

80.  Memorandum of Activity, dated April 1, 2005, Records Review: OIA Investigations of Ramos and (b)(7)c .

81.  Memorandum of Activity, dated May 12, 2005, Ramos Appeal of his Suspension.

82.  Memorandum of Activity, dated May 12, 2005, Transcript of Two Oral Boards concerning Jose Compean's Suspension.

**IMPORTANT NOTICE**

This report is intended solely for the official use o~~f the Department of Homeland Securi~~tity receiving a copy directly from the Office of
Inspector General. This report remains the prope REDACTED FOR PUBLIC RELEASE ndary distribution may be made, in whole or in
part, outside the Department of Homeland Securi pector General. Public availability of the report
will be determined by the Office of Inspector Ge e of this report may result in criminal, civil, or
administrative penalties.

INV FORM-08

# REPORT OF INVESTIGATION

83.  Memorandum of Activity, dated September 23, 2005, Assault of Ignacio Ramos on December 21, 2003.

84.  Memorandum of Activity, dated March 23, 2005, Records Review: Assaults Reported by [(b)(7)c].

85.  Memorandum of Activity, dated April 5, 2005, Records Review: Analysis of Form I-44 Data.

86.  Memorandum of Activity, dated June 3, 2005, Interview of [(b)(7)c].

87.  Memorandum of Activity, dated June 10, 2005, Interview of [(b)(7)c].

88.  Memorandum of Activity, dated June 23, 2005, Transcript of Radio Transmissions of the 12/03/2004 Shooting Incident.

89.  Memorandum of Activity, dated June 3, 2005, Border Patrol Reports of 12/03/2004 Shooting Incident.

90.  Memorandum of Activity, dated September 29, 2005, Receipt of Sector Evidence Team Reports.

91.  Memorandum of Activity, dated October 19, 2005, [(b)(7)c] Shooting Incident on May 30, 2003.

92.  Memorandum of Activity, dated March 2, 2006, 1996 Shooting Incident.

93.  Memorandum of Activity, CBP Letters of Proposed Removal (Termination) sent to Ramos and Compean on October 26, 2006 (without enclosures).

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the prop part, outside the Department of Homeland Secur will be determined by the Office of Inspector G administrative penalties.

REDACTED FOR PUBLIC RELEASE

ondary distribution may be made, in whole or in spector General. Public availability of the report re of this report may result in criminal, civil, or

INV FORM-08

EXHIBIT 46

Office of Inspector General - Investigations
U.S. Department of Homeland Security

## MEMORANDUM OF ACTIVITY

 **Homeland Security**

**Type of Activity:** Arrest of Ignacio Ramos

| **Case Number:** I05-BCBP-ELP-07117 | **Case Title:** Ignacio Ramos, et al. |
|---|---|

This investigation was initiated on March 4, 2005, upon receipt of information from the Office of Internal Audit (OIA), United States Border Patrol (BP), Customs & Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown BP Agent while attempting to cross into the United States on February 17, 2005 near (b)(7)c     Texas. Aldrete-Davila advised that he fled back to Mexico where his wound was treated at a local hospital but the bullet was left in Aldrete-Davila's body.

On March 18, 2005, U.S. Magistrate Judge Richard P. Mesa, Western District of Texas, signed a Criminal Complaint, Case Number: 05-1535M(01) & (02) and Warrants for Arrest for Ignacio "Nacho" Ramos and Jose Alonso Compean. (Attachments 1 and 2)

On that same date, at approximately 9:30 p.m., DHS Office of Inspector General (OIG) agents executed the Warrant for Arrest, 05-1535(01), at Ramos' residence,     (b)(7)c
(b)(7)c

DHS OIG agents took Ramos into custody and Ramos invoked his right to remain silent. Ramos was transported back to the DHS OIG, El Paso Resident Office, 1200 Golden Key Circle, Suite 230, El Paso, Texas.

(b)(7)c  filled out INV Form-13, Personal History Information, and then obtained Ramos' fingerprints and photos. (Attachments 3, 4, and 5)

Special Agents  (b)(7)c  and     (b)(7)c     DHS OIG, transported and booked Ramos into the El Paso County Detention Facility, Booking Number (b)(7)c, (b)(2)Low (Attachment 6)

| Name, Title, Signature, and Date: (b)(7)c  , Special Agent  (b)(7)c, (b)(2)Low  3/24/05 | Reviewing Official Name, Title, Signature, and Date: James E. Smith, RAC  (b)(7)c, (b)(2)Low  5-25-05 |
|---|---|

**IMPORTANT NOTICE**

This report is intended solely for the of Inspector General. This report remains part, outside the Department of Homel will be determined by the Office of In administrative penalties.

Redacted for Public Release.

ny entity receiving a copy directly from the Office of secondary distribution may be made, in whole or in f Inspector General. Public availability of the report closure of this report may result in criminal, civil, or

## MEMORANDUM OF ACTIVITY

### ATTACHMENTS

1.) Western District of Texas, Criminal Complaint, Case Number: 05-1535M(01) & (02), dated March 18, 2005.
2.) Western District of Texas, Warrant for Arrest for Ignacio Ramos, dated March 18, 2005
3.) INV Form-13, Personal History Information, for Ignacio Ramos, completed on March 18, 2005.
4.) Photocopy of Fingerprint card containing Ignacio Ramos' fingerprints.
5.) Photos of Ignacio Ramos.
6.) Form USM-41, U.S. Marshall Service Prisoner Remand, for Ignacio Ramos, booking number
   (b)(7)c, (b)(2)Low

**IMPORTANT NOTICE**

This report is intended solely for the official u:
Inspector General. This report remains the pro
part, outside the Department of Homeland Sec
will be determined by the Office of Inspector
administrative penalties.

Redacted for Public Release

eceiving a copy directly from the Office of
y distribution may be made, in whole or in
r General. Public availability of the report
this report may result in criminal, civil, or

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

FILED

MAR 2 1 2005

U.S. MAGISTRATE JUDGE
FOR THE WESTERN DISTRICT OF TEXAS
BY_____
SPECIAL DEPUTY CLERK

UNITED STATES OF AMERICA

V.

**Ignacio Ramos, aka: Nacho and
Jose Alonso Compean**

# CRIMINAL COMPLAINT

CASE NUMBER:  05-1535M(01)&(02)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  On or about February 17, 2005, in El Paso County, in the Western District of Texas, defendants did unlawfully, knowingly, and intentionally assault, a Mexican national, one O. A.D., resulting in serious bodily injury, is in violation of 18 USC 113(a)(6).  I further state that I am a Special Agent with the Department of Homeland Security, Office of Inspector General, and that this complaint is based on the following facts:

*See attached affidavit*

Continued on the attached sheet and made a part hereof:        X    Yes        No

(b)(7)c

_____
Signature of Complainant

(b)(7)c

Sworn to before me and subscribed in my presence,

March 18, 2005                                                El Paso, Texas
_____              _____
Date                                                                 City and State

RICHARD P. MESA
~~Norbert J. Garney,~~ U.S. Magistrate Judge          _____
_____              Signature of Judicial Officer
Name & Title of Judicial Officer

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I,      (b)(7)c        being duly sworn, do hereby state that I am a Special Agent with the Department of Homeland Security, Office of Inspector General, and, as such, am vested with the authority to investigate violations of Federal laws, including Title 18 of the United States Code.

Further the Affiant states as follows:

1. On or about February 17, 2005, a Mexican National, hereinafter referred to as "the victim" illegally entered the United States.

2. According to the victim, he drove towards the U.S./Mexico international border where he drove up onto a drainage ditch that that runs parallel with the levy that lies between the Rio Grand River and the drainage ditch.

3. The victim further states he then encountered Border Patrol Agent Jose Alonso Compean on the levy where Compean attempted to hit him in the head with the butt of his shotgun after the victim had raised his hands over his head to surrender. The victim moved to avoid being hit and then ran over the levy towards the Rio Grande, followed by U.S. Border Patrol Agents Jose Alonso Compean and Igancio "Nacho" Ramos. U.S. Border Patrol Agent Compean fired his government issued weapon, a 96D Beretta 40 caliber automatic pistol, serial number      (b)(2)Low      at the victim while he was attempting to run back to Mexico.

4. Ballistics testing confirms a government issued weapon belonging to U.S. Border Patrol Agent Ignacio "Nacho" Ramos, a 96D Beretta 40 caliber automatic pistol, serial number      (b)(2)Low      fired a bullet (a 40 caliber Smith & Wesson jacketed hollow point) which hit the victim in the left buttocks while he was attempting to flee to Mexico. Where the victim was shot on U.S. Government property between the U.S. bank of the Rio Grande River and the levy.

5. According to a confidential informant, Agent Jose Alonso Compean told him that he (Compean) had shot up to 12 rounds, but had only been able to locate a portion of the casings. Border Patrol Agent(s) subsequently responded to the scene of the shooting and found five more bullet casings.

6. On or about March 16, 2005, Colonel      (b)(7)c      , MD, Orthopedics, William Beaumont Army Medical Center removed a 40 caliber Smith & Wesson jacketed hollow point projectile from the      (b)(6)      of the victim. Colonel      (b)(7)c      MD, advised that the bullet entered the      (b)(6)      of the victim and _ (b)(6)      (b)(6)      and lodged in his      (b)(6) _

7. On or about March 16, 2005, Major      (b)(7)c      . MD,      (b)(7)c      William Beaumont Army Medical Center, examined the victim and stated that the bullet      (b)(6)      causing a complete posterior      (b)(6)

OIG Case: I05-BCBP-ELP-07117
Date: March 18,2005
Page 2 of 2

## AFFIDAVIT IN SUPPORT OF COMPLAINT

This prosecution was authorized by Assistant United States Attorney J. Brandy Gardes.

FURTHER THE AFFIANT SAYETH NOT

(b)(7)c

Special Agent
Department of Homeland Security, Office of
Inspector General

OIG Case: I05-BCBP-ELP-07117
Date: March 18,2005
Page 3 of 2

# United States District Court

## WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA

v.

Ignacio "Nacho" Ramos

**WARRANT FOR ARREST**

CASE NUMBER:  05-1535M(01)

To: The United States Marshal
   and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest  **Ignacio "Nacho" Ramos**                          .

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Intentionally assaulting, a Mexican national, one O. A.D., resulting in serious bodily injury.

in violation of Title 18  United States Code, Section(s) 113(a)(6).

RICHARD P. MESA
~~Norbert J. Garney~~
Name of Issuing Officer

_(signature)_
Signature of Issuing Officer

Bail fixed at $_____.

United States Magistrate Judge
Title of Issuing Officer

March 18, 2005, at El Paso, Texas
Date and Location

by   Norbert J. Garney
Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received an executed with the arrest of the above named defendant at_ (b)(7)c  _____ <br> (b)(7)c | | |
| DATE RECEIVED <br> 3/18/05 <br> DATE OF ARREST <br> 3/18/05 | NAME AND TITLE OF ARRESTING OFFICER <br> (b)(7)c <br> Special Agent | SIGNATURE OF ARRESTING OFFICER <br> (b)(7)c |

*Office of Inspector General - Investigations*
**U.S. Department of Homeland Security**



**PERSONAL HISTORY INFORMATION**

Case Number: _____

## Personal

| Subject Name: *IGNACIO RAMOS JR.* | Armed & Dangerous: |
|---|---|
| Alias/Nickname: *NACHO* | Alias/Nickname: |

| Sex: *M* | Race: *W* | Eyes: *BRO* | Hair: *BLK* | Height: (FT;IN) (b)(7)c | | Weight: (b)(7)c |
|---|---|---|---|---|---|---|
| DOB: (b)(7)c | | Est. Age: (b)(7)c | | POB: (b)(7)c  *TX* | | |
| Scars: (b)(7)c | | | | Tattoos: *N/A* | | |
| Physical Deformity: | | | | Speech/Accent: | | |
| SSN: (b)(7)c | | | | Drivers License (State/No.): (b)(7)c | | |
| FBI No: | | | | State/Local Police No.: | | |
| State/Local Police No.: | | | | State/Local Police No.: | | |
| Military Service Branch: (b)(7)c | | | | Duty Dates: (b)(7)c  Discharge Type: (b)(7)c | | |
| Military Service No.: | | | | Misc. No.: | | |
| INS Alien No.: | | | | Passport No.: | | |
| Education: (b)(7)c | | | | | | |

## Residence & Vehicle

| Primary Address: | (b)(7)c |
|---|---|
| Secondary Address: *N/A* | |

| Primary Telephone: (b)(7)c | Secondary Telephone: | |
|---|---|---|
| Vehicle: (b)(7)c  *PU BLACK* | Tag No.: (b)(7)c | State: *TX* |
| Vehicle: | Tag No.: | State: |

## Employment & Financial

| Occupation(s): *B.P.A.* | Skills: | |
|---|---|---|
| Employer Name: *U.S.B.P.* | | Telephone: |
| Address: (b)(7)c  *, TX* | | |
| Supervisor's Name: (b)(7)c | Duties Performed: | |
| Employer Name: | | Telephone: |
| Address: | | |
| Supervisor's Name: | Duties Performed: | |
| Bank or Credit Card Name: (b)(7)c | | Account No.: |
| Bank or Credit Card Name: | | Account No.: |
| Bank or Credit Card Name: | | Account No.: |

## PERSONAL HISTORY INFORMATION

### Relatives and/or Associates

| Relationship | Name | Address | Telephone |
|---|---|---|---|
| (b)(7)c | | | |
| (b)(7)c | (b)(7)c | SAS | SAS |
| (b)(7)c | | | |
| (b)(7)c | (b)(7)c | | |
| (b)(7)c | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Additional Information:    (b)(7)c    — DISMISSED,

(b)(7)c    DISMISSED.

(b)(7)c    DISMISSED.

Handwriting Date: _____    Photograph Date: 3-18-05    Fingerprints Date: 3-18-05

Date of NCIC/State Wanted Check: _____    Results: _____

Special Agent (*Signature*)    (b)(7)c    Date: 3-18-05

STATE USAGE

NFF SECOND

SUBMISSION          APPROXIMATE CLASS          AMPUTATION          SCAR

LAST NAME, FIRST NAME, MIDDLE NAME, SUFFIX

RAMOS, IGNACIO JR.

STATE USAGE

SIGNATURE OF PERSON FINGERPRINTED

(b)(7)c

(b)(7)c

Ignacio "Nacho" Ramos

U. S. Department of Justice
*United States Marshals Service*

PRISONER REMAND OR ORDER TO DELIVER AND
RECEIPT FOR UNITED STATES PRISONERS

UNITED STATES MARSHAL
Western DISTRICT OF Texas

TO: Sheriff Leo Samaniego      DATE: 3/18/05
(Name & Title)

☐ are herewith remanded to your custody

THE FOLLOWING NAMED UNITED STATES PRISONER(S):      ☐ are to be delivered to representative
presenting and signing this order

1  Ignacio Ramos JR          (b)(7)c      4 _____

2  18 USC 113 (a)(6) Assault        5 _____

3  _____ B##       (b)(7)c    2300 hrs    6 _____

RECEIPT      31805

THE ABOVE NAMED UNITED STATES PRISONER(S) WERE RECEIVED:

BY: _____      (b)(7)c      (b)(7)c
                                  United States Marshal
TITLE: _____ Records    (b)(7)c
                                  (b)(7)c
DISTRICT OR ORGAN. ADDRESS _____
                                  BY: ~~Deputy U. S. Marshal~~ Special Agent

(PRIOR EDITIONS MAY BE USED)      Form USM-41
                                  (REV. 11/83)
                                  (Supersedes USM-40,

FEDERAL BUREAU OF INVESTIGATION, UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL JUSTICE INFORMATION SERVICES DIVISION, CLARKSBURG, WV  26306

PRIVACY ACT OF 1974 (P.L. 93-579) REQUIRES THAT ... ERAL, STATE, OR LOCAL AGENCIES INFORM INDIVIDUALS WHOSE SO ...     ECURITY NUMBER IS REQUESTED WHETHER
SUCH DISCLOSURE IS MANDATORY OR VOLUNTARY ...     .S OF AUTHORITY FOR SUCH SOLICITATION, AND USES WHICH WILL ...     DE OF IT.

| JUVENILE FINGERPRINT | DATE OF ARREST | ORI | TXDHS0200 |
|---|---|---|---|
| SUBMISSION          YES ☐ | MM  DD  YY | CONTRIBUTOR | Office of Inspector General |
|  | 03 18 05 | ADDRESS | Department of Homeland Security |
| TREAT AS ADULT     YES ☐ |  | REPLY        YES ☐ | 1200 Golden Key Circle, Suite 230 |
|  |  | DESIRED? | El Paso, Texas 79912 |

| SEND COPY TO: (ENTER ORI) | DATE OF OFFENSE | PLACE OF BIRTH (STATE OR COUNTRY) | ...ASHIP |
|---|---|---|---|
|  | MM  DD  YY | (b)(7)c     Tx | U.S.Citizen |
|  | 02 17 05 |  |  |

| MISCELLANEOUS NUMBERS | SCARS, MARKS, TATTOOS, AND AMPUTATIONS |  |  |
|---|---|---|---|
|  | (b)(7)c |  |  |

| | RESIDENCE/HOME/ST ADDRESS | CITY | STATE |
|---|---|---|---|
|  | (b)(7)c | (b)(7)c | Tx |

| OFFICIAL TAKING FINGERPRINTS (NAME OR NUMBER) | LOCAL IDENTIFICATION/REFERENCE | PHOTO AVAILABLE?     YES |
|---|---|---|
| (b)(7)c |  | PALM PRINTS TAKEN?     YES |

EMPLOYER:    IF U.S. GOVERNMENT, INDICATE SPECIFIC AGENCY. *Dept of Homeland Security*
IF MILITARY, LIST BRANCH OF SERVICE AND SERIAL NO. *U.S. Border Patrol, Customs Border Protection, El Paso TX*

OCCUPATION  *Border Patrol Agent*

| CHARGE/CITATION | DISPOSITION |
|---|---|
| 1. | 1. |
| 2. | 2. |
| 3. | 3. |
| ADDITIONAL | ADDITIONAL |
| ADDITIONAL INFORMATION/BASIS FOR CAUTION | STATE BUREAU STAMP |

FD-259 (REV 5-11-99)
★U.S. GPO: 2002 491-378/40032

EXHIBIT 47



*Office of Inspector General - Investigations*
*U.S. Department of Homeland Security*

**MEMORANDUM OF ACTIVITY**

**Type of Activity**: Interview of Jose Alonso Compean

| | |
|---|---|
| **Case Number**: I05-BCBP-ELP-07117 | **Case Title**: Ignacio Ramos, et al. |

This investigation was initiated on March 4, 2005, upon receipt of information from the Office of Internal Audit (OIA), United States Border Patrol (BP), Customs & Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown BP Agent while attempting to cross into the United States on February 17, 2005 near (b)(7)c Texas. Aldrete-Davila advised that he fled back to Mexico where his wound was treated at a local hospital but the bullet was left in Aldrete-Davila's body.

On March 18, 2005, U.S. Magistrate Judge Richard P. Mesa, Western District of Texas, signed a Criminal Complaint, Case Number: 05-1535M(01) & (02) and Warrants for Arrest for Ignacio "Nacho" Ramos and Jose Alonso Compean. (Attachments 1 and 2)

On that same date, at approximately 11:55 p.m., DHS Office of Inspector General (OIG) agents, OIA Agents, and Officers from the El Paso Police Department (EPPD) executed the Warrant for Arrest, 05-1535(02), at Compean's residence, (b)(7)c

DHS OIG agents took Compean into custody and Special Agent (b)(7)c DHS OIG, advised Compean of his Miranda Rights. Compean stated that he understood his Miranda Rights and waived his right to remain silent.

Special Agents (b)(7)c and (b)(7)c transported Compean to the DHS OIG, El Paso Resident Office, 1200 Golden Key Circle, Suite 230, El Paso, Texas.

(b)(7)c provided an INV Form-25, Advice of Rights (Miranda), to Compean, which Compean read and signed on March 19, 2005, at approximately 12:20 a.m.. Compean reiterated that he understood his rights and waived his right to remain silent. (Attachment 3)

Compean provided the following written statement on INV Form 28-A, Sworn Statement. The following is a **verbatim** transcript of Compean's sworn statement: (Attachment 4)

*"The alien was coming at me when he climbed into the ditch. I told him to stop and put his hands up. He kept coming at me and I tried pushing him away from me with the butt end of the shotgun I had. I slipped into the ditch and the alien went around me. After he went around me, I jumped on his back*

| Name, Title, Signature, and Date: (b)(7)c , Special Agent | Reviewing Official Name, Title, Signature, and Date: James E. Smith, RAC |
|---|---|
| (b)(7)c    3/24/05 | (b)(7)c    5-25-05 |

**IMPORTANT NOTICE**

This report is intended solely for the official use of Inspector General. This report remains the prope part, outside the Department of Homeland Securit will be determined by the Office of Inspector Ge administrative penalties.

Redacted for Public Release.

y receiving a copy directly from the Office of lary distribution may be made, in whole or in ctor General. Public availability of the report of this report may result in criminal, civil, or

## MEMORANDUM OF ACTIVITY

*and we fell into the vega. We tumbled and wrestled for a little bit. I got some dirt in my eyes and he got up an started running south he was pointing something shiny with his left hand. It looked like a gun. This is when I started shooting.*

*I shot about 10 or 11 rounds. At this time Agent Ramos was already standing next to me. He took a shot and then we saw the alien climbing out of the river. We holstered our weapons and walked back to the levee. When we were on the levee I picked up the brass I had seen. Someone asked us if we had hit him. I answered no I don't think so. When we were getting off the levee I asked.* (b)(7)c *if* (b)(7)c *could look for some rounds if* (b)(7)c *could. I think I picked up about 10 rounds. I did not report the shooting because I didn't think anything had happened to the guy. I was afraid I was going to get in trouble. I think* (b)(7)c *picked up a few rounds and* (b)(7)c *told me had thrown them in a ditch. The rounds I picked up I threw them into the ditch where we were at on the same day right after I picked them up.*

*Afterwards.* (b)(7)c *and.* (b)(7)c *asked what had happened. I told them I think Nacho might have hit him. When I started shooting at the alien he was about halfways between the levee and the river bank. When Nacho took the last shot the alien was climbing into the river. When we saw him climbing out of the river on the Mexican side, the alien looked like he was limping and he was walking back slowly. I think* (b)(7)c *said a van had stopped to pick the alien up on the Mexican side. Nacho is the nickname for Ignacio Ramos. When we were on the drainage ditch the alien was coming straight at me. I heard someone say hit him but I don't know who it was.*

*My intent was to kill the alien because I thought he had a gun but I never really saw for certain that he had a gun. From what I remember the following Agents were present Ignacio Ramos,* (b)(7)c (b)(7)c *and.* (b)(7)c FOS (b)(7)c *showed up after everything happened and took pictures of the van. I think Nacho was also trying to kill the alien."*

Following the interview, (b)(7)c filled out INV Form-13, Personal History Information, and then obtained Compean's fingerprints and photos. (Attachments 5, 6, and 7)

On March 19, 2005, at approximately 1:30 a.m., Special Agents (b)(7)c and (b)(7)c , DHS OIG, transported and booked Compean into the El Paso County Detention Facility, Booking Number (b)(7)c, (b)(2)Lc (Attachment 8)

**IMPORTANT NOTICE**

This report is intended solely for the official use of t[...]Inspector General. This report remains the property[...]part, outside the Department of Homeland Security,[...]will be determined by the Office of Inspector Gener[...]administrative penalties.

Redacted for Public Release.

any entity receiving a copy directly from the Office of[...]o secondary distribution may be made, in whole or in[...]of Inspector General. Public availability of the report[...]sclosure of this report may result in criminal, civil, or

## MEMORANDUM OF ACTIVITY

### ATTACHMENTS

1.) Western District of Texas, Criminal Complaint, Case Number: 05-1535M(01) & (02), dated March 18, 2005.
2.) Western District of Texas, Warrant for Arrest for Jose Alonso Compean, dated March 18, 2005
3.) INV Form-25, Advice of Rights (Miranda), signed by Jose Alonso Compean on March 19, 2005, at 12:20 am.
4.) INV Form 28-A, Sworn Statement, written by Jose Alonso Compean on March 19, 2005.
5.) INV Form-13, Personal History Information, for Jose Alonso Compean, completed on March 19, 2005.
6.) Photocopy of Fingerprint card containing Jose Alonso Compean's fingerprints.
7.) Photos of Jose Alonso Compean.
8.) Form USM-41, U.S. Marshall Service Prisoner Remand, for Jose Alonso Compean, booking number (b)(7)c, (b)(2)Low

**IMPORTANT NOTICE**

This report is intended solely for the official use of _____ Inspector General. This report remains the prope__ part, outside the Department of Homeland Securi__ will be determined by the Office of Inspector Ge__ administrative penalties.

Redacted for Public Release.

ity receiving a copy directly from the Office of idary distribution may be made, in whole or in ector General. Public availability of the report : of this report may result in criminal, civil, or

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

FILED

MAR 2 1 2005

U.S. MAGISTRATE JUDGE
FOR THE WESTERN DISTRICT OF TEXAS
BY_____
SPECIAL DEPUTY CLERK

UNITED STATES OF AMERICA

V.

**Ignacio Ramos, aka: Nacho and**
**Jose Alonso Compean**

# CRIMINAL COMPLAINT

CASE NUMBER:  05-1535M(01)&(02)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about February 17, 2005, in El Paso County, in the Western District of Texas, defendants did unlawfully, knowingly, and intentionally assault, a Mexican national, one O. A.D., resulting in serious bodily injury, is in violation of 18 USC 113(a)(6). I further state that I am a Special Agent with the Department of Homeland Security, Office of Inspector General, and that this complaint is based on the following facts:

*See attached affidavit*

Continued on the attached sheet and made a part hereof:      X , Yes _____ No

(b)(7)c

_____
Signature of Complainant

(b)(7)c

Sworn to before me and subscribed in my presence,

March 18, 2005                                             El Paso, Texas
_____                        _____
Date                                                              City and State

RICHARD P. MESA
~~Norbert J. Garney,~~ U.S. Magistrate Judge
_____
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

<u>AFFIDAVIT IN SUPPORT OF COMPLAINT</u>

I,          (b)(7)c          being duly sworn, do hereby state that I am a Special Agent with the Department of Homeland Security, Office of Inspector General, and, as such, am vested with the authority to investigate violations of Federal laws, including Title 18 of the United States Code.

Further the Affiant states as follows:

1.  On or about February 17, 2005, a Mexican National, hereinafter referred to as "the victim" illegally entered the United States.

2.  According to the victim, he drove towards the U.S./Mexico international border where he drove up onto a drainage ditch that that runs parallel with the levy that lies between the Rio Grand River and the drainage ditch.

3.  The victim further states he then encountered Border Patrol Agent Jose Alonso Compean on the levy where Compean attempted to hit him in the head with the butt of his shotgun after the victim had raised his hands over his head to surrender. The victim moved to avoid being hit and then ran over the levy towards the Rio Grande, followed by U.S. Border Patrol Agents Jose Alonso Compean and Igancio "Nacho" Ramos. U.S. Border Patrol Agent Compean fired his government issued weapon, a 96D Beretta 40 caliber automatic pistol, serial number     (b)(2)Low     at the victim while he was attempting to run back to Mexico.

4.  Ballistics testing confirms a government issued weapon belonging to U.S. Border Patrol Agent Ignacio "Nacho" Ramos, a 96D Beretta 40 caliber automatic pistol, serial number     (b)(2)Low     fired a bullet (a 40 caliber Smith & Wesson jacketed hollow point) which hit the victim in the left buttocks while he was attempting to flee to Mexico. Where the victim was shot on U.S. Government property between the U.S. bank of the Rio Grande River and the levy.

5.  According to a confidential informant, Agent Jose Alonso Compean told him that he (Compean) had shot up to 12 rounds, but had only been able to locate a portion of the casings. Border Patrol Agent(s) subsequently responded to the scene of the shooting and found five more bullet casings.

6.  On or about March 16, 2005, Colonel     (b)(7)c     , MD, Orthopedics, William Beaumont Army Medical Center removed a 40 caliber Smith & Wesson jacketed hollow point projectile from the     (b)(6)     of the victim. Colonel     (b)(7)c     MD, advised that the bullet entered the     (b)(6)     of the victim and     (b)(6)
          (b)(6)

7.  On or about March 16, 2005, Major     (b)(7)c     , MD,     (b)(7)c     William Beaumont Army Medical Center, examined the victim and stated that the bullet     (b)(6)          a complete          (b)(6)

OIG Case: I05-BCBP-ELP-07117
Date: March 18,2005
Page 2 of 2

## AFFIDAVIT IN SUPPORT OF COMPLAINT

This prosecution was authorized by Assistant United States Attorney J. Brandy Gardes.

FURTHER THE AFFIANT SAYETH NOT

(b)(7)c

Special Agent
Department of Homeland Security, Office of
Inspector General

OIG Case: I05-BCBP-ELP-07117
Date: March 18,2005
Page 3 of 2

# United States District Court

## WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA

v.

**Jose Alonso Compean**

**WARRANT FOR ARREST**

CASE NUMBER:     05-1535M(02)

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest __Jose Alonso Compean_____ .

and bring him or her forthwith to the nearest magistrate to answer a(n)

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Intentionally assaulting, a Mexican national, one O. A.D., resulting in serious bodily injury.

in violation of Title 18  United States Code, Section(s) 113(a)(6).

RICHARD P. MESA
~~Norbert J. Garney~~
Name of Issuing Officer

_Richard P. Mesa_
Signature of Issuing Officer

United States Magistrate Judge
Title of Issuing Officer

March 18, 2005, at El Paso, Texas
Date and Location

Bail fixed at $ _____

by  Norbert J. Garney
Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received an executed with the arrest of the above named defendant at_ (b)(7)c | | (b)(7)c |
| DATE RECEIVED  3/18/05  DATE OF ARREST  3/18/05 | NAME AND TITLE OF ARRESTING OFFICER  (b)(7)c  _____ Special Agent  (b)(7)c | SIGNATURE OF ARRESTING OFFICER  (b)(7)c |

U.S. Department of Homeland Security
Office of Inspector General -- Investigations    **ADVICE OF RIGHTS (MIRANDA)**

You have the right to remain silent.

Anything you say can be used against you in a court or other proceeding.

You have the right to consult an attorney for advice before making any statement or answering any questions, and you may have him/her present with you during questioning.

You may have an attorney appointed by the U.S. Magistrate or the court to represent you if you cannot afford or otherwise obtain one.

If you decide to answer questions now, with or without an attorney, you still have the right to stop the questioning at any time.

However, you may waive the right to advice of counsel and your right to remain silent and answer questions or make a statement without consulting an attorney if you so desire.

Do you understand your rights?    Yes

Do you waive your rights?    Yes

3/19/05 1220    EL Paso    Jose Compean    (b)(7)c, (b)(2)Low
(Date/Time)    (Location)    (Printed Name)    (Signature)

(b)(7)c    (b)(7)c
(Witness' Printed Name)    (Witness' Printed Name)

(b)(7)c    (b)(7)c
(Witness' Signature)    (Witness' Signature)
                                        (b)(7)c
3/19/05    1220    (b)(7)c 3/19/05  12:20
(Date/Time)    (Date/Time)

INV FORM-25



U.S. Department of Homeland Security
Office of Inspector General – Investigations                    **SWORN STATEMENT**

Date/Time: 3/19/05  0100 hrs     Location: DHS OIG office
                                            1200 Golden Key Circle, El Paso

County of: El Paso     State of: Texas

I, Jose Alonso Compean , hereby make the following free and voluntary sworn statement to
(b)(7)c
_____ , who has identified himself/herself to me as a Special Agent
with the Office of Inspector General, U.S. Department of Homeland Security.  No promises or threats have
been made to me.

The alien was coming at me when he climbed into the
ditch. I told him to stop and put his hands up. He kept
coming at me. and I tried pushing him away from me with
the butt end of the shot gun I had. I slipped into
the ditch and the alien went around me. After he
went around me, I jumped on his back and we fell
into the ditch into the vega. we tumbled and wrestled
for a little bit. I got some dirt in my eyes. and
the he got up and started running back south towards
Mexico. When he was running south he was pointing
something shiny with his left hand. It looked like
a gun. This is when I started shooting. I shot

INV FORM-28A          Page 1 of 4          Initials: JaC

## SWORN STATEMENT

about 10 or 11 rounds. At this time Agent Ramos was already standing next to me. He took a shot and then we saw the alien climbing out of the river. We holstered our weapons and walked back to the levee. When we were on the levee I picked up the brass I had seen. Someone asked us if we had hit him. I answered no I don't think so. (b)(7)c when we were getting off the levee I asked if (b)(7)c could look for some rounds, (b)(7)c if (b)(7)c could. I think I picked up about 10 rounds. I did not report the shooting because I didn't think anything had happened to the guy. I was afraid I was going to get in trouble. I think (b)(7)c picked up a few rounds and (b)(7)c told me had thrown them in a ditch. I (b)(7)c The rounds I picked up I threw them into the ditch where (b)(7)c we were at, on the same day right after I picked them up. Afterwards Agents (b)(7)c and (b)(7)c asked what had happened. I told them I think Nacho might have hit him. When I started shooting at the alien he was about halfways between the levee and the river bank. When Nacho took the last shot the (b)(7)c was the alien was climbing into the river. When we saw him climbing

**SWORN STATEMENT**

Out of the river on the Mexican side, the alien looked like he was limping, and he was walking back slowly. I think ___(b)(7)c___ said a van had stopped to pick the alien up on the Mexican side. Nacho is the nickname for Ignacio Ramos. When we were on the drainage ditch the alien was coming straight at me. I heard someone say hit him, but I don't know who it was. But My intent was to kill the alien because I thought he had a gun, but I never really saw for certain that he had a gun. From what I remember the following Agents were present Ignacio Ramos, ___(b)(7)c___

___(b)(7)c___    and ___(b)(7)c___

___(b)(7)c___    FOS    ___(b)(7)c___    showed up after everything happened and took pictures of the van. I think Nacho was also trying to to kill the alien.

___(b)(2)Low___

## SWORN STATEMENT

STATEMENT OF: *Jose Alonso Compean*

I have read this statement of _____4_____ pages. It is true, accurate, and complete to the best of my knowledge and belief. I have been given an opportunity to make any corrections, additions, or deletions.

(b)(2)Low                                   3/99/05
_____
(Signature)

Subscribed and sworn (or affirmed) to before me this _19_ day of _March_ , _2005_ , at _El Paso_ , _Texas_ .
      (Month)       (Year)        (City)              (State)

(b)(7)c                    *Badge #*    (b)(7)c
_____
Special Agent
U.S. Department of Homeland Security
Office of Inspector General
Office of Investigations

(b)(7)c

_____
(b)(7)c        (Witness's Signature)

INV FORM-28A                    Page _4_ of _4_



U.S. Department of Homeland Security
Office of Inspector General – Investigations     **PERSONAL HISTORY INFORMATION**

Case Number: _____

### Personal

| | |
|---|---|
| Subject Name: *Jose Alonso Compean* | Armed & Dangerous: |
| Alias/Nickname: *N/A* | Alias/Nickname: |
| Sex: *M*   Race: *W*   Eyes: *Brn*   Hair: *Blk* | Height: (FT;IN) (b)(7)c   Weight: (b)(7)c |
| DOB: (b)(7)c   Est. Age: (b)(7)c | POB: (b)(7)c |
| Scars: (b)(7)c | Tattoos: *N/A* |
| Physical Deformity: *N/A* | Speech/Accent: *N/A* |
| SSN: (b)(7)c | Drivers License (State/No.): (b)(7)c |
| FBI No: | State/Local Police No.: |
| State/Local Police No.: | State/Local Police No.: |
| Military Service Branch: (b)(7)c | Duty Dates: (b)(7)c   Discharge Type: (b)(7)c |
| Military Service No.: (b)(7)c | Misc. No.: |
| INS Alien No.: | Passport No.: *N/A* |
| Education: (b)(7)c | |

### Residence & Vehicle

| | |
|---|---|
| Primary Address: | (b)(7)c |
| Secondary Address: *N/A* | |
| Primary Telephone: (b)(7)c | Secondary Telephone: (b)(7)c |
| Vehicle: (b)(7)c | Tag No.:   State: *TX* |
| Vehicle: (b)(7)c | Tag No.:   State: *TX* |

### Employment & Financial

| | |
|---|---|
| Occupation(s): *Border Patrol Agent* | Skills: *law enforcement* |
| Employer Name: *U.S. Border Patrol* | Telephone: (b)(7)c |
| Address: (b)(7)c | |
| Supervisor's Name: (b)(7)c | Duties Performed: *BP Agent* |
| Employer Name: *U.S. Border Patrol* | Telephone: |
| Address: (b)(7)c | |
| Supervisor's Name: | Duties Performed: |
| Bank or Credit Card Name: | Account No.: |
| Bank or Credit Card Name: | Account No.: |
| Bank or Credit Card Name: | Account No.: |

## PERSONAL HISTORY INFORMATION

### Relatives and/or Associates

(b)(7)c

| Relationship | Name | Address | Telephone |
|---|---|---|---|
| (b)(7)c | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Additional Information: _____ (b)(7)c     _____

_____

_____

_____

Handwriting Date: _____ Photograph Date: _____ Fingerprints Date: _____

Date of NCIC/State Wanted Check: __✓_____ Results: (b)(7)c _____

_____

_____

Special Agent (*Signature*): (b)(7)c     Date: 3/19/05

STATE USAGE

NFF SECOND

SUBMISSION    APPROXIMATE CLASS    AMPUTATION    SCAR

STATE USAGE

LAST NAME, FIRST NAME, MIDDLE NAME, SUFFIX

*Compean, Jose A.*

SIGNATURE OF PERSON FINGERPRINTED

(b)(7)c

(b)(7)c

Jose Alonso Compean

U. S. Department of Justice
*United States Marshals Service*

**PRISONER REMAND OR ORDER TO DELIVER AND
RECEIPT FOR UNITED STATES PRISONERS**

## UNITED STATES MARSHAL

*Western* DISTRICT OF *Texas*

TO: *Sheriff Leo Samaniego*
     (Name & Title)

DATE: *03/19/05*

☒ are herewith remanded to your custody

☐ are to be delivered to representative
   presenting and signing this order

THE FOLLOWING NAMED UNITED STATES PRISONER(S):

1 *Jose Alonso Compean*
2 *DOB:* (b)(7)c
3 *18 USC 113 (Assault)*

4 _____
5 _____
6 *BIC* (b)(7)c

---

## RECEIPT

THE ABOVE NAMED UNITED STATES PRISONER(S) WERE RECEIVED:

BY: _____ (b)(7)c

TITLE: _____

DISTRICT OR ORGAN. ADDRESS _____

*3/19/05*
*0130*

(b)(7)c

**United States Marshal**

(b)(7)c

BY: _____ Deputy U.S. Marshal

*Special Agent*

(PRIOR EDITIONS MAY BE USED)

Form USM-41
(REV. 11/83)
(Supersedes USM-40,
)

FEDERAL BUREAU OF INVESTIGATION, UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL JUSTICE INFORMATION SERVICES DIVISION, CLARKSBURG, WV 26306

PRIVACY ACT OF 1974 (P.L. 93-579) REQUIRES THAT ... RAL, STATE, OR LOCAL AGENCIES INFORM INDIVIDUALS WHOSE SO... ECURITY NUMBER IS REQUESTED WHETHER
SUCH DISCLOSURE IS MANDATORY OR VOLUNTARY, ... E OF AUTHORITY FOR SUCH SOLICITATION, AND USES WHICH WILL B... OE OF IT.

| JUVENILE FINGERPRINT | DATE OF ARREST | ORI | TXDHS0200 |
| SUBMISSION          YES ☐ | MM  DD  YY    03 18 05 | CONTRIBUTOR | Office of Inspector General |
| | | ADDRESS | Department of Homeland Security |
| TREAT AS ADULT       YES ☐ | | | 1200 Golden Key Circle, Suite 230 |
| | | REPLY    YES   DESIRED? | El Paso, Texas 79912 |

| SEND COPY TO: (ENTER ORI) | DATE OF OFFENSE MM  DD  YY   02 17 05 | PLACE OF BIRTH ... | ...ENSHIP |
| | | (b)(7)c        TX | US. |

| MISCELLANEOUS NUMBERS | SCARS, MARKS, TATTOOS, AND AMPUTATIONS |
| | (b)(7)c |

| | RESIDENCE/COMPLETE ADDRESS | CITY | STATE |
| | (b)(7)c | (b)(7)c | TX |

| OFFICIAL TAKING FINGERPRINTS (NAME OR NUMB...) (b)(7)c | LOCAL IDENTIFICATION/REFERENCE | PHOTO AVAILABLE?    YES |
| | | PALM PRINTS TAKEN?   YES |

EMPLOYER:  IF U.S. GOVERNMENT, INDICATE SPECIFIC AGENCY. *Dept of Homeland Security* OCCUPATION
IF MILITARY, LIST BRANCH OF SERVICE AND SERIAL NO.
*Customs & Border Protection, U.S. Border Patrol*        *Border Patrol Agen...*

| CHARGE/CITATION | DISPOSITION |
| 1. | 1. |
| 2. | 2. |
| 3. | 3. |
| ADDITIONAL | ADDITIONAL |
| ADDITIONAL INFORMATION/BASIS FOR CAUTION | STATE BUREAU STAMP |

FD-259 (REV 5-11-99)
★U.S. GPO: 2002 491-378/40032

EXHIBIT 48

*Office of Inspector General - Investigations*
**U.S. Department of Homeland Security**

## MEMORANDUM OF ACTIVITY



**Homeland Security**

**Type of Activity:** Oral Interview of Jose Alonso Compean

| *Case Number*: I05-BCBP-ELP-07117 | *Case Title*: Ignacio Ramos, et al. |
| --- | --- |

This investigation was initiated on March 4, 2005, upon receipt of information from the Office of Internal Audit (OIA), United States Border Patrol (BP), Customs & Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown BP Agent while attempting to cross into the United States on February 17, 2005 near (b)(7)c , Texas. Aldrete-Davila advised that he fled back to Mexico where his wound was treated at a local hospital but the bullet was left in Aldrete-Davila's body.

On March 18, 2005, DHS Office of Inspector General (OIG) agents, OIA Agents, and Officers from the El Paso Police Department (EPPD) executed the Warrant for Arrest, 05-1535(02), at (b)(7)c (b)(7)c , and arrested Jose Alonso Compean without incident.

Special Agent (b)(7)c DHS OIG, provided INV Form-25, Advice of Rights (Miranda), to Compean, which Compean read and signed on March 19, 2005, at approximately 12:20 am. Compean reiterated that he understood his rights and waived his right to remain silent. Special Agent (b)(7)c DHS OIG, witnessed Compean read and sign the INV Form-25.

Prior to Compean writing out a sworn statement, (b)(7)c and (b)(7)c conducted an oral interview of Compean who substantially stated the following:

Compean stated he was on the levee when the driver (i.e., Aldrete-Davila) of the van stopped the vehicle on the north side of the drainage ditch. Compean observed the driver exit the van and climb down into the drainage ditch.

(Agent's Note: Compean referred to Aldrete-Davila as the driver of the van or the alien during this interview because he did not know Aldrete-Davila's name at the time of the incident. However, for the purpose of clarity, (b)(7)c will use the name Aldrete-Davila during this report.)

Compean stated as Aldrete-Davila entered the drainage ditch, which the BP calls the (b)(7)c , Compean observed BP Agent Ignacio Ramos and other BP Agents pull up next to the (b)(7)c

Compean said he was standing on the south end of the (b)(7)c and he had his shotgun pointed at Aldrete-Davila. Compean ordered Aldrete-Davila to come out of the (b)(7)c with his hands up.

| Name, Title, Signature, and Date: (b)(7)c | Special Agent | Reviewing Official Name, Title, Signature, and Date: James E. Smith, RAC |
| --- | --- | --- |
| (b)(7)c | (b)(7)c 4/4/05 | (b)(7)c 4/4/05 |

**IMPORTANT NOTICE**

This report is intended solely for the official use of Inspector General. This report remains the property part, outside the Department of Homeland Security, will be determined by the Office of Inspector Gene administrative penalties.

Redacted for Public Release.

ty receiving a copy directly from the Office of dary distribution may be made, in whole or in ctor General. Public availability of the report of this report may result in criminal, civil, or

INV FORM-09

Item #: 38

## MEMORANDUM OF ACTIVITY

Compean advised that he spoke in Spanish the entire time when he was giving Aldrete-Davila commands. Compean said he repeatedly told Aldrete-Davila, "Levante las manos" and "Parete," which respectively mean "raise your hands" and "stop."

Compean said that he never used obscene language when giving Aldrete-Davila commands. Compean said he observed both of Aldrete-Davila's hands in the air and observed no weapons at that time.

Compean reiterated that he tried telling Aldrete-Davila to stop coming towards him but Aldrete-Davila continued to come out of the ditch towards Compean. At that time, Compean stated that he heard one of the BP Agents yell in English, "Hit him!" Compean did not recall who yelled it out. Compean recalled that Aldrete-Davila said, "No me pege," which means "do not hit me" in English. Compean said he did not remember Aldrete-Davila saying anything to him in English, such as "take it easy."

Compean said that he turned his shotgun to where the barrel was facing him (Compean) and the butt of the weapon was facing Aldrete-Davila. Compean explained that he was going to try to push Aldrete-Davila back into the      (b)(7)c     . Compean stated at no time did he ever try to butt-stroke (i.e., hit with the butt of the shotgun) Aldrete-Davila in the head. Compean reiterated that he was merely trying to push Aldrete-Davila back into the      (b)(7)c

When    (b)(7)c    asked Compean to demonstrate how he was holding the shotgun when he was going to push Aldrete-Davila, Compean demonstrated with his hands showing that both his hands would have been on the barrel of the shotgun so he could reach Aldrete-Davila with the butt of the shotgun.      (b)(7)c    observed that Compean would have had the barrel of the shotgun aimed at his (Compean) own head and the trigger of the shotgun would have been closer to Aldrete-Davila's reach.

Compean stated he slipped into the      (b)(7)c      when he maneuvered on the ledge to push Aldrete-Davila with the butt of his weapon. Compean advised that Aldrete-Davila then went around him and ran up the north side of the levee and headed south towards Mexico.

Compean said he recovered from sliding into the      (b)(7)c      and ran after Aldrete-Davila. Compean stated that he dropped his shotgun on the north side of the levee as he was running after Aldrete-Davila.

Compean stated that he jumped on Aldrete-Davila's back on the south side of the levee and they both tumbled down the slope of the levee. Compean said they were rolling in the dirt and that Aldrete-Davila may have thrown dirt in his eyes. Compean advised that he was wearing contact lenses on the day of the incident.

Compean said Aldrete-Davila broke free from his grasp and ran away from him towards Mexico. Compean stated that he did not see any weapons when Aldrete-Davila broke away from him.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security. Inspector General. This report remains the proper part, outside the Department of Homeland Security will be determined by the Office of Inspector Ger administrative penalties.

Redacted for Public Release.

y receiving a copy directly from the Office of ary distribution may be made, in whole or in tor General. Public availability of the report of this report may result in criminal, civil, or

## MEMORANDUM OF ACTIVITY

Compean then stated that as Aldrete-Davila was running away from him he thought he saw something shiny in Aldrete-Davila's left hand. Compean said that Aldrete-Davila continued to look back over his shoulder towards Compean as Aldrete-Davila ran away from him.

Compean said that he began to shoot at Aldrete-Davila because of the shiny object he thought he saw in Aldrete-Davila's left hand and because Aldrete-Davila continued to look back towards his direction. Compean explained that he thought that the shiny object might be a gun and that Aldrete-Davila was going to shoot at him because he kept looking back at him as he ran away from Compean.

Compean stated that he intended to kill Aldrete-Davila when he was shooting at him.

Compean stated that even though Aldrete-Davila never fired a shot at him he (Compean) thought Aldrete-Davila might shoot at him even though Compean advised that Aldrete-Davila continued to run towards Mexico and away from him (Compean).

When asked if he (Compean) was positive he saw a weapon in Aldrete-Davila's left hand, Compean reiterated that he saw something shiny in Aldrete-Davila's left hand, which he thought might be a gun, but then added that he was never certain that Aldrete-Davila had a weapon.

Compean stated he shot approximately ten rounds at Aldrete-Davila. Compean said he knew Ramos was running behind him (Compean) as he was shooting at Aldrete-Davila. Compean stated he started shooting at Aldrete-Davila midway between the levee and the Rio Grande River. Compean said he stopped shooting at Aldrete-Davila when it appeared Aldrete-Davila was at the bank of the Rio Grande River on the U.S. side.

Compean said Ramos came up next to him just as he stopped shooting. However, even though he stopped shooting, Compean said a few seconds later Ramos aimed in and shot once at Aldrete-Davila as Aldrete-Davila continued towards the river. Compean said Ramos was the last one to shoot at Aldrete-Davila.

Compean stated that he and Ramos stood in the middle of the vega, the area between the levee and the Rio Grande River and watched as Aldrete-Davila disappeared from view when he entered the bushes that are on the U.S. side of the bank of the Rio Grande River.

Compean said he and Ramos then watched as Aldrete-Davila came into view again as he (Aldrete-Davila) emerged on the Mexican side of the Rio Grande River. Compean stated he knew Ramos must have hit Aldrete-Davila with that last shot because Aldrete-Davila was limping. Compean recalled that Aldrete-Davila looked back at he and Ramos then continued on towards the Mexican highway.

IMPORTANT NOTICE

This report is intended solely for the official use o Inspector General. This report remains the prope part, outside the Department of Homeland Securit will be determined by the Office of Inspector Ge administrative penalties.

Redacted for Public Release.

ty receiving a copy directly from the Office of dary distribution may be made, in whole or in ctor General. Public availability of the report of this report may result in criminal, civil, or

## MEMORANDUM OF ACTIVITY

Compean stated that he did not observe Aldrete-Davila reach the highway but recalled that BP Agent (b)(7)c later advised Compean that he (b)(7)c observed Aldrete-Davila get picked up by a car or van.

Compean said he and Ramos turned away and headed back towards the levee to see what was in the van.

Compean recalled that everyone from his shift was at the scene except BP Agent (b)(7)c. Compean recalled seeing (b)(7)c (b)(7)c and (b)(7)c by the van or on the levee.

Compean said that Field Operations Supervisor (FOS) (b)(7)c showed up after the shooting incident occurred. Compean thought he remembered (b)(7)c taking photos of the van.

Compean stated that some of the agents asked if he had hit Aldrete-Davila because they had heard gunshots. Compean told them "no." Compean said he did not recall which agent or agents initially asked him about the gunshots and if he had shot Aldrete-Davila.

Compean overheard Ramos tell (b)(7)c, "Nothing happened," when (b)(7)c asked about the gunshots. However, Compean said he told (b)(7)c and (b)(7)c that he thought Ramos had hit Aldrete-Davila because he saw Aldrete-Davila limping and walking slow instead of running.

Compean said he later picked up 10 to 11 bullet casings, even though he stated he thought he only fired ten bullets. Compean said he threw the casings into the (b)(7)c (i.e., drainage ditch) right in front of where the van had stopped.

Compean said he asked (b)(7)c to look for some more casings since (b)(7)c was going to the levee to wait for the tow truck driver. Compean said he did not know if (b)(7)c picked up any casings. (Agent's Note: Compean later stated in his sworn statement that (b)(7)c did pick up some casings and told Compean that (b)(7)c had thrown them in the drainage ditch.)

Compean stated that he did not report the shooting incident because he did not want to get into trouble but would not elaborate on why he (Compean) thought he would get into trouble.

Compean added that he had never shot at anyone before this incident.

Compean stated that (b)(7)c

(b)(7)c

**IMPORTANT NOTICE**

This report is intended solely for the official use (   Inspector General. This report remains the prope part, outside the Department of Homeland Securit will be determined by the Office of Inspector Ge administrative penalties.

Redacted for Public Release.

eceiving a copy directly from the Office of y distribution may be made, in whole or in r General. Public availability of the report this report may result in criminal, civil, or

INV FORM-09

## MEMORANDUM OF ACTIVITY

At the termination of this interview, Compean agreed to make a written sworn statement based on the material discussed in the oral interview.

Another DHS OIG Memorandum of Activity details Compean's written sworn statement.

**IMPORTANT NOTICE**

This report is intended solely for the official ...
Inspector General.  This report remains the ...
part, outside the Department of Homeland S...
will be determined by the Office of Inspecto...
administrative penalties.

Redacted for Public Release.

... receiving a copy directly from the Office of ...
...ary distribution may be made, in whole or in ...
...tor General.  Public availability of the report ...
...f this report may result in criminal, civil, or ...

INV FORM-09

EXHIBIT B

Judicial Watch v. DHS, et. al
CA#:  07-0506

OIG records in Response to item No. 2ʃ3 of the request

Document No. _____18_____

**Sanchez, Christopher**

| | |
|---|---|
| **From:** | ( 7C, b2 ) |
| **Sent:** | Thursday, December 08, 2005 12:39 PM |
| **To:** | 'christopher.sanche ( b2 ) |
| **Subject:** | RE: El Paso Shooting Case |

Thanks, Christopher.  Very helpful.  Also, just spoke to ( 7C ) and ( 7C ) in San
Antonio so we're working on this in DC.  Stay tuned. ( 7C )

-----Original Message-----
From: christopher.sanche (        ) [mailto:christopher.sanche ( b2 )
Sent: Thursday, December 08, 2005 12:30 PM
To: ( b2, 7C )
Subject: El Paso Shooting Case

( 7C )

Attached is a report that documents the medical aid we obtained and the aid we were r
able to obtain for Osbaldo Aldrete-Davila, the shooting victim.

Any questions, please call or email me.

Thanks

Christopher Sanchez
Special Agent
DHS OIG Investigations
El Paso Field Office
Desk: (915)(        ) b2
Email: christopher.sanchez (        )

<<I05BCBPELP07117.MOA Funding for Operation.doc>>

mixed Doc

| RIP | WIF | RIF | Referred |
|---|---|---|---|
| 2 | 7 | 7 | 43 |

RIP
b2
7C

*Office of Inspector General - Investigations*
U.S. Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Homeland Security**

**Type of Activity**: Funding for Medical Operation

| *Case Number*: I05-BCBP-ELP-07117 | *Case Title*: Ignacio Ramos, et al. |
|---|---|

This investigation was initiated on March 4, 2005, upon receipt of information from the Office of Internal Audit (OIA), United States Border Patrol (BP), Customs & Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown BP Agent while attempting to cross into the United States on February 17, 2005 near San Elizario, Texas. Aldrete-Davila advised that he fled back to Mexico where his wound was treated at a local hospital but the bullet was left in Aldrete-Davila's body.

On March 16, 2005, DHS Officer of Inspector General (OIG) agents escorted Aldrete-Davila from the U.S. Consulate, Cd. Juarez, Mexico, to the William Beaumont Army Medical Center (WBAMC), Fort Bliss, El Paso, Texas, to have a bullet removed from his leg for evidentiary purposes and because it was causing Aldrete-Davila pain and suffering.

The bullet was safely removed from Aldrete-Davila's leg on that date. The WBAMC urologist informed DHS OIG that Aldrete-Davila's (              b 6          ) from the path of the bullet and they were unable to (                b 6              )        ) b6
WBAMC urologist advised that the (              b 6          ) not be conducted for at least six months. Thus allowing sufficient time (              b 6          )        )

Following the surgery to remove the bullet, Aldrete-Davila had the following appointments at the WBAMC urology and/or orthopedics clinics on the following dates:

**March 24, 2005:** Urology and Orthopedics
**May 6, 2005:** Urology
**June 6, 2005:** Urology
**July 8, 2005:** Urology (**Agent's Note:** Aldrete-Davila did not show up for this appointment.)
**July 14, 2005:** Urology
**August 17, 2005:** Urology
**September 15, 2005:** Urology (**Agent's Note:** Aldrete-Davila did not show up for this appointment.)
**September 16, 2005:** Urology
**October 12, 2005:** Urology (**Agent's Note:** Aldrete-Davila did not show up for this appointment.)
**October 20, 2005:** Urology

| Name, Title, Signature, and Date: Christopher Sanchez, Special Agent | Reviewing Official Name, Title, Signature, and Date: James E. Smith, RAC |
|---|---|

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

# Deletion Page

Requester:  Christopher Farrell (Judicial Watch)
Request #:  2007-58


_____7_____  Page(s) is/are being withheld in full by
DHS/OIG and the following marked
exemption(s) is/are being claimed.


TYPES OF EXEMPTIONS CLAIMED:

**FOIA:  5 U.S.C. § 552**

☐ b(1)        ☐ b(2)        ☐ b(3) _____

☐ b(4)        ☐ b(5)        ☒ b(6)        ☒ b(7)(A)        ☒ b(7)(C)        ☐ b(7)(D)

☐ b(7)(E)     ☐ b(7)(F)

**PRIVACY ACT:  5 U.S.C. § 552a**

☐ d(5)        ☐ j(1)        ☐ j(2)        ☐ k(1)        ☐ k(2)        ☐ k(3)

☐ k(4)        ☐ k(5)        ☐ k(6)        ☐ k(7)


Description of Document withheld: _Pages 2, 3, 4, 5, 6, 7_
_and 8 of the MOA entitled "Funding For_
_Medical Operation"_

# MEMORANDUM OF ACTIVITY

## <u>ATTACHMENTS</u>

1.) Photocopy of the Authorization for Medical Care Web Site, Division of Immigration Health Services, Account Request Form.

2.) Photocopy of a PowerPoint presentation explaining the Treatment Authorization Request (TAR), which is used by the U.S. Border Patrol to obtain medical treatment for illegal aliens.

3.) Brief explanation of Section 1011, Federal Reimbursement of Emergency Health Services Provided to Undocumented Aliens that was taken from the website for Trailblazer Health Enterprises, LLC., which is the agency that administers the Section 1011 funding.

4.) Photocopy of a brochure on Emergency Medicaid for Immigrants.

5.) Information on The Economy Act, 31 U.S.C. 1535.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.




# Deletion Page

Requester:      Christopher Farrell (Judicial Watch)
Request #:      2007-58

Attachment to OIG Document # __18__
consisting of __43__ page(s) originated and/or of
interest with _____ICE_____
is/are being referred to this component/agency
for review and direct response to the requester.

CBP = U.S. Customs Border Patrol
ICE = U.S. Immigration Customs Enforcement
EOUSA = Executive office for U.S. Attorneys (DOJ component)



# SECTION 1011
## FEDERAL REIMBURSEMENT OF EMERGENCY HEALTH SERVICES PROVIDED TO UNDOCUMENTED ALIENS

**TrailBlazer**
HEALTH ENTERPRISES, LLC

Create Account | Sign In

Skip Navigation

Home
News Highlights
Enrollment Info
Online Application
Customer Service
Payment Request Processing
Outreach and Education
Questions and Answers
Calendar of Events

**Listserv Sign Up**

Register for the Section 1011 mailing list by entering your email address here.

Email address:

[ Sign Up ]

View Listserv Archive

## About Section 1011



On December 8, 2003, the President signed into law the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Pub. L. 108-173) (MMA), Section 1011, Federal Reimbursement of Emergency Health Services Furnished to Undocumented Aliens.

Pursuant to Section 1011 of the act, Congress has mandated that the Secretary of Health and Human Services directly pay hospitals, physicians, and ambulance providers (including Indian Health Service and Indian tribe and tribal organizations) for their otherwise un-reimbursed costs of providing services required by section 1867 of the Social Security Act (EMTALA) and related hospital inpatient, outpatient, and ambulance services furnished to undocumented aliens, aliens paroled into the United States at a United States port of entry for the purpose of receiving such services, and Mexican citizens permitted temporary entry to the United States with a laser visa.

Section 1011 provides $250 million per year for Fiscal Years (FY) 2005-2008 for payments to eligible providers for emergency health services provided to undocumented aliens and other specified aliens. Two-thirds of the funds will be divided among all 50 states and the District of Columbia, based on their relative percentages of undocumented aliens.



**Click Here For Details**

One-third will be divided among the six states with the largest number of undocumented alien apprehensions. From the respective state allotments, payments will be made directly to hospitals, certain physicians and ambulance providers for some or all of the costs of providing emergency health care required under Section 1867 and related hospital inpatient, outpatient and ambulance services to eligible individuals. Eligible

providers may include an Indian Health Service (IHS) facility, whether operated by the Indian Health Service or by an Indian tribe or tribal organization. A Medicare Critical Access Hospital (CAH) is also a hospital under the statutory definition.

## Section 1011 News You Can Use

more...

TrailBlazer is pleased to announce the availability of our Section 1011 Provider Online Enrollment Application.

TrailBlazer has released an update to the current Q&As related to the Section 1011 program.

TrailBlazer has released the minutes to the "Ask The Contractor" Teleconference conducted on Aug. 31, 2005.

TrailBlazer has released the minutes to the "Ask The Contractor" Teleconference conducted on Sept. 14, 2005.

TrailBlazer has released the minutes to the "Ask The Contractor" Teleconference conducted on Oct. 19, 2005.

TrailBlazer has released an update to the current Q&As related to the Section 1011 program.

TrailBlazer is providing the first state-specific list of approved participating Section 1011 hospitals.

TrailBlazer is providing a state-specific list of approved participating Section 1011 hospitals.

## Final Section 1011 Implementation Notice

The Internet link to the Centers for Medicare & Medicaid Services' (CMS) final implementation guidance regarding Section 1011, Federal Reimbursement of Emergency Health Services Furnished to Undocumented Aliens, which is part of the Medicare Modernization Act of 2003 (MMA), is included below.

On this Web site, guidance is provided outlining CMS' implementation approach, general framework and procedural rules for submitting an enrollment application and payment requests. The site also contains general statements of policy and provides CMS' interpretation of Section 1011.

http://www.cms.hhs.gov/providers/Section1011





Home | About TrailBlazer | Privacy Policy

If you require information about Section 1011 that is not contained on this site, please visit the
Centers for Medicare & Medicaid Services (CMS) Section 1011 information site.

© Copyright, 2005 - TrailBlazer Health Enterprises, LLC. All rights reserved.

RIF

# EMERGENCY MEDICAID FOR IMMIGRANTS



*This fact sheet only applies to immigrants who are not eligible for regular Medicaid. These immigrants may be eligible for Emergency Medicaid.*

## 1. WHAT IS EMERGENCY MEDICAID?

Emergency Medicaid is a special kind of Medicaid that will pay the full cost of emergency room services.

Medicaid is a program that pays the full cost of health care for some low-income people. To get Medicaid, you must be a qualified immigrant. To find out if you are a qualified immigrant, look at this chart:

| If you came to the U.S. before August 22, 1996, you can get Medicaid if you are a: | If you came to the U.S. after August 22, 1996, you can get Medicaid if you |
|---|---|
| Green card holder | Green card holder with 40 quarters of work (about 10 years of working) |
| Abused immigrant, your children, and your parents | An immigrant who has lived in the U.S. for 5 years as a qualified immigrant. If you have had a green card for 5 years, you can get Medicaid |
| | Member of the military or a veteran |
| All refugees, asylees, Cuban/Haitians, and conditional entrants can get Medicaid for their first seven years in the U.S. They cannot get Medicaid after that. | |

This brochure was produced by South Carolina Appleseed Legal Justice Center. This brochure is for information only. If you have problems with Emergency Medicaid, you may want to contact your local legal services program by calling Legal Aid Telephone Intake Service for referral at (803) 744-9430 in Columbia or toll-free at (888) 346-5592 from other places in the state.

South Carolina Appleseed Legal Justice Center is dedicated to advocacy for low-income people in South Carolina to effect systemic change by acting in or through the courts, legislature, administrative agencies, community and the media, and helping others do the same through education, training, and co-counseling.

Copyright retained by South Carolina Appleseed Legal Justice Center. For permission to reproduce this brochure, contact SCALJC at P.O. Box 7187, Columbia, SC 29202.

Many immigrants who cannot get regular Medicaid may still be able to get Emergency Medicaid. Emergency Medicaid is only for immigrants, and it will only pay for very serious emergencies. **You can get Emergency Medicaid even if you are undocumented.**

## 2. CAN I GET EMERGENCY MEDICAID?

If you cannot get regular Medicaid because you are not a qualified immigrant, you may still be able to get Emergency Medicaid. You can be undocumented and get Emergency Medicaid. To get Emergency Medicaid, you must:

- Have a very low income and fit into one of these groups:

  - Pregnant;
  - Age 65 or older;
  - Disabled;
  - Under age 19; or
  - A relative who lives with a child under age 18 and who takes care of that child.

- Be a resident of South Carolina (be able to prove you live in this state). One way to prove you live here is by showing you have paid rent in South Carolina.

## 3. WHAT KINDS OF THINGS DOES EMERGENCY MEDICAID COVER?

Emergency Medicaid only covers very serious emergencies that put your health or body in lots of danger. The Department of Health & Human Services (DHHS) decides if an emergency is serious enough to be covered by Emergency Medicaid.

For example, labor and delivery of a baby would be covered by Emergency Medicaid, but the mother's care before the baby is born would not. A heart attack or stroke would probably be covered, but a black eye or a broken ankle would probably not be covered.

Emergency Medicaid does not cover organ transplants.

## 4. HOW DO I APPLY FOR EMERGENCY MEDICAID?

A lot of hospitals in South Carolina will help you apply for Emergency Medicaid. If you do not have health insurance, a hospital employee will help find out if you can get Emergency Medicaid. This hospital employee will set up a meeting for you to meet with a DHHS caseworker. When you go to this meeting, the DHHS caseworker will fill out the application with you.

If you need an interpreter (someone who speaks your language) or need to have the application translated into your language, you should ask the hospital and DHHS to help you with that.

Even if the hospital does not tell you about Emergency Medicaid, you should ask if you can get Emergency Medicaid. You can also take all your hospital paperwork to your local DHHS office and apply on your own. You can even apply for Emergency Medicaid after you have gone to the emergency room.

## 5. WILL THE HOSPITAL OR DHHS ASK ME QUESTIONS ABOUT BEING AN IMMIGRANT WHEN I APPLY?

No. Because Emergency Medicaid is for immigrants, the hospital and DHHS do not need to ask questions about your status or your Social Security number. This means you do not have to tell anyone about your status or Social Security Number when you apply for Emergency Medicaid.

The Economy Act, 31 U.S.C. 1535,

**31 U.S.C. 1535.** Agency agreements

(a) The head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services if--
(1) amounts are available;
(2) the head of the ordering agency or unit decides the order is in the best interest of the United States Government;
(3) the agency or unit to fill the order is able to provide or get by contract the ordered goods or services; and
(4) the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.
(b) Payment shall be made promptly by check on the written request of the agency or unit filling the order. Payment may be in advance or on providing the goods or services ordered and shall be for any part of the estimated or actual cost as determined by the agency or unit filling the order. A bill submitted or a request for payment is not subject to audit or certification in advance of payment. Proper adjustment of amounts paid in advance shall be made as agreed to by the heads of the agencies or units on the basis of the actual cost of goods or services provided.
(c) A condition or limitation applicable to amounts for procurement of an agency or unit placing an order or making a contract under this section applies to the placing of the order or the making of the contract.
(d) An order placed or agreement made under this section obligates an appropriation of the ordering agency or unit. The amount obligated is deobligated to the extent that the agency or unit filling the order has not incurred obligations, before the end of the period of availability of the appropriation, in--
(1) providing goods or services; or
(2) making an authorized contract with another person to provide the requested goods or services.
(e) This section does not--
(1) authorize orders to be placed for goods or services to be provided by convict labor; or
(2) affect other laws about working funds.



Economy Act of 1932, as amended (31 USC 1535), authorizes an agency to place orders for goods and services with another government agency when the head of the ordering agency determines that it is in the best interest of the government and decides ordered goods or services cannot be provided as conveniently or cheaply by contract with commercial enterprise.

# Federal Acquisition Regulation Authorities

1. FAR 6.002, *Limitations,* mandates that no agency shall contract for supplies or services from another agency for the purpose of avoiding the requirements of competition.

2. FAR 17.502, *Interagency Acquisitions Under the Economy Act,* establishes procedures for a federal agency to place work with another federal agency for supplies or services that the servicing agency may be in a position or equipped to supply, render, or obtain by contract if it is determined by the head of the requesting agency, or designee, that it is in the government's interest to do so.

3. FAR 17.6, *Management and Operating (M&O) Contractors,* prescribes policies and procedures for M&O contracts for the Department of Energy and any other agency having requisite authority. The business firm that performs under an M&O contract is established to perform tasks assigned by DOE and does not perform any commercial work.

4. FAR 35.017, *Federally Funded Research and Development Centers (FFRDCs),* establishes government-wide policies for the establishment, use, review, and termination of federally funded research and development centers. An FFRDC may perform for other than the sponsoring agency under the Economy Act, or other applicable legislation, when the work is not otherwise available from the private sector.



EXHIBIT C

Judicial Watch v. DHS, et. al
CA#:  07-0506

OIG records in Response to item No. 2 ↖3 of the
request

Document No. ___1 5___

*Office of Inspector General - Investigations*
U.S. Department of Homeland Security

# MEMORANDUM OF ACTIVITY

 **Homeland Security**

**Type of Activity:** Money to Aldrete-Davila

| **Case Number:** I05-BCBP-ELP-07117 | **Case Title:** Ignacio Ramos, et al. |
|---|---|

This investigation was initiated on March 4, 2005, upon receipt of information from the Office of Internal Audit (OIA), United States Border Patrol (BP), Customs & Border Protection (CBP), U.S. Department of Homeland Security (DHS), El Paso, Texas, alleging that Osvaldo Aldrete-Davila, a Mexican national, was shot by an unknown BP Agent while attempting to cross into the United States on February 17, 2005 near San Elizario, Texas.

On October 12, 2005, Aldrete-Davila had a 9:45 am medical appointment at William Beaumont Army Medical Center (WBAMC), Urology Clinic, (      b 6      ) Aldrete-Davila is required to have the (           b 6           ) Aldrete-Davila had missed a medical appointment in July 2005 and (           b 6           ) his   b 6
(      b 6      )

On October 11, 2005, Special Agent Christopher Sanchez, DHS Office of Inspector General (OIG), had spoken to Aldrete-Davila and (       7 C       ) and reminded them about the appointment on October 12, 2005.

Sanchez had told Aldrete-Davila to be at WBAMC at 9:30 am because the Urology clinic requires patients to check in 15 minutes before their scheduled appointment, which Aldrete-Davila is aware of since he has been seen at the Urology clinic once a month since the bullet was removed in March 2005.

On October 12, 2005, at 9:45 am, Sanchez attempted to call Aldrete-Davila's cellular telephone and (    7 C    ) home and cellular telephone to locate Aldrete-Davila since he had not shown up at WBAMC.

At approximately 10:30 am, Sanchez advised the urology clinic that it appeared Aldrete-Davila was not going to show up for his appointment.

At approximately 10:45 am, Sanchez arrived back at the DHS OIG office, 1200 Golden Key, Suite 230, El Paso, Texas. As Sanchez was entering the office parking lot he observed Aldrete-Davila exit a vehicle with Chihuahua plates.

Sanchez called Aldrete-Davila over to his vehicle and questioned him why he did not make his

| Name, Title, Signature, and Date: Christopher Sanchez, Special Agent | Reviewing Official Name, Title, Signature, and Date: James E. Smith, SAC |
|---|---|
| *Chris Sanchez*   10/18/05 | *J.E. Smith*  10/18/05 |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

appointment. Aldrete-Davila said his vehicle ran out of gas going across the Ysleta Port of Entry (POE) and he had to borrow gas from another motorist.

Sanchez observed that Aldrete-Davila (    7C    ) Aldrete-Davila had previously advised that the   7C (    7E    )

Sanchez informed Aldrete-Davila that he might ( b6 ) Aldrete-Davila said he did not have any problems and ( b6 ) b6 from the last time he had missed an appointment ( b6 )

Sanchez requested to know why Aldrete-Davila showed up at the DHS OIG office instead of driving to the hospital. Aldrete-Davila said he came to pick up his check. (Agent's Note: Aldrete-Davila had met with Assistant U.S. Attorney (AUSA) Debra Kanof and AUSA Jose Luis Gonzalez two times in preparation for the trial and was owed approximately $80.00 for having to leave work and travel to come into speak to them.)

When Sanchez stated he did not have the check and that Aldrete-Davila would have to go to the U.S. Attorney's Office, 700 E. San Antonio, El Paso, Texas, to pick up the check from ( 7C ) Victim/Witness Coordinator, Aldrete-Davila said he would go pick it up.

When Sanchez called to inquire if the check was ready, ( 7C ) stated that the check would not be ready until the next day.

Sanchez informed Aldrete-Davila that the check would not be ready until October 13, 2005. Aldrete-Davila stated that he had no money to purchase gas and did not know how he was going to get back to Mexico.

Sanchez provided $10.00 (   ) to Aldrete-Davila so he could purchase gas to return to Mexico.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

EXHIBIT D

Judicial Watch v. DHS, et. al
CA#: 07-0506

OIG records in Response to item No. $\underline{2}$ of the request

Document No. $\underline{23}$

**Sanchez, Christopher**

| | |
|---|---|
| **From:** | Sanchez, Christopher |
| **Sent:** | Thursday, February 16, 2006 12:03 PM |
| **To:** | 'debra.kanof |
| **Cc:** | 'jose.gonzale |
| **Subject:** | Medical Photos for pretrial interviews |

**Attachments:**    X_Ray AldreteDavila 10003.jpg; X_Ray AldreteDavila 10004.jpg; Bullet Location.jpg; Entry
Wound.jpg; X_Ray AldreteDavila 10002.jpg

Debra & Jose

Here are some photos of the Xrays and when we first brought Aldrete-Davila into William Beaumont. The photo that shows
a finger pointing to the area of Aldrete-Davila's leg belongs to Dr            was pointing where        could feel the bullet in
Aldrete-Davila's right thigh.

**Christopher Sanchez**
**Special Agent**
**DHS OIG Investigations**
**El Paso Field Office**
**Desk: (915)**


X_Ray
eteDavila 10003.jpg


X_Ray
eteDavila 10004.jpg


Bullet Location.jpg
(229 KB)


Entry Wound.jpg
(236 KB)


X_Ray
eteDavila 10002.jpg

# Deletion Page

Requester: Christopher Farrell (Judicial Watch)
Request #: 2007-58

_____5_____ Page(s) is/are being withheld in full by DHS/OIG and the following marked exemption(s) is/are being claimed.

TYPES OF EXEMPTIONS CLAIMED:

**FOIA: 5 U.S.C. § 552**

☐ b(1)       ☐ b(2)       ☐ b(3) _____

☐ b(4)       ☐ b(5)       ☒ b(6)       ☒ b(7)(A)       ☐ b(7)(C)       ☐ b(7)(D)

☐ b(7)(E)    ☐ b(7)(F)              *and NR*

**PRIVACY ACT: 5 U.S.C. § 552a**

☐ d(5)       ☐ j(1)       ☐ j(2)       ☐ k(1)       ☐ k(2)       ☐ k(3)

☐ k(4)       ☐ k(5)       ☐ k(6)       ☐ k(7)

Description of Document withheld: 3 X-Rays & 2 Photos

EXHIBIT E

Judicial Watch v. DHS, et. al
CA#:  07-0506

OIG records in Response to item No. 2&3 of the
request

Document No. ___3 7___

**Sanchez, Christopher**

| | |
|---|---|
| **From:** | Sanchez, Christopher |
| **Sent:** | Friday, January 12, 2007 10:04 AM |
| **To:** | 'Gonzalez, Jose (USATXW)' |
| **Cc:** | Kanof, Debra (USATXW); Leachman, Margaret (USATXW); Smith, James; Laferty, John |
| **Subject:** | RE: Parole Info on Aldrete-Davila |

**Tracking:**

| Recipient | Delivery |
|---|---|
| 'Gonzalez, Jose (USATXW)' | |
| Kanof, Debra (USATXW) | |
| Leachman, Margaret (USATXW) | |
| Smith, James | Delivered: 1/12/2007 10:04 AM |
| Laferty, John | |

FYI:  AUSA Gonzalez noticed the below error.

Correction:

b5

**Christopher Sanchez**
**Special Agent**
**DHS OIG Investigations**
**El Paso Field Office**
**Desk: (915)**

b2

-----Original Message-----
**From:** Gonzalez, Jose (USATXW) [mailto:
**Sent:** Friday, January 12, 2007 8:46 AM
**To:** Sanchez, Christopher
**Cc:** Kanof, Debra (USATXW); Leachman, Margaret (USATXW)
**Subject:** RE: Parole Info on Aldrete-Davila

b2

Chris. your last entry

b5

**From:** Sanchez, Christopher [mailto:
**Sent:** Thursday, January 11, 2007 3:47 PM
**To:** Smith, James
**Cc:** Gonzalez, Jose (USATXW); Kanof, Debra (USATXW); Leachman, Margaret (USATXW)
**Subject:** Parole Info on Aldrete-Davila

b2

## PAROLES

### for

### Osvaldo Aldrete-Davila

<u>**March 16, 2005  to April 15, 2005**</u>

2/15/2007

Parole: Public Interest

<<Parole #1.pdf>>
**May 6, 2005 to May 6, 2005**

Parole: Public Interest

<<Parole #2.pdf>>
**June 1, 2005 to September 1, 2005**

Parole: Medical Humanitarian

<<Parole #3.pdf>>
**September 14, 2005 to November 14, 2005**

Parole: Public Interest

<<Parole #4.pdf>>
**October 27, 2005 to December 15, 2005**

Parole: Public Interest

<<Parole #5.pdf>>
**January 24, 2006 to March 31, 2006**

Parole: Public Interest

<<Parole #6.pdf>>

*Christopher Sanchez*
*Special Agent*
*DHS OIG Investigations*

*El Paso Field Office*
*Desk: (915)* b2

Warning    A nonimmigration who accepts unauthorized employment is subject to deportation.

**Important** Retain this permit in your possession; *you must surrender it when you leave the U.S.* Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form 1-20 prior to surrendering this permit.

**Record of Changes**

212 (d)(5)

| Port: | | Departure Record |
| Date: | | |
| Carrier: | | |
| Flight # / Ship Name: | | |

Multiple entries per IAPD Mullins
Christopher Sanchez Special Agent Badge #143

---

Departure Number

820299399 11

Department of Homeland Security

CBP I-94A (11/04)
Departure Record

PAROLED UNTIL 04/15/2005
PURPOSE PUBLIC INTEREST
EXP/DOA 03/16/05 #2035
(PORT) (DATE) (OFFICE)

Family Name
ALDERETE AVILA

First (Given) Name
OSBALDO

Country of Citizenship
MEXICO

Birth Date (Day Mo Yr)
( 7C, b6 )

20050316 US-VISIT          MULTIPLE

See Other Side                    STAPLE HERE

RIP
b6
7C



825339882

**Department of Homeland Security**

CBP I-94A (11/04)
Departure Record

Family Name
**ALDRETE DAVILA**

First (Given) Name
**OSVALDO**

Country of Citizenship
**MEXICO**

Birth Date (Day Mo Yr)
( '06 '72 )

20050506 US-VISIT

SINGLE USE

See Other Side

STAPLE HERE

PUROLE
PURPOSE
_Public Interest_
_Public Public Parole_

PAROLE

---

deportation.
**Important:** Retain this permit in your possession; you **must surrender it** when you leave the U.S. Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

**Record of Changes**

Public Interest
Texas SCBP

Port: _____

Date: _____

Carrier: _____

Flight # / Ship Name:

Departure Record

R I P
'06
'72

**Warning** A nonimmigration who accepts unauthorized employment is subject to deportation.

**Important** Retain this permit in your possession; *you must surrender it when you leave the U.S.* Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. Official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

**Record of Changes**

*MEDICAL HUMANITARIAN APPROVED BY CBPC VENZIAGA* ( b6,7c )

Port:

Date:                                                    Departure Record

Carrier:

Flight # / Ship Name:

---

**Departure Number**

827007877 1 | PAROLED UNTIL SEP 01, 2005

PURPOSE HUMANITARIAN

MEDICAL

Department of Homeland Security

CBP I-94A (11/04) Departure Record

YSL-ELN 06-01-05 #0717
(PORT) (DATE) (OFFICE)

Family Name
ALDRETE DAVILA

First (Given) Name
OSVALDO

Birth Date (Day Mo Yr)
( b6,7c )

Country of Citizenship
MEXICO

20050601 US-VISIT ADMITTED MULTIPLE ENTRY

See Other Side                    STAPLE HERE

**Warning**  A nonimmigration who accepts unauthorized employment is subject to deportation.

**Important**  Retain this permit in your possession; *you must surrender it when you leave the U.S.*  Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. Official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

Record of Changes

☐ 212(D)(4)(A) ☒ 212(D)(5) FOR PUBLIC INTEREST

ADDRESS IN US        1200 GOLDEN KEY #230, EL PASO, TX 79925

ELP ONLY ☒ Y ☐ N   HQ AUTHORIZED MULTIPLE ENTRY
                          A#                          Garena (A

Port:                                        Departure Record
Date:
Carrier:

Flight # / Ship Name:

---

Departure Number

838317105 11

Department of
Homeland Security

CBP I-94A (11/04)
Departure Record

PAROLED UNTIL Nov 14, 2005

PURPOSE Public Interest

YSL/ELP 09/14/05  01255
(PORT) (DATE) (OFFICE)

Family Name
ALDERETE DAVILA
First (Given) Name                    Birth Date (Day Mo Yr)
OSVALDO
Country of Citizenship
MEXICO
20050915 US-VISIT          SINGLE USE

See Other Side                    STAPLE HERE

See Other Side          ENGLISH          STAPLE HERE

Departure Number

441089909 10

PAROLED UNTIL
DECEMBER 15, 2005
PURPOSE:
PUBLIC BENEFIT
Jay C. Cond
ELP/10/27/05 SAC
(PORT)     (DATE)     (OFFICE)

Immigration and
Naturalization Service
I-94
Departure Record

MULTIPLE ENTRY

14. Family Name
ALDRETE DAVILA

15. First (Given) Name
OSVALDO

16. Birth Date (Day/Mo/Yr)

17. Country of Citizenship
MEXICO

DB
7C

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

Warning - A nonimmigrant who accepts unauthorized employment is subject to deportation.
Important - Retain this permit in your possession; *you must surrender it when you leave the U.S.* Failure to do so may delay your entry into the U.S. in the future. You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from immigration authorities, is a violation of the law.
Surrender this permit when you leave the U.S.:
- By sea or air, to the transportation line;
- Across the Canadian border, to a Canadian Official;
- Across the Mexican border, to a U.S. Official.
Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.
Record of Changes

212 (d) (5)
A*          DB
            7C
                    Departure Record

Port:

Date:

Carrier:

Flight #/Ship Name:

U.S. Government Printing Office

RIP
DB
7C

Departure Number

441141178 10

PAROLED UNTIL
MARCH 31, 2006

PURPOSE
PUBLIC BENEFIT

_Del_  A/sac

ELP 1/24/06 SAC

(PORT)    (DATE)    (OFFICE)

Immigration and
Naturalization Service

I-94
Departure Record

**MULTIPLE ENTRY**

14. Family Name
A L D R E T E - D A V I L A

15. First (Given) Name
O S V A L D O

16. Birth Date (Mo/Da/Yr)

b6, 7c

17. Country of Citizenship
M E X I C O

See Other Side.          ENGLISH          STAPLE HERE

---

Warning - A nonimmigrant who accepts unauthorized employment is subject to deportation.

Important - Retain this permit in your possession; *you must surrender it when you leave the U.S.* Failure to do so may delay your entry into the U.S. in the future.

You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from immigration authorities, is a violation of the law.

Surrender this permit when you leave the U.S.:
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official.

Students planning to reenter the U.S. within 30 days to return to the same school, see "Arrival-Departure" on page 2 of Form I-20 prior to surrendering this permit.

Record of Changes

212 (d) (5)
A

b6, 7c

Port:                                    Departure Record

Date:

Carrier:

Flight #/Ship Name:

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402

RIP
b6, 7c